FILED

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

2015 FEB -3  A 11: 55

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, THE STATE OF CONNECTICUT, THE STATE OF COLORADO, THE STATE OF DELAWARE, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF HAWAII, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF LOUISIANA, THE STATE OF MARYLAND, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MINNESOTA, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OKLAHOMA, THE STATE OF RHODE ISLAND, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WASHINGTON, THE STATE OF WISCONSIN and DISTRICT OF COLUMBIA *ex rel.* TINA D. GROAT, M.D., M.B.A<br><br>        Plaintiffs,<br><br>        v.<br><br>BOSTON HEART DIAGNOSTICS CORPORATION AND HEALTH DIAGNOSTIC LABORATORIES INCORPORATED<br><br>        Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>**CASE NO. :** 1:15-CV-121 (GBL / JFA)<br><br>**FILED UNDER SEAL**<br><br>**RELATOR'S COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ.* AND PENDENT STATE FALSE CLAIMS ACTS**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

## TABLE OF CONTENTS

I.    SUMMARY OF THE ACTION ........................................................................................ 2

II.   THE PARTIES.............................................................................................................. 5

III.  JURISDICTION AND VENUE ...................................................................................... 9

IV.   APPLICABLE LAW ...................................................................................................... 9

    A.   The False Claims Acts ........................................................................................... 9

    B.   Only "Medically Necessary" Diagnostic Laboratory Tests are Reimbursable........ 10

    C.   Relevant Definitions ............................................................................................ 15

    D.   Billing For a Laboratory Test .............................................................................. 16

V.    THE FALSE CLAIMS SCHEME: BILLING FOR MEDICALLY UNNECESSARY
      TESTS THE LABS FALSELY CLAIM PREDICT CARDIAC RISK........................... 18

    A.   The Common Diagnoses Health Diagnostic Labs and Boston Heart Falsely Use to
        Justify the Medically Unnecessary Tests ................................................................ 18

        1.   There is No Science Supporting Performing these Tests to Predict Cardiac
            Risk, and the Experts Specifically Recommend Against Doing So .................. 19

    B.   Genetic Tests that Health Diagnostic Labs and Boston Heart Falsely Claim
        Predict Cardiac Risk ............................................................................................. 21

        1.   There is No Science Supporting Performing these Genetic Tests to Predict
            Cardiac Risk, and the Experts Specifically Recommend Against Doing So ..... 23

        2.   UHC Data Shows that Health Diagnostic Labs and Boston Heart Are Extreme
            Outliers in Billing for the Genetic Tests They Falsely Claim Predict Cardiac
            Risk ........................................................................................................ 24

    C.   Non-Genetic Tests that Health Diagnostic Labs and Boston Heart Falsely Claim
        Predict Cardiac Risk ............................................................................................. 26

        1.   There is No Science Supporting Performing these Non-Genetic Tests to Predict
            Cardiac Risk, and the Experts Specifically Recommend Against Doing So ..... 27

    D.   The Health Diagnostic Labs Tests .......................................................................... 29

        1.   Health Diagnostic Labs Is An Extreme Outlier in its Billing of Tests
            Purportedly Able to Predict Cardiac Risk.......................................................... 33

        2.   Health Diagnostic Claims Show the Fraudulent Billing..................................... 34

        3.   Health Diagnostic Labs Made False Statements to Market its Worthless
            Tests ........................................................................................................ 37

        4.   UHC Payments to Health Diagnostics for Worthless Tests ............................... 38

    E.   The Boston Heart Tests.......................................................................................... 39

        1.   Boston Heart Is An Extreme Outlier in its Billing of Tests Purportedly
            Able to Predict Cardiac Risk.............................................................................. 40

2.   Boston Heart Claims Show the Fraudulent Billing ........................................... 40

3.   Boston Heart Made False Statements to Market its Scientifically-Unproven
and Worthless Tests .......................................................................................... 41

4.   Boston Heart Targets General Practitioners and Other Non-Cardiology
Physicians to Maximize its Test Revenues ....................................................... 43

VI.   COUNTS .......................................................................................................................... 45

1.      The relator, Tina D. Groat, M.D., M.B.A, ("Relator"), on behalf of the United

States of America, the State of California, the State of Colorado, the State of Delaware, the State

of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the

State of Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of

Michigan, the State of Minnesota, the State of Montana,  the State of Nevada, the State of New

Jersey, the State of New Mexico, the State of North Carolina, the State of Oklahoma, the State of

Rhode Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, and the

State of Washington, (hereinafter referred to as the "Plaintiff States"), brings this action against

Boston Heart Diagnostics Corporation and Health Diagnostic Laboratories Incorporated for

violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*., and for violations

of the following State False Claims Acts ("State FCAs"): The California False Claims Act, Cal.

Gov't Code §§12650 *et seq.*; The Colorado Medicaid False Claims Act, § 25.5-4-304, *et seq.*;

The Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; The District of Columbia False

Claims Act, D.C. Code Ann. §§2-308.03 *et seq.*; The Delaware False Claims and Reporting Act,

Del. Code Ann. tit. 6, §§1201 *et seq.*; The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*;

The Georgia False Medicaid Claims Act, Ga. Code Ann. §§49-4-168 *et seq*.; The Hawaii False

Claims Act, Haw. Rev. Stat. §§661-21 *et seq.*; The Illinois Whistleblower Reward and Protection

Act, 740 Ill. Comp. Stat. Ann. §§175/1 *et seq.*; The Indiana False Claims and Whistleblower

Protection Act, Indiana Code §5-11-5.5; The Iowa False Claims Act, §685.1, *et seq.*; The

Louisiana Medical Assistance Programs Integrity Law, La. R.S. 46:437.1 *et seq.*; The Maryland

False Health Claims Act, § 2-601, *et seq.*; The Massachusetts False Claims Act, Mass. Ann.

Laws. Ch. 12, §§5A *et seq.*; The Michigan Medicaid False Claims Act, MCLS §§400.601 *et seq.*;

Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq*.; Montana False Claims Act, Mont.

Code Anno. §§17-8-401 et *seq.*; The Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; The New Jersey False Claims Act, N.J. Stat. §2A:32C-1 *et seq.*; The New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*; The New York False Claims Act, NY CLS St. Fin. §§187 *et seq.*; The North Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§1-605 *et seq.*; The Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§5053 *et seq.*; The Rhode Island False Claims Act, R.I. Gen. Laws §§9-1.1-1 *et seq.*; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-171 *et seq.*; The Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 *et seq.*; The Virginia Fraud Against Taxpayers Act, Va. Code §§8.01-216.1 *et seq.*; The Washington Medicaid Fraud False Claims Act, RCW 74.09.201 *et seq.*; and the Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§20.931 (hereinafter referred to as the "State False Claims Acts") to recover all damages, civil penalties and all other recoveries provided for under the Federal FCA and the State FCAs.

## I.    SUMMARY OF THE ACTION

2.    Defendants Health Diagnostic Laboratories Incorporated ("Health Diagnostics") and Boston Heart Diagnostics Corporation (Boston Heart), in order to inflate their revenues at the expense of government and private insurers, systematically and fraudulently performed and billed for excessive and unnecessary laboratory tests that were purportedly able to assess the risk of future heart disease ("cardiac risk").

3.    Health Diagnostics and Boston Heart are clinical diagnostic laboratories that are focused on heart health and provide, *inter alia*, cardiovascular disease-focused laboratory tests. Thus, if a cardiovascular-related issue is suspected or diagnosed in a patient, such as hypertension (high blood pressure), hyperlipidemia (high cholesterol), or malaise and fatigue, the

physician could draw a blood sample, fill out a laboratory test requisition form and send it to one of these labs for testing.

4.      These labs prominently displayed on their test requisition forms certain test panels that grouped together a significant number of varied and unrelated genetic and non-genetic laboratory tests purportedly able to assess or predict cardiac risk which, in fact, they cannot do. The labs marketed these panels to primary care physicians and general practitioners who are not experts in cardiology and duped them into ordering these panels by representing themselves as the experts in the field and making false statements regarding the ability of tests included in the panels to predict cardiac risk.  The labs further promoted the use of these test panels by placing them in a prominent position on the test requisition form with a single check box next to them.

5.      The genetic tests listed in these panels are worthless, of no therapeutic or predictive value whatsoever and known to be medically unnecessary because they (1) do not and cannot screen for any currently existing heart disease in the patient, (2) do not and cannot predict the patient's risk of future heart disease, and (3) provide no additional information regarding the cardiovascular-related diagnoses used to justify the tests, such as hypertension, hyperlipidemia, or malaise and fatigue, and have no bearing on any potential treatments for those diagnoses.  The same is true for nearly all of the non-genetic tests in the test panels. Further, the tests at issue did not comport with clear industry guidelines, including those of The American Heart Association. Defendants ignored the known standards, promoted these tests in easily-ordered test panels on their test requisition forms and falsely touted the efficacy of such tests to predict cardiac risk.

6.      As a result of Defendants' systematic and fraudulent scheme, the Defendants billed government insurers for these unnecessary tests far more often than other labs. Relator is a Medical Doctor with a Masters of Business Administration and an expert in the field of genetic

3

laboratory testing who has direct access to a wealth of data related to billing for tests purportedly performed to assess cardiac risk for hundreds of thousands of patients by hundreds of labs that bill to United Healthcare over the past six years. Her unique background and her position as a National Medical Director at United Healthcare, the largest health insurer in America, give her a distinct ability to identify and understand issues surrounding laboratory billing and to objectively analyze the reams of data United Healthcare provides her. This data clearly shows that Boston Heart and Health Diagnostics billed far more of such unnecessary tests per patient than almost all other labs, including Laboratory Corporation of America ("LabCorp"), one of the nation's two largest labs in terms of tests performed. The data, which Relator has studied and has access to, clearly shows that defendants are extreme outliers in laboratory testing for common diagnoses in the cardiology area.

7.      All labs directly or indirectly seeking government reimbursement for their testing are legally required, independent of the physician ordering the lab tests, to review and maintain sufficient diagnostic information and documentation to justify the medical necessity of all lab tests performed and billed. Without having documentation that clearly verifies the medically necessity of the tests (which they do not have and which simply does not for the vast majority of tests purportedly justified by a cardiovascular-related diagnosis), the labs cannot legally bill government payors for those tests.

8.      Here, the two defendant labs knowingly billed for lab tests that do not predict cardiac risk and were not justified by the common cardiovascular-related diagnoses given to the patients being tested. Further, the results of the lab tests could not provide any useful information that could be utilized to treat the patient or prevent heart disease, underscoring the lack of medical necessity. In performing and submitting claims for such medically unnecessary

4

lab tests to government insurers, Health Diagnostics and Boston Heart violated the Federal and State False Claims Acts.

## II.    THE PARTIES

9.      The United States is a plaintiff to this action, which it brings on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and other federally funded healthcare programs, including Medicare, Medicaid, TRICARE, and the Veterans Administration.

10.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395- 1395ggg; 42 U.S.C. §§ 426 and 426A, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program. Medicare is a government health insurance program for people age 65 or older, certain disabled people under age 65, and people of all ages with end stage renal disease. See. The Medicare Program is comprised of four parts; Medicare Parts A through D.

11.     Part A of the Medicare program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care.

12.     Medicare Part B, which is particularly relevant to the allegations raised herein, authorizes payment for physician and ancillary services, including laboratory and diagnostic tests and procedures. Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. CMS contracts with private insurance companies to administer, process, and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund. The private insurance companies that contract with CMS to provide these services are called Part B Carriers.

13.     Part C of the Medicare program is also known as Medicare Advantage. Medicare Advantage Plans stand in place of Medicare Parts A and B and are offered by private companies

approved by Medicare. These plans are typically less expensive for the consumer, but limit covered beneficiaries to a network of covered providers.

14.     Currently, only 30% of people on Medicare obtain coverage through Medicare Part C. *Medicare Advantage Fact Sheet*, The Henry J. Kaiser Family Foundation, available at http://kff.org/medicare/fact-sheet/medicare-advantage-fact-sheet/ (last accessed September 22, 2014).

15.     Medicare Part D provides prescription drug coverage for Medicare beneficiaries.

16.     TRICARE is a federally funded program providing medical benefits to military personnel, their families, retired veterans, and reservists called to duty. See 32 C.F.R. § 19 et seq.

17.     The Veterans Administration is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

18.     Medicaid is a government health insurance program funded jointly by the Federal and State governments. See 42 U.S.C. § 1396 et seq. Each State administers its own Medicaid program. However, each State program is governed by Federal statutes, regulations and guidelines. The federal portion of each State's Medicaid payment – the Federal Medical Assistance Percentage – is based on that State's per capita income compared to the national average. During the relevant time period, the Federal Medical Assistance Percentage was between approximately 50% and 80%.

19.     Throughout the relevant time period, the services specified herein were provided to Medicaid beneficiaries in California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island,

6

Tennessee, Texas, Virginia, Washington, Wisconsin, and the District of Columbia (hereinafter referred to as the "Plaintiff States").

20.     All of the Plaintiff States are plaintiffs in this action.

21.     Throughout the relevant time period, the services described herein were provided to beneficiaries of Medicare, Medicaid, TRICARE, the Veterans Administration, and other federally and state funded healthcare programs (collectively referred to herein as "government payers" or "government insurers").

22.     Relator Dr. Tina Groat is a citizen of the United States and a resident of the state of Michigan. She earned her medical degree at Harvard Medical School and was an obstetrics and gynecology resident at Duke University Medical Center, where she was the Assistant Administrative Chief Resident.  Dr. Groat also holds a Masters of Business Administration from the University of Michigan. She is a Fellow of the American College of Obstetricians and Gynecologists and a Diplomate of the American Board of Obstetrics and Gynecology. Dr. Groat has taught at the Indiana University School of Medicine as an Assistant Professor of Clinical Ob/Gyn and at the University of Michigan as a Clinical Instructor of Obstetrics and Gynecology. Currently, Dr. Groat is a National Medical Director of Women's Health and Genetics for United Healthcare.  In this position, Relator's duties included examining and evaluating the drivers of increased costs in women's care and genetic testing.

23.     United Healthcare ("UHC"), which is not a defendant in this action, is the nation's largest health benefits company, offering health insurance in the following areas: State Medicaid and community programs; employer sponsored and individual health benefits plans; Medicare and all major senior health benefit product categories; Tricare insurance for military personnel and their families; and health care in the international marketplace. In total, UHC

7

services 27 million commercial patients, 11 million Medicare patients, 4 million Medicaid patients and 3 million TriCare patients.

- UHC's Medicare & Retirement group provides three types of coverage; Medicare Advantage Plans, Medicare Part D prescription drug plans, and Medicare Supplemental and gap insurance.

- UHC's Community & State unit acts as a Managed Care Organizations ("MCO") in providing coverage to those patients insured by Medicaid.

- UHC's Military & Veterans division provides coverage to 3 million Tricare beneficiaries in Alaska, Arizona, California, Colorado, Hawaii, Idaho, Iowa, Kansas, Minnesota, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oregon, South Dakota and parts of Texas and Utah, Washington and Wyoming.

24.     Defendant Boston Heart Diagnostics Corporation is a privately held company based in Framingham, Massachusetts. The Company provides diagnostic testing related to cardiovascular health through its clinical laboratory, also in Framingham, Massachusetts, for specimens delivered from across the United States, including Virginia. The Company states on its website that it is "committed to adding to our exclusive portfolio and suite of cardiovascular disease (CVD)-focused tests that are designed to improve outcomes for patients and save health dollars by tailoring a therapeutic regimen to the patient's particular circumstances" and that "We offer the most clinically advanced, scientifically relevant tools to help identify cardiovascular risk and select the treatment and care that's optimal for each patient." Its stated mission is to "improve heart health and prevent disease. [1]

25.     Defendant Health Diagnostic Laboratories Incorporated ("Health Diagnostics") is a privately held company based in Richmond, Virginia. Health Diagnostics provides diagnostic tests related to cardiovascular health and diabetes primarily in its Richmond clinical lab and also in a De Soto, Kansas branch lab. The Company conducts over 200,000 tests each day and touts

---

[1] http://www.bostonheartdiagnostics.com/about_business.php

on its website that it "offers the most comprehensive test menu of biomarkers for cardiovascular, diabetes, and related diseases providing a basis for early detection, effective treatment, and disease reversal." [2]

### III.    JURISDICTION AND VENUE

26.     Jurisdiction is founded upon the Federal False Claims Act (the "Act" or the "False Claims Act"), 31 U.S.C. § 3729 *et seq*., specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.

27.     Venue in the Eastern District of Virginia is appropriate under 31 U.S.C. § 3732(a) in that, at all times material to this civil action, Defendants resided in and/or transacted business in the Eastern District of Virginia.

### IV.    APPLICABLE LAW

#### A.    The False Claims Acts

28.     The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, inter alia, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

29.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

---

[2] http://www.hdlabinc.com/

30. The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

31. "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

32. Each of the Plaintiff States has individually enacted a False Claims Act. Each of those Acts is modeled after the Federal FCA, and each contains provisions similar to those quoted above. Relator asserts claims under the State FCAs for the State portion of Medicaid false claims detailed in this Complaint.

   **B.** **Only "Medically Necessary" Diagnostic Laboratory Tests are Reimbursable**

33. Services provided to Medicare and other federal health care program beneficiaries are only reimbursable if they are medically necessary. *See* 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1); Medicare Carrier's Manual § 2049. That is, Medicare and other federal health care programs only cover medical services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." *Id.*

34. Accordingly, providers may only submit claims for government healthcare reimbursement for "reasonable and necessary" medical services. And, in submitting claims, providers make certain express certifications, including an assurance that the services were

10

"provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1); *see also* 42 U.S.C. § 1395n(a)(2)(B) (to receive payment for claims providers must certify that services were "medically required"). Moreover, in submitting reimbursement claim form CMS-1500 to obtain reimbursement from Medicare or other Federal health care programs, diagnostic laboratories (also known as an "Independent Diagnostic Testing Facility" or "IDTF") expressly certify "that the services shown on [the] form were medically indicated and necessary for the health of the patient." Thus, each time a claim for payment is submitted to a Federal healthcare program, the provider expressly certifies that the services performed were medically justified. In addition, each time a provider submits a claim, the provider impliedly certifies that the service was provided in accordance with Federal and State statutes, regulations, and program rules.

35.     Knowingly causing the submission of claims that are ineligible for payment under a federal health care program constitutes a violation of the FCA. *See U.S. ex. rel. Franklin v. Parke-Davis*, 147 F. Supp. 147, 152-153 (D. Mass. 2001) (knowingly causing the submission of claims that are ineligible for reimbursement can serve as a basis for liability under the FCA); *see also U.S ex rel. Nowak v. Medtronic, Inc.*, Case Nos. 1:08-cv-10368 and 09-cv-11625 (D. Mass.) (United States' Statement of Interest, at 6)("[t]o the extent that a healthcare provider seeks reimbursement for a procedure that is ineligible for payment under a federal healthcare program ... because the program places other conditions on coverage that are not satisfied, the claim is false").

36.     Similarly, a claim for "worthless" medical care violates the FCA because the government believes it is paying for services or items that have medical value when, in fact, the

11

services or items are essentially worthless. *See Mikes v. Straus*, 274 F.3d 687, 702-4 (2d Cir. 2001); *U.S. v. SmithKline Beecham, Inc.,* 245 F.3d 1048, 1053 (9th Cir. 2001).

37.     To be medically necessary, diagnostic lab tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a). *See also* 42 C.F.R. § 410.33(d) ("All procedures performed by the IDTF must be specifically ordered in writing by the physician who is treating the beneficiary, that is, the physician who is furnishing a consultation or treating a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem").

38.     In addition, to comply with these regulations and justify the medical necessity of the tests performed, IDTFs must meet certain documentation requirements. *See generally* 42 C.F.R. §§ 410.32; 410.33.

39.     Specifically, 42 C.F.R. § 410.32(d)(2) provides that laboratories and other entities seeking reimbursement for laboratory and other diagnostic tests are required to keep records that accurately document the medical necessity of such tests. If the laboratory does not receive documentation sufficient to justify the medical necessity of a test from the prescribing physician, the laboratory or other entity "may request additional diagnostic and other medical information to document that the services it bills are reasonable and necessary." *Id.*

40.     42 C.F.R. § 410.32(d)(3) further provides,

(i) … Upon request by CMS, the entity submitting the claim must provide the following information:

(A) Documentation of the order for the service billed (including information sufficient to enable CMS to identify and contact the ordering physician or nonphysician practitioner).

12

(B) Documentation showing accurate processing of the order and submission of the claim.

(C) Diagnostic or other medical information supplied to the laboratory by the ordering physician or nonphysician practitioner, including any ICD–9–CM code or narrative description supplied.

41.    If adequate documentation is not supplied, CMS must deny the claim. *Id.* at 410.32(d)(3)(ii)(C).

42.    Federal case law also confirms that Federal healthcare programs may require billing entities to supply such documentation as may be deemed necessary to support coverage. *See KGV Easy Leasing Corp. v. Sebelius*, No. 09-56393, 2011 WL 490990 (9th Cir. 2011) (upholding decision that Medicare could require documentation, from a laboratory or IDTF, justifying the medical necessity of diagnostic tests as a condition of payment); *Gulfcoast Med. Supply, Inc. v. Leavltt*, 468 F.3d 1347 (11th Cir. 2006); *Mackenzie Med. Supply v. Leavltt*, 506 F.3d 341 (4th Cir. 2007); *Maximum Comfort, Inc. v. Secretary of Health & Human Services*, 512 F.3d 1081 (9th Cir. 2007).

43.    Local Coverage Determination[3] L29195 reiterates the requirements of the above regulations and sets forth specific documentation requirements. The LCD states that the laboratory or other entity making a claim for reimbursement must maintain the following:

- A written order from the treating physician

- Hard copy documentation of the test results and interpretation; and

- The medical necessity (reason) for performing the diagnostic test(s).

---

[3] Local coverage determinations (LCDS) are defined in Section 1869(f)(2)(B) of the Social Security Act. This section states: "For purposes of this section, the term 'local coverage determination' means a determination by a fiscal intermediary or a carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis under such parts, in accordance with section 1862(a)(1)(A)."

LCD L29195.[4]

44.    In addition, LCD L29195 states,

Although all procedures performed by the IDTF must be specifically ordered in writing by the practitioner treating the beneficiary as noted above, **the mere fact that the test(s) were properly ordered does not reflect or imply Medicare coverage for these services. Medical necessity must be apparent** and statutory exclusions, national and local coverage determinations (LCDs) apply.

*As noted above, the results of any diagnostic test performed by the IDTF must actually be used in the management of the beneficiary's specific medical problem. If a beneficiary's medical care will not be significantly altered by the results of a test performed by an IDTF, even if properly ordered, it will not be paid.*

*Id.* (bold emphasis added) (italics emphasis in the original).

45.    Documentation is insufficient if the supplied documents lack clinical notes from the physicians to demonstrate why they ordered the IDTF services at issue, lack documentation from the physicians suggesting how they used, or intended to use, the test results in the management of the beneficiaries' conditions, or lack any indication as to whether the physician who ordered the IDTF services was actually the beneficiary's treating physician. *See, e.g., In the Case of Virtual Imaging Servs., Inc.* 2013 WL 8812402, *5 (Aug. 23, 2013).

46.    Thus, check the box physician order forms are insufficient to establish the medical necessity of IDTF services. *See, e.g., KGV Easy Leasing Corp,* No. 09-56393, 2011 WL 490990; *KGV Easy Leasing Corp. v. Sebelius*, No. 08-06281, 2010 WL 342598 (CD. Cal. 2010).

47.    Every Medicare supplier is charged with knowledge of Medicare regulations and with the understanding that Medicare does not provide reimbursement for services that are not properly documented. *KGV Easy Leasing Corp.*, No. 09-56393, 2011 WL 490990, *2 (9th Cir.

---

[4] LCD L29195 has been cited approvingly in several decisions of the Medicare Appeals Council. *See, e.g., In the Case of Virtual Imaging Servs., Inc.* 2013 WL 871989, *4-*6 (Aug. 27, 2013); *In the Case of Virtual Imaging Servs., Inc.* 2013 WL 8812402, *4-*6 (Aug. 23, 2013); *In the Case of Mobile Quality Diagnostic,* 2012 WL 2343273, *4 (April 30, 2012).

2011) (citing *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384-85 (1947); *Maximum Comfort Inc. v. Sec'y of Health & Human Servs.,* 512 F.3d 1081, 1088 (9th Cir. 2007).

48.     In addition, the Centers for Medicare & Medicaid Services (CMS) regulates all laboratory testing (except research) performed on humans in the U.S. through the Clinical Laboratory Improvement Amendments of 1988 (CLIA). The CLIA regulations include federal standards applicable to all U.S. facilities or sites that test human specimens for health assessment or to diagnose, prevent, or treat disease. The Division of Laboratory Services, within the Survey and Certification Group, under the Center for Clinical Standards and Quality (CCSQ), has the responsibility for implementing the CLIA Program. CLIA considers all entities that perform even one test on "materials derived from the human body for the purpose of providing information for the diagnosis, prevention or treatment of any disease or impairment of, or the assessment of the health of, human beings" to be governed by CLIA and must register with the CLIA program.

49.     CLIA imposes an affirmative pre-analytic obligation on laboratories to monitor the medical necessity and completeness of test request information solicited and obtained by the laboratory. *See* 42 CFR 493, 3641, Federal Register / Vol. 68, No. 16 / Friday, January 24, 2003 / Rules and Regulations.

## C.     Relevant Definitions

50.     ICD-9 Code – International Classification of Disease-9 Code ("diagnosis code"):

International Classification of Diseases (ICD) is the international standard diagnostic tool for epidemiology, health management and clinical purposes and is maintained by the World Health Organization. The ICD is designed as a health care classification system, providing a system of diagnostic codes for classifying diseases, a wide variety of signs, symptoms, abnormal findings, complaints, social circumstances, and external causes of injury or disease. This system is designed to map health conditions to corresponding generic categories together with specific variations, assigning for these a designated code, up to six characters long.

15

51.     CPT Code – Current Procedure Terminology Code ("test procedure code"):

The Current Procedural Terminology (CPT) code is a medical code set maintained by the American Medical Association that describes medical, surgical, and diagnostic services and is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes.

52.     Screening, in medicine, is a strategy used to identify an unrecognized disease in individuals without signs or symptoms. As such, screening tests are performed on persons apparently in good health. Screening interventions are designed to identify disease in a community early, thus enabling earlier intervention and management in the hope to reduce mortality and suffering from a disease.

###     D.      Billing For a Laboratory Test

53.     Defendants are in the business of conducting laboratory tests that are ordered by doctors and other healthcare providers.  To facilitate the ordering of those tests, Defendants supply doctors with pre-printed test requisition forms which the doctor fills out and sends to the Defendant labs along with the patient's specimen that is to be tested.  Doctors can also order tests electronically through a website or system integrated with the physician's electronic health records (EHR) system.

54.     These test requisition forms include a list of the tests that the labs perform for the doctor to select based on the doctor's examination of the patient and subsequent diagnosis.  The form also groups certain tests together in test panels, which allows the doctor to easily order several tests at once simply by checking one box on the form.

55.     These test panels are cash cows for the labs and the labs actively promote their use through internet and direct marketing to doctors.  These test panels increase the number of

tests that the labs conduct and, as detailed below, include a number of medically unnecessary tests that should not be performed and should not be billed to government payors.

56.     During the patient's visit to the doctor, the patient is examined, a diagnosis is made and specimens (*e.g.* blood, urine, saliva, fluid samples) are drawn. The doctor uses the test requisition form to select the laboratory tests the doctor would like performed.   The test requisition form and the specimen are then sent to one of the Defendants' labs.

57.     After receiving the test requisition form and the specimen, the lab conducts the tests ordered, including all of the tests included in any test panel that has been ordered.  As set forth above, the lab may not perform medically unnecessary tests and must retain documentary evidence that each of the tests performed were medically necessary and justified by the patient's diagnosis.  This means that the ICD-9 Code assigned to the patient must directly support and justify the CPT Code of the test performed.

58.     After the lab conducts the tests ordered, it bills the government or government intermediary (such as Medicare Part C as discussed in ¶ 13 above) for tests performed for Medicare, Medicaid and TriCare patients. If a panel was ordered and the lab conducted the tests contained within that panel, the lab separately bills the government for each of those tests performed under its own CPT Code.  As set forth below, many tests included in these panels are not medically necessary and should not be billed to the government.

59.     For example, where a doctor determines that a patient has hypertension (high blood pressure) of undetermined origin (ICD-9 Code 401.9), the doctor may order Health Diagnostic Lab's Baseline Assessment test panel.  If the panel is ordered and each of the 28 tests included in the panel is then performed by the lab, the lab will bill the government separately for each of those 28 tests under the corresponding CPT Code for each test. However, while high

17

blood pressure does pose a risk of heart disease or an adverse cardiac event such as a heart attack, 27 of the 28 tests included in the Baseline Assessment panel should not and cannot be used to predict cardiac risk, provide no additional information related to the high blood pressure, are not justified by the diagnoses, and are not considered medically necessary. Thus, any claims submitted to government payors for those 27 tests when the underlying diagnosis is hypertension of undetermined origin (ICD-9 Code 401.9) are false claims.

## V.   THE FALSE CLAIMS SCHEME: BILLING FOR MEDICALLY UNNECESSARY TESTS THE LABS FALSELY CLAIM PREDICT CARDIAC RISK

### A.   The Common Diagnoses Health Diagnostic Labs and Boston Heart Falsely Use to Justify the Medically Unnecessary Tests

60.     Health Diagnostic Labs and Boston Heart conduct and bill for laboratory tests, including genetic and non-genetic tests, which purportedly assess the patient's risk of developing heart disease in the future. These tests are included in basic assessment test panels in order to increase the frequency with which they are ordered. However, all of the genetic tests and nearly all of the non-genetic tests in these panels are not justified by the underlying diagnoses given to the patients on which they are performed, provide no information related to the risk of developing heart disease, provide no additional information related to blood cholesterol levels, and are not medically necessary.

61.     The following four diagnoses, along with their corresponding ICD-9 diagnosis codes, are commonly seen in patients whose specimens have been submitted to the lab for testing:

> a)  Routine general medical examination at a health care facility (ICD-9 Code V70.0)
>
> b)  Essential hypertension (high blood pressure) (ICD-9 Code 401)
>       Hypertension, malignant (401.0)
>       Hypertension, benign (401.1)

18

Hypertension, Unspecified (401.9)

c) Other and unspecified hyperlipidemia (high cholesterol) (ICD-9 Code 272.4)

d) Other malaise and fatigue (ICD-9 Code 780.79)

**1.      There is No Science Supporting Performing these Tests to Predict Cardiac Risk, and the Experts Specifically Recommend Against Doing So**

62.      Health Diagnostic Labs and Boston Heart frequently use these four diagnoses to justify certain genetic and non-genetic laboratory tests under the false premise that they assist in assessing cardiac risk.  These laboratory tests, which are set forth below, do no such thing, and this is common knowledge in the medical and scientific community.

63.      **The American Heart Association and the American College of Cardiology, in a joint effort that resulted in publication of Guideline for Assessment of Cardiovascular Risk in Asymptomatic Adults in November 2010 ("Guideline"), specifically recommends against certain of these tests,   as set forth below, to assess the risk of developing heart disease**.  The Guideline focused on "the initial assessment of the apparently healthy adult for risk of developing cardiovascular events associated with atherosclerotic vascular disease."  The Guideline investigated several genetic and non-genetic tests as predictors of cardiac risk under the following criteria:

> For any risk marker to be considered a useful candidate for risk prediction, it must, at the very least, have an independent statistical association with risk after accounting for established readily available and inexpensive risk markers.  This independent statistical association should be based on studies that include large numbers of outcome events.
> …
> In the absence of this evidence of "additive predictive information," the writing committee generally concluded that a new risk marker was not ready for routine use in risk assessment.

64.      The Guideline specifically states that genetic testing for cardiac heart disease risk in asymptomatic adults is not recommended, and that certain non-genetic tests (such as testing of

lipid parameters beyond the standard fasting lipid profile and tests for natriuretic peptides) are also not recommended to predict cardiac risk. Indeed, the Guideline "recommends against their use for cardiovascular risk assessment."

65.    This Guideline is the authority in the industry and is adhered to by major healthcare institutions, including the Mayo Clinic. United Healthcare investigated the insurance industry and found that other major insurers, including Anthem, Blue Cross Blue Shield and Aetna, consider these tests experimental and investigational for assessing risk of cardiac heart disease because their clinical value has not been established.[5]

66.    Because there is no science supporting the use of these tests to assess cardiac risk, and the scientific community and experts in the cardiology field specifically recommend against using these tests for that purpose, these tests, when justified by the four common diagnoses and when used to assess cardiac risk, are worthless.

67.    High blood pressure and high cholesterol can increase risk of a cardiac event or heart disease. If you have high blood pressure, the force exerted on your arteries is too high and can create microscopic tears in the artery walls that then turn into scar tissue. Damaged arteries accumulate circulating materials such as cholesterol. Acting like latticework inside your arteries, this scar tissue provides a lodging place for particles of fat, cholesterol and other substances, which are collectively called plaque. As the plaque builds up, the arteries slowly narrow and harden, causing conditions such as coronary artery disease (CAD). Also, a heart attack is the result of a blocked blood supply to the heart muscle tissue. This can happen when the arteries to the heart become thicker and harder from a buildup of plaque.

---

[5] *See, e.g.*, http://www.aetna.com/cpb/medical/data/300_399/0381.html

68.     While high blood pressure can be diagnosed in a medical office and high cholesterol can be diagnosed through standard tests for LDL (low-density lipoprotein), HDL (high-density lipoprotein) and triglyceride levels, 26 of the 28 tests contained in the basic assessment test panels are not considered medically necessary to screen for these medical conditions or to assess the risk that these conditions pose to a patient's future cardiac health. Furthermore, if a patient receives a diagnosis of fatigue and malaise, some lab tests would be appropriate (i.e. thyroid testing and glucose testing), but the vast majority of tests contained in Health Diagnostic Labs and Boston Heart panel tests are not indicated.

69.     As such, the labs cannot have received or have in their possession the documentation required to justify the medically necessity of nearly all of these tests.  This means that the vast majority of these tests are per se worthless and medically unnecessary when justified by the four common cardiovascular-related diagnoses set forth in ¶61 above, and billing government insurers for them violates the Federal and State False Claims Acts.

### B.     Genetic Tests that Health Diagnostic Labs and Boston Heart Falsely Claim Predict Cardiac Risk

70.     When one or any combination of these four diagnoses is given to a patient, Health Diagnostic Labs and Boston Heart, because of the way they structure their lab panels, are conducting and billing for the following medically unnecessary genetic tests that are purportedly designed to identify and assess the risk of heart disease, but do not:

- Genetic tests for Hereditary Thrombophilia (blood clots), which are billed through the following CPT codes:

| CPT Code | Description |
| --- | --- |
| 81240 | F2 (prothrombin, coagulation factor II) (e.g., hereditary hypercoagulability) gene analysis, 20210G>A variant |
| 81241 | F5 (coagulation factor V) (e.g., hereditary hypercoagulability) gene analysis, |

|       | Leiden variant |
|-------|----------------|
| 81291 | MTHFR (5,10-methylenetetrahydrofolate reductase) (e.g., hereditary hypercoagulability) gene analysis, common variants (e.g., 677T, 1298C) |

- <u>CYP2C19 gene analysis</u>: This analysis tests for cytochrome P450 enzymes, which are a super-family of enzymes located in the liver and mucosal surface of the intestinal tract. They play important roles in the biosynthesis and metabolism of endogenous and exogenous compounds. Allelic variations in the CYP2C19 gene results in the patient's markedly increased or decreased metabolism of certain drugs, leading to wide variations in clinical effect. **This genetic testing is specifically appropriate for people taking the drug clopidogrel, whose brand name is Plavix, to determine if the patient is able to metabolize that drug properly. Clopidogrel is used to prevent blood clots after a recent heart attack or stroke.[6] However, this test is being performed by Health Diagnostic Labs and Boston Heart to purportedly predict future cardiac risk for patients who are not taking clopidogrel.** The exact CPT code used is:

| CPT Code | Description |
|----------|-------------|
| 81225 | CYP2C19 (cytochrome P450, family 2, subfamily C, polypeptide 19) (e.g., drug metabolism) gene analysis, common variants (e.g., *2, *3, *4, *8, *17) |

71.     Government payors reimburse the labs at the rate of approximately $50-$100 for each one of these genetic tests conducted for government-insured patients.

---

[6] This test can be used for other drugs metabolized by this same pathway as clopidogrel—PPIs (omeprazole), anticonvulsants (phenytoin and diazepam) and TCAs (amitriptyline and nortriptyline).

1.   **There is No Science Supporting Performing these Genetic Tests to Predict Cardiac Risk, and the Experts Specifically Recommend Against Doing So**

72.   For each of the four common diagnoses above, there is absolutely no medical indication to perform genetic tests for Hereditary Thrombophilia or the CYP2C19 gene analysis, or any genetic testing at all. **The American Heart Association and American College of Cardiology Guideline specifically state "Genotype testing for CHD [Cardiac Heart Disease] risk assessment in asymptomatic adults is not recommended."**

73.   The two most common diagnoses of underlying medical conditions that justify the medical necessity of these two categories of genetic tests are (1) Venous thromboembolism for hereditary thrombophilia testing, and (2) myocardial infarction for CYP2C19 gene analysis.  To substantiate the inclusion of these genetic tests in test panels, these labs falsely promote genetic testing for hereditary thrombophilia and CYP2C19 gene analysis as a general way to predict cardiac risk, even when the patient does not have either of the two necessary underlying conditions to justify the medical necessity of these genetic tests.

74.   Furthermore, these genetic tests, in the rare instances when they are justified by a diagnosis of Venous thromboembolism or myocardial infarction and are, thus, medically necessary, are appropriate only once per lifetime for patients because a patient's genetic makeup does not change.  However, UHC data shows that in these cases, these genetic tests are being performed more than one time per patient.

75.   These genetic tests were also used, without any medical justification, to screen for hypercholesterolemia, which is the presence of high levels of cholesterol in the blood.   To screen for hypercholesterolemia, it is standard to test for LDL (low-density lipoprotein) and HDL (high-density lipoprotein) because LDL cholesterol and HDL cholesterol, along with one fifth of

23

the triglyceride level, make up a person's total cholesterol count.  Such medically justified tests are properly billed under four or five distinct CPT Codes.  However, there is no medical justification to conduct genetic testing for either the CYP2C19 gene or for hereditary thrombophilia in order to screen for hypercholesterolemia.

76.     In addition, genetic tests for Hereditary thrombophilia were often billed together with the CYP2C19 gene analysis, meaning that they were performed on the same patient.  In fact, these two categories of tests would be performed on entirely distinct patient populations, such that it would not be medically indicated to perform both categories of tests on the same person. CYP2C19 gene analysis is indicated in people taking clopidogrel (Plavix) which is a blood thinner used to help prevent additional strokes and heart attacks in patients with myocardial infarction and angina.  Hereditary thrombophilia testing is indicated in people with venous blood clots.  Having both of those conditions and thus being in both patient populations is very rare, less than 1% of the population.

77.     Health Diagnostic Labs and Boston Heart each promote test panels that group together only a few medically justified tests with many medically unnecessary tests, including cardiac genetic tests, in order to increase the number of these medically unnecessary and worthless tests ordered by physicians and then performed and billed by the labs.

>    **2.      UHC Data Shows that Health Diagnostic Labs and Boston Heart Are Extreme Outliers in Billing for the Genetic Tests They Falsely Claim Predict Cardiac Risk**

78.     Relator's regular duties as National Medical Director of Women's Health and Genetics for United Healthcare include examining and evaluating the drivers of increased costs in women's care and genetic testing. She and her team examined the volume and type of genetic testing purportedly related to cardiac risk performed for thousands of patients by hundreds of

laboratories that bill to United Healthcare.    Separately, UHC's Fraud, Waste & Abuse Department similarly analyzed claims submission data of these labs.  UHC's Fraud, Waste & Abuse Department was originally alerted to potentially fraudulent billing at Health Diagnostic Labs by Medicare patients complaining about large bills for medically unnecessary tests and tips that Health Diagnostic Labs was giving kickbacks to physicians in the form of processing and handling payments.  In mid to late 2013, the two separate UHC teams - Dr. Groat's team and UHC's Fraud, Waste & Abuse Department - compared findings and discovered they each had similar results.

79.    United Healthcare gained more insight into these labs' billing patterns for genetic testing purportedly related to cardiac risk by examining data for the year 2013 because specific CPT codes for genetic tests became effective January 1, 2013.  Before 2013, genetic tests were billed using stacking CPT codes 83890–83914, which described the test process (e.g., DNA analysis), but not the actual test being performed.

80.    The 2013 UHC data showed that Health Diagnostic Labs and Boston Heart were: (1) each outliers when compared to other labs in the volume of genetic testing, which were falsely justified as being necessary to assess cardiac risk when they do not; and (2) among the top three laboratory billers to UHC for such genetic testing. The following chart shows the total amount of money that UHC paid to the labs listed for genetic testing (described by the six CPT codes listed at the top of the chart) for UHC's commercially insured population:

25

# Top Providers for 6 Genetic Expression Test codes

Genetic Expression codes 81225, 81240, 81241, 81291, 81400, and 81401

| PROVIDER NAME | 2013 NET PD UNET FI |
|---|---|
| HEALTH DIAGNOSTIC LABORATORY INC | $1,662,031.14 |
| ASCENDANT MDX INC | $993,633.38 |
| BOSTON HEART DIAGNOSTICS CORP | $427,378.98 |
| PROGENITY INC | $363,275.07 |
| AIBIOTECH | $334,772.95 |
| BIO REFERENCE LABORATORIES INC | $248,630.83 |
| GOOD START GENETICS INC | $225,024.01 |

The six CPT Codes listed are genetic tests for Hereditary Thrombophilia, CYP2C19 gene

analysis and apolipoprotein E genotyping.

### C. Non-Genetic Tests that Health Diagnostic Labs and Boston Heart Falsely Claim Predict Cardiac Risk

81.     When a patient is given one or some combination of the four non-specific

diagnoses (ICD-9 Codes) listed above (routine medical exam, hypertension, hyperlipidemia, or

fatigue and malaise) and that patient's specimen is sent for testing to Health Diagnostic Labs or

Boston Heart, those labs nearly always perform and bill for, in addition to the medically

unnecessary CYP2C19 and hereditary thrombophilia genetic tests discussed above, some

combination of the following additional medically unnecessary tests:

| CPT Code | Description |
|---|---|
| 83700 83704 83701 83695 83698 82172 | Additional cholesterol particles through miscellaneous CPT Codes - Testing for LDL subspecies (small and large LDL particles), HDL subspecies, apolipoprotein E, apolipoprotein A-1, etc. |
| 82652 | Vitamin D |
| 86141 | CRP (C-reactive protein) (grouped in the Health Diagnostic Labs Baseline Assessment) |
| 83525 | Diabetes test (blood insulin) |
| 84439 84443 84480 | Thyroid tests |

| 84550 | Uric Acid |
|-------|-----------|
| 81355 | Genotyping to determine cytochrome p450 2C9 (CYP2C9) and vitamin K epoxide reductase subunit C1 (VKORC1) genetic polymorphisms for the purpose of managing the administration and dosing of warfarin |
| 81401 | Molecular pathology procedure, Level 2, used for apolipoprotein E genotyping (ABL Kinase Domain Mutation in CML) |

### 1. There is No Science Supporting Performing these Non-Genetic Tests to Predict Cardiac Risk, and the Experts Specifically Recommend Against Doing So

82.     Relator's analysis of the UHC data shows that in nearly every case where the above tests were performed by Health Diagnostic Labs and Boston Heart, the patients' diagnoses (ICD-9 Codes) did not justify performing and billing for any of these additional tests because there is no scientific evidence at all that these tests predict cardiac risk.  For several of these tests, cardiovascular experts specifically recommend against performing these tests to assess cardiac risk .  Relator found similar patterns of billing by these labs for both unnecessary cardiac genetic and non-genetic testing in each of the commercial, Medicare and Medicaid populations.

83.     For example, Lipoprotein particle tests (the first row in the chart in ¶ 75 above) are never medically necessary to predict cardiac risk.  These additional measurements of lipid parameters or modified lipids are no better at determining cardiac risk than the standard fasting lipid profile (total cholesterol, high-density lipoprotein (HDL) cholesterol, LDL cholesterol and triglycerides).  All lipid particles (e.g., LDL or HDL) are present in the circulation in a range of sizes.  However, additional measurements of lipid parameters or modified lipids vary in their interassay agreement, laboratory standardization, and established reference ranges.  Also, the use of such measurements is generally limited because there are no clear thresholds that would trigger treatment, no therapeutic targets and no unique treatments beyond those already recommended by lipid treatment guidelines directed by the standard lipid profile.  Therefore, there is no evidence that the assessment of additional lipid parameters leads to an improved net

27

health outcome. The American Heart Association and the American College of Cardiology, in their joint Guideline, specifically state that "Measurement of lipid parameters, including lipoproteins, apolipoproteins, particle size, and density, beyond a standard fasting lipid profile is not recommended for cardiovascular risk assessment in asymptomatic adults." Such tests are labeled as having "No Benefit."

84.      Although diabetes is a risk factor for heart disease, tests for blood insulin are not appropriate to screen for diabetes and do not predict the future risk of developing diabetes. They are only appropriate to monitor patients who already have diabetes. Thus, tests for blood insulin do not predict a patient's cardiac risk. The American Heart Association and the American College of Cardiology's joint Guideline make no mention at all of blood insulin tests when discussing diabetic patients because such tests are not remotely connected to or within the realm of possibility for predicting cardiac risk. The Guideline only discusses a hemoglobin A1C test in the context of asymptomatic adults without a diagnosis of diabetes. Thus, a blood insulin test is not appropriate to screen for cardiovascular diseases whereas Hemoglobin AIC may be appropriate.    The Guideline recommends Hemoglobin AIC for screening in certain circumstances, but doesn't even mention a blood insulin test ever because the blood insulin test is not at all relevant to screen for cardiovascular risk.

85.      Uric Acid and Vitamin D tests together or separately cannot and do not predict a patient's future risk of developing heart disease, and they are not recommended by any medical body for that purpose.

86.      CRP (C-reactive protein) appears in higher amounts when there is swelling (inflammation) somewhere in the body.  Although a C-reactive protein test can also be used to evaluate the risk of developing coronary artery disease, according to the American Heart

28

Association and as set forth in the joint Guideline, having a C-reactive protein test isn't recommended for the general population to evaluate the risk of developing heart disease.[7]

87.     Relator estimates that UHC paid out millions of dollars to these two labs for medically unnecessary testing for Medicare and Medicaid patients for 2013 alone.  Prior to 2013, there were no CPT billing codes for these cardiac tests so Relator is unable to track outlier payments by UHC to these labs in any year prior to 2013.  Before 2013, these tests were billed using CPT stacking codes 83890 - 82914, which were deleted effective January 1, 2013. However, there is evidence of similar billing patterns prior to 2013 for medically unnecessary cardiac genetic and related additional tests using these stacking codes.

        **D.      The Health Diagnostic Labs Tests**

88.     The laboratory test requisition form of Health Diagnostics contains a custom test panel, called the Baseline Assessment Panel, which is placed front and center on the form with a simple check box next to it.

---

[7] http://www.mayoclinic.org/tests-procedures/c-reactive-protein/basics/definition/prc-20014480



HealthDiagnosticLaboratoryInc.

Joseph P. McConnell, Laboratory Director

CLIA No. 49D1100708 | CAP No. 7224971 | NPI No. 1639229853

**INSTRUCTIONS**

1) Please fill in all of the highlighted areas.
2) Have patient sign Release and Assignment of Benefits below.
3) Copy BOTH sides of patient's insurance card(s).
4) HDL, Inc. will accept an In-House Demographic Sheet as substitute for Patient Information, provided that it contains all required info. If ICD-9 codes are not part of your demographic sheet, please provide a copy of the patient problem sheet (of patient specific ICD-9 codes).
NOTE: Physicians (or other individuals authorized to order tests) should only order tests that are medically necessary and reasonable.

**PATIENT INFORMATION**

★ Height: feet inches | ★ Weight: pounds

**SPECIMEN INFORMATION**

Drawing Lab: | Phone:

Collection Date: 9/11/12 Time: 8:04 am/pm | Fasting: ☒ Yes Hrs ☐ No

Phlebotomist Initials: | Insulin: time of last dose: am/pm date: / /

**BILLING INFORMATION**

☐ INSURANCE: Please attach a copy of both sides of patient's insurance card

☐ MEDICARE No.: Is coverage secondary? ☐ Yes ☐ No

☐ CHECK: Please make check payable to Health Diagnostic Laboratory, Inc.

☐ CREDIT CARD No.: Exp. Date: /

Name as it appears on card:

Total Amount: $ Card Issuer: ☐ Visa ☐ MC ☐ Amex

**RELEASE AND ASSIGNMENT OF BENEFITS**

[illegible]

★ Patient Signature / / Date

**HDL, INC. USE ONLY**

| | | | |
|---|---|---|---|
| Received Date: / / | | Time: am/pm | Initials: |
| # Serum SST™ 8.5mL tubes: | | # Plasma PPT™ "Pearl" 5mL tubes: | |
| # Serum "Bumble Bee" 5mL tubes: | | # Urine 8mL tubes: | |
| # Whole Blood EDTA 4mL tubes: | | # Other tubes: | |

**REQUESTING PROVIDER/LAB/INSTITUTION**

DK Pressley
Kevin L. Pressley DO PA
4474 Edgewater Drive
Orlando, FL 32804

Client ID: 12-32804-18-0003536
Phone: (407) 297-8007
Fax: (407) 297-0006 V.4

Physician or Authorized Signature / / Date

**CUSTOM PANELS**

☒ Baseline Assessment: Lipid Panel, Apo B, LDL-P & HDL-P, sdLDL, Apo A-I, HDL 2, Lp(a) mass w/reflex, MPO, Lp-PLA2, hs-CRP, Fibrinogen, NT-proBNP, Apo E Genotype, CYP2C19, Factor V Leiden, Prothrombin Mutation, Insulin, FFA/NEFA, Vitamin D, Homocysteine W/ reflex, MTHFR, Thyroid Cascade, Uric Acid, HbA1C, Cystatin-C, Glucose, Omega 3, AspirinWorks

☐ Follow-Up Profile: Lipid Panel, Apo B, LDL-P & HDL-P, sdLDL, Apo A-I, HDL 2, Lp(a) mass w/reflex, MPO, Lp-PLA2, hs-CRP, Fibrinogen, NT-proBNP, Insulin, FFA/NEFA, Vitamin D, Homocysteine W/ reflex, Thyroid Cascade, Uric Acid, HbA1C, Cystatin-C, Glucose, Omega 3, AspirinWorks

**INDIVIDUAL TESTS**

| | | |
|---|---|---|
| ☒ Basic Metabolic Panel 80048 | ☐ Apolipoprotein A-I 82172 | ☐ Apo E Genotype |
| ☒ Comp Metabolic Panel 80053 | ☐ Apolipoprotein B 82172 | ☐ CYP2C19 |
| ☐ Electrolyte Panel 80051 | ☐ HDL2 Subclass 82664 | ☐ Factor V Leiden |
| ☐ Hepatic Function Panel 80076 | ☐ LDL-P & HDL-P by NMR 83704 | ☐ MTHFR |
| ☐ Lipid Panel 80061 | ☐ Lp(a) cholesterol 83664 | ☐ Prothrombin Mutation |
| ☐ Renal Panel 80069 | ☐ Lp(a) mass 83695 | ☐ Warfarin Sensitivity (CYP2C9 & VKORC1) |
| | ☐ sdLDL-C 83700 | CPT Codes used for all Genetic Assays: 83891, 83892, 83896, 83903, 83906, 83912 |
| ☐ AspirinWorks® (urine) 83520 & 82565 | ☐ C-peptide 84681 | ☐ Thyroid Cascade Panel 84443 |
| ☐ $F_2$-Isoprostanes 83789, 82570 | ☐ FFA/NEFA 82726 | ☐ T4, free 84439 |
| ☐ Fibrinogen 85384 | ☐ Glucose 82947 | ☐ T4 84436 |
| ☐ hs-CRP 86141 | ☐ Hemoglobin A1c 83036 | ☐ T3 84480 |
| ☐ Lp-PLA2 83698 | ☐ Homocysteine 83090 | ☐ T Uptake 84482 |
| ☐ MPO 83516 | ☐ Insulin 83525 | ☐ PSA |
| ☐ Galectin-3 83520 | ☐ RBC Folate 82747, 85014 | ☐ CK |
| ☐ NT-proBNP 83880 | ☐ TSH 84443 | ☐ Omega-3/Omega-6 Fatty Acid Profile |
| (may require additional ICD-9 coding) | ☐ Uric Acid 84550 | ☒ 83525 |
| ☐ FSH 83001 | ☒ Vitamin $B_{12}$ 82607 | ☐ |
| ☐ LH 83002 | ☐ 25-hydroxy-Vitamin D 82652 | ☐ |
| ☐ Testosterone 84403 | ☐ Creatinine (serum) 82565 | |
| | ☐ Cystatin C 82610 | |
| | ☐ Microalbumin (urine) 82043 | |

**DIAGNOSIS (ICD-9 CODE)**

NOTE: The below ICD-9 codes are listed as a convenience. Please check all codes that apply. This is not an all inclusive list. Please write additional codes in the designated section to the right.

| | | | | | |
|---|---|---|---|---|---|
| ☐ Vitamin D Deficiency, Unspec. | 268.9 | ☐ Pure Hypercholesterolemia | 272.0 | ☐ Hypertensive Heart Disease/ Malignant W/O HF | 402.00 |
| ☐ Coronary Artherosclerosis, Native Artery | 414.01 | ☐ Pure Hyperglyceridemia | 272.1 | ☐ Hypertensive Heart Disease/ Malignant W/ HF | 402.01 |
| ☐ Shortness of Breath | 786.05 | ☐ Mixed Hyperlipidemia | 272.2 | ☐ Hypertensive Heart Disease/ Benign W/O HF | 402.10 |
| ☐ Other Severe Protein-Calorie Malnutrition | 262 | ☐ Unspecified Hyperlipidemia | 272.4 | ☐ Hypertensive Heart Disease/ Benign W/ HF | 402.11 |
| ☐ Malnutrition of Moderate Degree | 263.0 | ☐ Dysmetabolic Syndrome X | 277.7 | ☐ Hypertensive Renal/ Malignant Stage I-V, Unspec. | 403.00 |
| ☐ Unspecified Deficiency Anemia | 281.9 | ☐ Hypertension Malignant | 401.0 | ☐ Hypertensive Renal/ Benign Stage I-V, Unspec. | 403.10 |
| ☐ Personal History Nutritional Deficiency | V12.1 | ☐ Hypertension Benign | 401.1 | ☐ Diabetes Type II Not Uncontrolled | 250.00 |
| ☐ Long-Term (Current) Use Medications | V58.69 | ☐ Hypertension Unspecified | 401.9 | ☐ Diabetes Type II Uncontrolled | 250.02 |
| ☐ Congestive Heart Failure, Unspecified | 428.0 | ☐ Respiratory Abnormality Other | 786.09 | ☐ Intermediate Coronary Syndrome | 411.1 |

PLEASE WRITE IN ADDITIONAL CODES BELOW. PLEASE CODE TO THE HIGHEST LEVEL POSSIBLE USING FOURTH AND FIFTH DIGITS.

1) 281.1
2) 272.0
3) 733.90
4)
5)
6)

Health Diagnostic Laboratory, Inc. | 737 N. 5th St., Suite 103 | Richmond, VA 23219 | Phone: (877) 443-5227 | Fax: (804) 343-2704 | www.myhdl.com HDL-170.6

89. The Baseline Assessment Panel, which includes 28 varied lab tests, was frequently selected when the underlying diagnosis was one or some combination of the four non-specific diagnoses (ICD-9 Codes) listed above (routine medical exam, hypertension,

hyperlipidemia, or fatigue and malaise). 26 of these tests, which are set forth below, are not medically necessary to assess or provide any additional information regarding high blood pressure or high cholesterol, and in no way can they pinpoint the cause of fatigue and malaise. Further, in a patient with hypertension, hyperlipidemia, or fatigue and malaise, these tests cannot assess or provide any clinical information regarding the risk of future heart disease posed by these conditions. Thus, these 26 tests, when based on any of the four non-specific diagnoses codes, cannot be considered medically necessary. As such, submitting a claim for these tests when purportedly justified by any of those four diagnoses violates the Federal and State False Claims Acts.

90. The Baseline Assessment Panel on Health Diagnostic's test requisition form is comprised of the following 28 tests:

| Test | CPT Code |
|------|----------|
| Lipid Panel | 80061 |
| Apo B | 82172 |
| LDL-P & HDL-P | 83704 |
| sdLDL | 83700 |
| Apo A-I | 82172 |
| HDL 2 | 82664 |
| Lp(a) mass w/ rofle | 83695 |
| MPO | 83876 |
| Lo-PLA2 | 83698 |
| hs-CRP | 81506 |
| Fibrinogen | 85384 |
| NT-proBNP | 83880 |
| Insulin | 83525 |
| FFA/NEFA | 82726 |
| Vitamin D | 82652 |
| Homocysteine w/ rofle | 83090 |

| | |
|---|---|
| Thyroid Cascade | 84443 |
| Uric Acid | 84550 |
| HbA1C | 81506 |
| Cystatin-C | 82610 |
| Glucose | 82947 |
| Omega 3 | 0111T |
| AspirinWorks | 84431 |

91.     As noted by the highlighted entries in the chart above, the Baseline Assessment Panel includes the following five genetic tests which each are not medically necessary for predicting cardiac risk and are worthless when justified by any of the four common diagnoses:

- CYP2C19
- Apolipoprotein E genotyping
- F5 Leiden variant
- MTHFR
- Prothrombin mutation

92.     Of the 23 non-genetic tests included in the Baseline Assessment Panel, only the Lipid Panel and blood glucose test are valid to predict cardiac risk. In patients with a diagnosis of high blood pressure, the blood glucose test is valid to assess cardiac risk because high blood pressure is a symptom of type-2 diabetes, and type-2 diabetes is a risk factor for heart disease. The standard Lipid Panel is used to diagnose high cholesterol which can, over time, build up as plaque in the arteries and result in heart disease known as coronary artery disease. That leaves 21 of the 23 non-genetic tests in the panel (or 26 of the total 28 tests in the panel) that are not medically necessary to predict cardiac risk. These tests separately or together cannot and do not predict one's future risk of developing cardiac disease, and they are not recommended by any medical body for that purpose.

93.     With respect to the NT-proBNP test (Natriuretic Peptides) listed, The American Heart Association and the American College of Cardiology's joint Guideline specifically state

32

that "Measurement of natriuretic peptides is not recommended for CHD [cardiac heart disease] risk assessment in asymptomatic adults."

94.     Further, the 23 non-genetic tests included in the Baseline Assessment Panel also comprise the entirety of a separate test panel that is also prominently displayed on the test requisition form – the "Follow-Up Profile."  When the diagnosis is one or some combination of the four non-specific diagnoses listed above (routine medical exam, hypertension, hyperlipidemia, or fatigue and malaise), 21 of the tests included in this panel are not medically necessary.

### 1.     Health Diagnostic Labs Is An Extreme Outlier in its Billing of Tests Purportedly Able to Predict Cardiac Risk

95.     UHC identified the combination of tests that Health Diagnostic Labs billed most frequently to UHC.  This combination was comprised of eight tests, all of which   are included in the 28 tests that appear in the Baseline Assessment Panel on Health Diagnostic Labs' test requisition form.   UHC then specifically examined how frequently that combination of eight tests was billed compared to other laboratories. These eight tests were:

    81225 - CYP2C19 (cytochrome P450)
    81401 - Molecular pathology procedure, Level 2
    81241 - F5 gene analysis, Leiden variant
    81240 - F2 gene analysis
    81291 - MTHFR
    83880 - Brain Natriuretic Peptide (BNP) Level: for Congestive Heart Failure patients
    86141 - C-Reactive Protein
    83090 - homocysteine testing (measurements of plasma homocysteine)

96.     Compared to other laboratories that billed to UHC, Health Diagnostic Labs was an extreme outlier in the frequency of billing this combination of eight tests. While individually one or some of these tests could be indicated based on a certain diagnosis (such as a diagnosis of thromboembolism for hereditary thrombophilia testing or myocardial infarction for CYP2C19

gene analysis), the chance that someone has all of the diagnoses needed to justify all the tests on the panel is extremely unlikely.

97.     **Health Diagnostic Labs' billed this combination 16,935 times, whereas the second highest biller of this combination – LabCorp, a much larger lab that serviced significantly more UHC customers– billed this combination only once.** For this combination of tests, UHC paid Health Diagnostics over $17.6 million in 2013.  Because there is no medical basis to group these tests together, some or many of them are almost always medically unnecessary any time they are performed collectively.

98.     UHC next compared seven of the 28 tests that that appeared in the Baseline Assessment Panel on Health Diagnostic Labs' test requisition form and specifically examined how frequently that combination of seven tests was billed compared to other laboratories. This seven test combination was the same as the combination of eight tests set forth directly above but excluded "81291 – MTHFR."   Compared to other labs, Health Diagnostic Labs was again an extreme outlier, billing this combination of seven tests a total of 2,223 times and being paid by UHC over $1.6 million in 2013. Health Diagnostics was surpassed only by Boston Heart, which billed this combination of seven tests a total of 2,384 times and was paid by UHC over $4 million. LabCorp, again a much larger lab, billed UHC this combination of seven tests a total of 46 times.

## 2.     Health Diagnostic Claims Show the Fraudulent Billing

99.     Examples of specific claims show that Health Diagnostic Labs was billing for medically unnecessary tests to screen for cardiac-related issues and predict future cardiac risk. In claim # 1401576827969, the patient was given ICD-9 code 272.2 - Mixed hyperlipidemia (high cholesterol).  Based on that diagnosis, the laboratory performed, *inter alia*, the following

34

unnecessary tests that do not predict cardiac risk and do not provide any relevant medical information concerning high cholesterol:

- 81225 - CYP2C19 (cytochrome P450)
- 81401 - Molecular pathology procedure, Level 2
- 81240 - F2 gene analysis
- 81241 - F5 gene analysis, Leiden variant
- 81291 - MTHFR
- 82172 – Apolipoprotein
- 82652 – Vitamin D
- 82664 – Electrophoretic Technique
- 82726 – Very long Chain Fatty Acids
- 82947 – Thyroid Test
- 83525 – Thyroid Test
- 83695 – Lipoprotein (a)
- 83698 – Lipoprotein-associated phospholipase A2 (Lp-PLA2)
- 83700 – Lipoprotein, blood
- 83876 – Myeloperoxidase (MPO)
- 83880 – Brain Natriuretic Peptide (BNP) Level: for Congestive Heart Failure patients
- 85384 – Fibrinogen; activity

Together, these medically unnecessary tests accounted for $2,372.85 of the total $3,646.13 that Health Diagnostic Labs billed to UHC on this claim, or approximately 65% of the total.

100.  In claim # 1401576816969, the patient was given ICD-9 Code 272.2 - Mixed hyperlipidemia (high cholesterol) and V700 - Routine medical exam (routine general medical examination at a health care facility). Based on those two diagnoses, the laboratory performed, *inter alia*, the following unnecessary tests that do not predict cardiac risk and do not provide any relevant medical information concerning high cholesterol:

- 82172 – Apolipoprotein
- 82652 – Vitamin D
- 82664 – Electrophoretic Technique
- 82726 – Very long Chain Fatty Acids
- 83525 – Diabetes Test
- 83695 – Lipoprotein (a)
- 83698 – Lipoprotein-associated phospholipase A2 (Lp-PLA2)
- 83700 – Lipoprotein, blood

35

- 83876 - Myeloperoxidase (MPO
- 83880 - Brain Natriuretic Peptide (BNP) Level: for Congestive Heart Failure patients
- 84439 – Thyroid Test
- 84443 – Thyroid Test
- 84480 – Thyroid Test
- 84550 – Uric Acid
- 85384 - Fibrinogen; activity

Together, these medically unnecessary tests accounted for $1,081.35 of the total $2,275.23 billed

to UHC on this claim, or 47.5% of the total.

101.    In claim # 1402732348973, the Medicare patient was given an ICD-9 code of

401.9 - Essential hypertension, unspecified (high blood pressure) and 780.79 - Other malaise and

fatigue.    Based on these diagnoses, the laboratory performed, *inter alia*, the following

unnecessary tests that do not predict cardiac risk and do not provide any relevant medical

information concerning high blood pressure or malaise and fatigue:

- 81400 - Apolipoprotein E genotyping
- 81291 – MTHFR
- 82172 – Apolipoprotein
- 82610 – Cystatin C
- 82726 – Very long Chain Fatty Acids
- 83695 – Lipoprotein (a)
- 83698 – Lipoprotein-associated phospholipase A2 (Lp-PLA2)
- 83700 – Lipoprotein, blood
- 83876 – Myeloperoxidase (MPO
- 83880 – Brain Natriuretic Peptide (BNP) Level: for Congestive Heart Failure patients
- 85384 - Fibrinogen; activity

Together, these medically unnecessary tests accounted for $1,673.66 of the total $3,650.29 billed

to UHC Medicare, or 45.85% of the total.