**RECEIVED**

MAY - 1 2015

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
THE STATE OF CALIFORNIA, THE
STATE OF CONNECTICUT, THE
STATE OF COLORADO, THE
STATE OF DELAWARE, THE
STATE OF FLORIDA, THE STATE
OF GEORGIA, THE STATE OF
HAWAII, THE STATE OF ILLINOIS,
THE STATE OF INDIANA, THE
STATE OF LOUISIANA, THE
STATE OF MARYLAND, THE
COMMONWEALTH  OF
MASSACHUSETTS, THE STATE OF
MICHIGAN, THE STATE OF
MINNESOTA, THE STATE OF
MONTANA, THE STATE OF
NEVADA, THE STATE OF NEW
JERSEY, THE STATE OF NEW
MEXICO, THE STATE OF NEW
YORK, THE STATE OF NORTH
CAROLINA, THE STATE OF
OKLAHOMA, THE STATE OF
RHODE ISLAND, THE STATE OF
TENNESSEE, THE STATE OF
TEXAS, THE COMMONWEALTH
OF VIRGINIA, THE STATE OF
WASHINGTON, THE STATE OF
WISCONSIN and DISTRICT OF
COLUMBIA *ex rel.* TINA D. GROAT,
M.D., M.B.A

      Plaintiffs,

      v.

BOSTON HEART DIAGNOSTICS
CORPORATION

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO. : 1:15-cv-00487 (RBW)**

**FILED UNDER SEAL**

1

**RELATOR'S MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT
PURSUANT TO FED. R. CIV. P. 15(a)(2)
AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

Plaintiff, the *qui tam* relator Tina D. Groat ("Relator"), by and through her undersigned

counsel, hereby respectfully moves this Court for an Order permitting her to supplement and

amend her Complaint to remove the one of the original Defendants –  Health Diagnostic

Laboratory, Inc. ("HDL") – and to add additional facts in further support of the claims alleged

against Defendant Boston Heart Diagnostics Corporation ("Boston Heart") in the original

Complaint. A copy of Relator's proposed First Amended Complaint is attached hereto as Exhibit

1.

## I.      FACTUAL BACKGROUND

Proceeding on behalf of the United States pursuant to the federal False Claims Act, 31

U.S.C. §§3729, *et seq*., as well as on behalf of the State of California, the State of Colorado, the

State of Delaware, the State of Florida, the State of Georgia, the State of Hawaii, the State of

Illinois, the State of Indiana, the State of Louisiana, the State of Maryland, the Commonwealth

of Massachusetts, the State of Michigan, the State of Minnesota, the State of Montana,  the State

of Nevada, the State of New Jersey, the State of New Mexico, the State of North Carolina, the

State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the

Commonwealth of Virginia, and the State of Washington (the "States"), pursuant to their

individual False Claims Acts. Relator filed her original complaint under seal in January 2015.

The original complaint alleges that HDL and Boston Heart bill government healthcare programs,

such as Medicare and Medicaid, for medically unnecessary laboratory tests as part of cardiac test

panels they actively market and promote to general practitioners.

Simultaneously with the filing of this Motion, Relator has also filed a Notice of Partial

Dismissal under Federal Rule of Civil Procedure 41(a)(1)(A)(i), voluntarily dismissing her

claims, allegations and causes of action, with prejudice, against Defendant Health Diagnostics

with the consent of the United States and the States.the The filing of that Notice of Partial

Dismissal is not effective on, nor does it dismiss, any claims or allegations asserted against

Defendant Boston Heart, nor does it dismiss Boston Heart as a defendant in this action. Further, since the original complaint was filed, Relator and counsel have uncovered additional facts in support of her allegations against Boston Heart as reflected in the proposed First Amended Complaint. Relator now seeks leave under Fed. R. Civ. P. 15(a)(2) to file a First Amended Complaint that includes only Boston Heart as a defendant, also under seal.

## II.   ARGUMENT

### A. Leave to Amend Should Be Granted

Under Rule 15 of the Federal Rules of Civil Procedure, "[a] party may amend its pleading once as a matter of course within 21 days after serving it, or if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). In all other circumstances, the Court "will freely give leave [to amend a complaint] when justice so requires," Fed. R. Civ. P. 15(a)(2), and "[i]t is common ground that Rule 15 embodies a generally favorable policy toward amendments." *Howard v. Gutierrez*, 237 F.R.D. 310, 312 (D.D.C. 2006) (quoting *Davis v. Liberty Mut. Ins. Co.*, 871 F.2d 1134, 1136-37 (D.C. Cir. 1989)). If the movant has at least colorable grounds for relief, justice requires allowing amendments unless the movant is guilty of undue delay or bad faith, if the amendment would unduly prejudice the opposing party, or if the amendment would be futile. *Foman v. Davis*, 371 U.S. 178 (1962).

Here, no reason exists to deny Relator the opportunity to amend the complaint. The amendment is not the result of bad faith or dilatory motive. The case remains under seal and has not yet been actively litigated. Moreover, because the case is under seal and being investigated by the government, Defendant has not yet been served and thus has not had to expend resources defending the action. The failure to cure deficiency and futility of amendment factors are inapplicable. Even so, the amendment is not likely to be futile. The proposed Amended Complaint adds information which strengthens Relator's claims on behalf of the Government.

Finally, there is no evidence of prejudice or undue delay. "The key issue in considering a motion to amend is whether the non-movant will suffer any prejudice from the amendment." *Clark v. Feder Semo & Bard, P.C*, 560 F. Supp. 2d 1, 3 (D.D.C. 2008) (citation omitted); *see also Djourabchi v. Self*, 240 F.R.D. 5, 13 (D.D.C. 2006) (describing prejudice to the opposing party as the "most important factor the Court must consider when deciding whether to grant a motion for leave to amend"). To demonstrate "prejudice sufficient to justify a denial of leave to amend the 'opposing party must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments been timely.'" *In re Vitamins Antitrust Litig.*, 217 F.R.D. 30, 32 (D.D.C. 2003) (quoting *Dooley v. United Techs. Corp.*, 152 F.R.D. 419, 425 (D.D.C. 1993)) (internal quotation marks and citations omitted)). When ample time remains in discovery, a motion to amend usually does not create prejudice. *See Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 247-48 (D.C. Cir. 1987). Defendant here is clearly not prejudice by the proposed amendment as it has not yet even been served with the complaint in the action, consistent with False Claims Act procedure.

Relator has been informed by the United States Department of Justice that the United States consents to the filing of the Amended Complaint in this action.

## CONCLUSION

For the forgoing reasons, Relator respectfully requests leave to file a First Amended Complaint.

Dated: May 1, 2015

**THE EMPLOYMENT LAW GROUP, P.C.**

By:___/s/ David L. Scher_____
R. Scott Oswald (D.C. Bar No. 458859)
David L. Scher (D.C. Bar No. 474996)
The Employment Law Group, P.C.
888 17th Street NW, 9th Floor
Washington, D.C.  20006
Tel: (202) 331-2802
Fax: (202) 261-2835

**BERGER & MONTAGUE, P.C.**

Sherrie R. Savett (to be admitted *pro hac vice*)
Russell D. Paul (to be admitted *pro hac vice*)
Benjamin A. Waters (PA I.D. #313494)
1622 Locust Street
Philadelphia, PA  19103
Tel: (215) 875-3000
Fax: (215) 875-4636

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2015 a true and correct copy of the Relator's Motion for

Leave to File a First Amended Complaint Pursuant to Fed. R. Civ. P. 15(a)(2) and Memorandum

of Law in Support Thereof was served on the following via certified mail:

| | | |
|---|---|---|
| Hon. Eric H. Holder, Jr.<br>Attorney General<br>United States Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>Washington D.C. 20530-0001 | Kamala D. Harris<br>Attorney General<br>Office of the Attorney General<br>1300 "I" Street, Suite 1740<br>Sacramento, CA 95814 | Ken Paxton, Attorney General<br>Office of the Attorney General<br>Capitol Station<br>P.O. Box 12548<br>Austin, TX 78711-2548 |
| Robert B. Teitelman<br>Assistant Attorney General<br>State of Connecticut<br>55 Elm Street<br>Hartford, CT 06141-0120 | Joseph R. Biden, III<br>Attorney General<br>Carvel State Office Building<br>820 N. French Street<br>Wilmington, DE 19801 | Brad Schimel<br>Attorney General<br>Wisconsin Department of Justice<br>State Capitol, Room 114 East<br>P.O. Box 7857<br>Madison, WI 53707-7857 |
| Pam Bondi, Attorney General<br>State of Florida<br>The Capitol PL-01<br>Tallahassee, FL 32399-1050 | Jeff Atwater<br>Chief Financial Officer<br>Florida Dept. Of Financial Services<br>200 East Gaines Street<br>Tallahassee, FL 32399-0300 | Sam Olens<br>Attorney General<br>40 Capitol Square SW<br>Atlanta, GA 30334-1300 |
| Lisa Madigan<br>Attorney General<br>James R. Thompson Ctr.<br>100 W. Randolph Street<br>Chicago, IL 60601 | Greg Zoeller<br>Attorney General<br>Indiana Government Center South<br>302 W. Washington Street, 5th Fl.<br>Indianapolis, IN 46204 | Russell Suzuki<br>Attorney General<br>425 Queen Street<br>Honolulu, HI 46813 |
| James D. Caldwell<br>Attorney General<br>P.O. Box 94095<br>Baton Rouge, LA 70804- | Maura Healey<br>Attorney General<br>One Ashburton Place<br>Boston, MA 02108-1698 | Bill Schuette<br>Attorney General<br>525 W. Ottawa Street<br>P.O. Box 30212 |

| | | |
|---|---|---|
| 4095 | | Lansing, MI  48908-0212 |
| Herbert H. Slatery III<br>Attorney General<br>425 5th Avenue North<br>Nashville, TN 37243 | Roy Cooper<br>Attorney General<br>Department of Justice<br>P.O. Box 629<br>Raleigh, NC 27602-0629 | John Jay Hoffman<br>Acting Attorney General<br>Richard J. Hughes Justice<br>Complex<br>25 Market Street<br>P.O. Box 080<br>Trenton, NJ 08625 |
| Hector Balderas<br>Attorney General<br>State of New Mexico<br>P.O. Drawer 1508<br>Santa Fe, NM 87504-1508 | Adam Paul Laxalt<br>Attorney General<br>Office of the Attorney General<br>Old Supreme Ct. Building<br>100 North Carson Street<br>Carson City, NV 89701 | Niki Batt<br>Medicaid Fraud Control Unit<br>Office of the Attorney<br>General<br>313 N.E. 21st Street<br>Oklahoma City, OK 73105 |
| Karl Racine<br>Attorney General<br>441 4th Street, NW<br>Suite 1100S<br>Washington, DC 20001 | Mark Herring<br>Attorney General<br>Office of the Attorney General<br>900 East Main Street<br>Richmond, VA 23219 | Brent Earnest<br>Cabinet Secretary<br>New Mexico Human<br>Services Department<br>Office of the Secretary<br>P.O. Box 2348<br>Santa Fe, NM 87504 |
| Tim Fox<br>Attorney General<br>Justice Building<br>215 N. Sanders<br>Helena, MT 59620-1401 | Eric Schneiderman<br>Attorney General<br>Department of Law<br>The Capitol, 2nd Floor<br>Albany, NY 12224 | Peter Kilmartin<br>Attorney General<br>150 S. Main Street<br>Providence, RI 02903 |
| Walter Smith<br>Assistant Attorney<br>General<br>Medicare Fraud Control<br>Unit<br>2425 Bristol Court, SW<br>P.O. Box 40114<br>Olympia, WA 98504 | Douglas F. Gansler<br>Attorney General<br>200 St. Paul Place<br>Baltimore, MD 21202-22012 | Lori Swanson<br>Attorney General<br>State Capitol, Suite 102<br>St. Paul, MN 55155 |
| John Suthers<br>Attorney General | Dana J. Boente<br>U.S. Attorney for the Eastern | |

| 1300 Broadway 10th Floor<br>Denver, CO 80203 | District of Virginia<br>Gerard Mene<br>Affirmative Civil Enforcement<br>Supervisor<br>Justin W. Williams U.S.<br>Attorneys Building<br>2100 Jamieson Avenue<br>Alexandria, VA 22314 | |

/s/ David L. Scher
David L. Scher

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, THE STATE OF CONNECTICUT, THE STATE OF COLORADO, THE STATE OF DELAWARE, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF HAWAII, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF LOUISIANA, THE STATE OF MARYLAND, THE COMMONWEALTH  OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MINNESOTA, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OKLAHOMA, THE STATE OF RHODE ISLAND, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WASHINGTON, THE STATE OF WISCONSIN and DISTRICT OF COLUMBIA *ex rel.* TINA D. GROAT, M.D., M.B.A

        Plaintiffs,

        v.

BOSTON HEART DIAGNOSTICS CORPORATION

        Defendant.

**CASE NO**. : **1:15-cv-00487 (RBW)**

**FILED UNDER SEAL**

**RELATOR'S AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ.* AND PENDENT STATE FALSE CLAIMS ACTS**

**DEMAND FOR JURY TRIAL**

TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ............................................................................. 2

II.     THE PARTIES ................................................................................................... 5

III.    JURISDICTION AND VENUE ........................................................................... 8

IV.     APPLICABLE LAW .......................................................................................... 9

        A.      The False Claims Acts ............................................................................ 9

        B.      Only "Medically Necessary" Diagnostic Laboratory Tests are Reimbursable..... 10

        C.      Relevant Definitions ............................................................................ 15

        D.      Billing For a Laboratory Test .............................................................. 16

V.      THE FALSE CLAIMS SCHEME: BILLING FOR MEDICALLY UNNECESSARY
        TESTS BOSTON HEART FALSELY CLAIMS PREDICT CARDIAC RISK ............. 17

        A.      The Common Diagnoses Boston Heart Falsely Uses to Justify the Medically
                Unnecessary Tests ............................................................................... 17

        B.      Genetic Tests that Boston Heart Falsely Claims Predict Cardiac Risk ................ 20

                1.      There is No Science Supporting Performing these Genetic Tests to
                        Predict Cardiac Risk, and the Experts Specifically Recommend Against
                        Doing So ...................................................................................... 22

        C.      Non-Genetic Tests that Boston Heart Falsely Claims Predict Cardiac Risk ........ 24

                1.      There is No Science Supporting Performing these Non-Genetic Tests to
                        Predict Cardiac Risk, and the Experts Specifically Recommend Against
                        Doing So ...................................................................................... 25

        D.      Boston Heart Is An Extreme Outlier in its Billing of Tests Purportedly Able
                to Predict Cardiac Risk ........................................................................ 28

        E.      Boston Heart Claims Show the Fraudulent Billing ............................................. 30

        F.      Boston Heart Targets General Practitioners and Other Non-Cardiology
                Physicians to Maximize its Test Revenues ........................................................ 31

        G.      Boston Heart Made False Statements to Market its Scientifically-Unproven
                and Worthless Tests .............................................................................. 32

VI.     COUNTS ......................................................................................................... 39

1.      The relator, Tina D. Groat, M.D., M.B.A, ("Relator") brings this action on behalf of the United States of America, the State of California, the State of Colorado, the State of Delaware, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of Montana,  the State of Nevada, the State of New Jersey, the State of New Mexico, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, and the State of Washington, (hereinafter referred to as the "Plaintiff States"), brings this action against Boston Heart Diagnostics Corporation for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*., and for violations of the following State False Claims Acts ("State FCAs"): The California False Claims Act, Cal. Gov't Code §§12650 *et seq.*; The Colorado Medicaid False Claims Act, § 25.5-4-304, *et seq*.; The Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; The District of Columbia False Claims Act, D.C. Code Ann. §§2-308.03 *et seq.*; The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§1201 *et seq.*; The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*; The Georgia False Medicaid Claims Act, Ga. Code Ann. §§49-4-168 *et seq*.; The Hawaii False Claims Act, Haw. Rev. Stat. §§661-21 *et seq.*; The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. Ann. §§175/1 *et seq.*; The Indiana False Claims and Whistleblower Protection Act, Indiana Code §5-11-5.5; The Iowa False Claims Act, §685.1, *et seq.*; The Louisiana Medical Assistance Programs Integrity Law, La. R.S. 46:437.1 *et seq.*; The Maryland False Health Claims Act, § 2-601, *et seq.*; The Massachusetts False Claims Act, Mass. Ann. Laws. Ch. 12, §§5A *et seq.*; The Michigan Medicaid False Claims Act, MCLS §§400.601 *et seq.*; Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; Montana False Claims Act, Mont.

Code Anno. §§17-8-401 et seq.; The Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 et seq.; The New Jersey False Claims Act, N.J. Stat. §2A:32C-1 et seq.; The New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 et seq.; The New York False Claims Act, NY CLS St. Fin. §§187 et seq.; The North Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§1-605 et seq.; The Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§5053 et seq.; The Rhode Island False Claims Act, R.I. Gen. Laws §§9-1.1-1 et seq.; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-171 et seq.; The Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 et seq.; The Virginia Fraud Against Taxpayers Act, Va. Code §§8.01-216.1 et seq.; The Washington Medicaid Fraud False Claims Act, RCW 74.09.201 et seq.; and the Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§20.931 (hereinafter referred to as the "State False Claims Acts") to recover all damages, civil penalties and all other recoveries provided for under the Federal FCA and the State FCAs.

## I.  SUMMARY OF THE ACTION

2. Defendant Boston Heart Diagnostics Corporation ("Boston Heart" or the "lab"), in order to inflate its revenues at the expense of government and private insurers, systematically and fraudulently performed and billed for excessive and medically unnecessary laboratory tests that were purportedly able to assess the risk of future heart disease ("cardiac risk").

3. Boston Heart is a clinical diagnostic laboratory that is focused on heart health and provides, inter alia, cardiovascular disease-focused laboratory tests. Thus, if a cardiovascular-related issue is suspected or diagnosed in a patient, such as hypertension (high blood pressure), hyperlipidemia (high cholesterol), or malaise and fatigue, the physician could draw a blood sample, fill out a laboratory test requisition form and send it to Boston Heart for testing.

4.     Boston Heart prominently displays on its test requisition form certain test panels that grouped together a significant number of varied and unrelated genetic and non-genetic laboratory tests purportedly able to assess or predict cardiac risk which, in fact, they cannot do. The lab marketed these tests to primary care physicians and general practitioners who are not experts in cardiology and duped them into ordering these tests by representing themselves as the experts in the field and making false statements regarding the ability of those tests to predict cardiac risk.  Boston Heart further promoted the use of these tests by placing them or the panels that contain them in a prominent position on the test requisition form.

5.     The genetic tests are worthless, of no therapeutic or predictive value whatsoever and known to be medically unnecessary because they (1) do not and cannot screen for any currently existing heart disease in the patient, (2) do not and cannot predict the patient's risk of future heart disease, and (3) provide no additional information regarding the cardiovascular-related diagnoses used to justify the tests, such as hypertension, hyperlipidemia, or malaise and fatigue, and (4) have no bearing on any potential treatments for those diagnoses.  The same is true for nearly all of the non-genetic tests at issue. Further, the tests did not comport with clear industry guidelines, including those of The American Heart Association.  Boston Heart ignored the known standards, promoted these medically unnecessary tests in easily-ordered test panels on their test requisition forms and falsely touted the efficacy of such tests to predict cardiac risk.

6.     As a result of Boston Heart's systematic and fraudulent scheme, it billed government insurers for these medically unnecessary tests far more often than other labs. Relator is a Medical Doctor with a Masters of Business Administration and an expert in the field of genetic laboratory testing. Relator, through her position at United Healthcare as National Medical Director of Women's Health and Genetics, has direct access to a wealth of data related

3

to billing for tests purportedly performed to assess cardiac risk for hundreds of thousands of patients by hundreds of labs that have billed United Healthcare over the past six years.  Her unique background and her position as a National Medical Director at United Healthcare, the largest health insurer in America, give her a distinct ability to identify and understand issues surrounding laboratory billing and to objectively analyze the reams of data United Healthcare provides her. This data clearly shows that Boston Heart billed far more of these medically unnecessary tests per patient than almost all other labs, including Laboratory Corporation of America ("LabCorp"), one of the nation's two largest labs in terms of tests performed.  The data, which Relator has studied and has access to, clearly shows that Boston Heart is an extreme outlier in laboratory testing for common diagnoses in the cardiology area.

7.     All labs which directly or indirectly seek government reimbursement for their testing are also legally required, independent of the physician ordering the lab tests, to review and maintain sufficient diagnostic information and documentation to justify the medical necessity of all lab tests performed and billed.  Without having documentation that clearly verifies the medically necessity of the tests (which Boston Heart does not have and which simply does not exist for the vast majority of tests purportedly justified by a cardiovascular-related diagnosis), Boston Heart cannot legally bill government payors for those tests.

8.     Here, Boston Heart knowingly billed for lab tests that do not predict cardiac risk and were not justified by the common cardiovascular-related diagnoses given to the patients being tested.  Further, the results of the lab tests could not provide any useful information that could be utilized to treat the patient or prevent heart disease. In sum, these tests are not medically necessary.  In performing and submitting claims for such medically unnecessary lab tests to government insurers, Boston Heart violated the Federal and State False Claims Acts.

4

## II.    THE PARTIES

9.    The United States is a plaintiff to this action, which it brings on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and other federally funded healthcare programs, including Medicare, Medicaid, TRICARE, and the Veterans Administration.

10.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395- 1395ggg; 42 U.S.C. §§ 426 and 426A, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program. Medicare is a government health insurance program for people age 65 or older, certain disabled people under age 65, and people of all ages with end stage renal disease. See. The Medicare Program is comprised of four parts; Medicare Parts A through D.

11.    Part A of the Medicare program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care.

12.    Medicare Part B, which is particularly relevant to the allegations raised herein, authorizes payment for physician and ancillary services, including laboratory and diagnostic tests and procedures. Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. CMS contracts with private insurance companies to administer, process, and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund. The private insurance companies that contract with CMS to provide these services are called Part B Carriers.

13.    Part C of the Medicare program is also known as Medicare Advantage. Medicare Advantage Plans stand in place of Medicare Parts A and B and are offered by private companies approved by Medicare. These plans are typically less expensive for the consumer, but limit covered beneficiaries to a network of covered providers.

14.     Currently, only 30% of people on Medicare obtain coverage through Medicare Part C. *Medicare Advantage Fact Sheet*, The Henry J. Kaiser Family Foundation, available at http://kff.org/medicare/fact-sheet/medicare-advantage-fact-sheet/ (last accessed September 22, 2014).

15.     Medicare Part D provides prescription drug coverage for Medicare beneficiaries.

16.     TRICARE is a federally funded program providing medical benefits to military personnel, their families, retired veterans, and reservists called to duty. See 32 C.F.R. § 19 et seq.

17.     The Veterans Administration is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

18.     Medicaid is a government health insurance program funded jointly by the Federal and State governments. See 42 U.S.C. § 1396 et seq. Each State administers its own Medicaid program. However, each State program is governed by Federal statutes, regulations and guidelines. The federal portion of each State's Medicaid payment – the Federal Medical Assistance Percentage – is based on that State's per capita income compared to the national average. During the relevant time period, the Federal Medical Assistance Percentage was between approximately 50% and 80%.

19.     Throughout the relevant time period, the services specified herein were provided to Medicaid beneficiaries in California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, Wisconsin, and the District of Columbia (hereinafter referred to as the "Plaintiff States").

20.     All of the Plaintiff States are plaintiffs in this action.

21.     Throughout the relevant time period, the services described herein were provided
to beneficiaries of Medicare, Medicaid, TRICARE, the Veterans Administration, and other
federally and state funded healthcare programs (collectively referred to herein as "government
payers" or "government insurers").

22.     Relator Dr. Tina Groat is a citizen of the United States and a resident of the state
of Michigan. She earned her medical degree at Harvard Medical School and was an obstetrics
and gynecology resident at Duke University Medical Center, where she was the Assistant
Administrative Chief Resident. Dr. Groat also holds a Masters of Business Administration from
the University of Michigan. She is a Fellow of the American College of Obstetricians and
Gynecologists and a Diplomate of the American Board of Obstetrics and Gynecology. Dr. Groat
has taught at the Indiana University School of Medicine as an Assistant Professor of Clinical
Ob/Gyn and at the University of Michigan as a Clinical Instructor of Obstetrics and Gynecology.
Currently, Dr. Groat is a National Medical Director of Women's Health and Genetics for United
Healthcare.  In this position, Relator's duties included examining and evaluating the drivers of
increased costs in women's care and genetic testing.

23.     United Healthcare ("UHC"), which is not a defendant in, or a party to, this
action,[1] is the nation's largest health benefits company, offering health insurance in the following
areas: State Medicaid and community programs; employer sponsored and individual health
benefits plans; Medicare and all major senior health benefit product categories; Tricare insurance
for military personnel and their families; and health care in the international marketplace. In
total, UHC services 27 million commercial patients, 11 million Medicare patients, 4 million
Medicaid patients and 3 million TriCare patients.

---

[1] In fact, UHC is completely unaware that this action exists.

- UHC's Medicare & Retirement group provides three types of coverage; Medicare Advantage Plans, Medicare Part D prescription drug plans, and Medicare Supplemental and gap insurance.

- UHC's Community & State unit acts as a Managed Care Organizations ("MCO") in providing coverage to those patients insured by Medicaid.

- UHC's Military & Veterans division provides coverage to 3 million Tricare beneficiaries in Alaska, Arizona, California, Colorado, Hawaii, Idaho, Iowa, Kansas, Minnesota, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oregon, South Dakota and parts of Texas and Utah, Washington and Wyoming.

24.     Defendant Boston Heart Diagnostics Corporation is a privately held company based in Framingham, Massachusetts. The Company provides diagnostic testing related to cardiovascular health through its clinical laboratory, also in Framingham, Massachusetts, for specimens delivered from across the United States, including Virginia and the District of Columbia. The Company states on its website that it is "committed to adding to our exclusive portfolio and suite of cardiovascular disease (CVD)-focused tests that are designed to improve outcomes for patients and save health dollars by tailoring a therapeutic regimen to the patient's particular circumstances" and that "We offer the most clinically advanced, scientifically relevant tools to help identify cardiovascular risk and select the treatment and care that's optimal for each patient." Its stated mission is to "improve heart health and prevent disease. [2]

## III.   JURISDICTION AND VENUE

25.     Jurisdiction is founded upon the Federal False Claims Act (the "Act" or the "False Claims Act"), 31 U.S.C. § 3729 et seq., specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.

---

[2] http://www.bostonheartdiagnostics.com/about_business.php

26.     Venue in the District of Columbia is appropriate under 31 U.S.C. § 3732(a) in that, at all times material to this civil action, Defendant resided in and/or transacted business in the District of Columbia.

## IV.     APPLICABLE LAW

### A.     The False Claims Acts

27.     The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, inter alia, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

28.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

29.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

30.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

31.     Each of the Plaintiff States has individually enacted a False Claims Act. Each of those Acts is modeled after the Federal FCA, and each contains provisions similar to those quoted above. Relator asserts claims under the State FCAs for the State portion of Medicaid false claims detailed in this Complaint.

### B.     Only "Medically Necessary" Diagnostic Laboratory Tests are Reimbursable

32.     Services provided to Medicare and other federal health care program beneficiaries are only reimbursable if they are medically necessary. *See* 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1); Medicare Carrier's Manual § 2049. That is, Medicare and other federal health care programs only cover medical services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." *Id.*

33.     Accordingly, providers may only submit claims for government healthcare reimbursement for "reasonable and necessary" medical services. And, in submitting claims, providers make certain express certifications, including an assurance that the services were "provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1); *see also* 42 U.S.C. § 1395n(a)(2)(B) (to receive payment for claims providers must certify that services were "medically required"). Moreover, in submitting reimbursement claim form CMS-1500 to obtain reimbursement from Medicare or other Federal health care programs, diagnostic laboratories (also known as an "Independent Diagnostic Testing Facility" or "IDTF") expressly certify **that the services shown on [the] form were medically indicated and necessary for the health of the patient."** Thus, each time a claim for payment is submitted to a Federal healthcare program, the provider expressly certifies that the services performed were

medically justified. In addition, each time a provider submits a claim, the provider impliedly certifies that the service was provided in accordance with Federal and State statutes, regulations, and program rules.

34.     Knowingly causing the submission of claims that are ineligible for payment under a federal health care program constitutes a violation of the FCA. *See U.S. ex. rel. Franklin v. Parke-Davis*, 147 F. Supp. 147, 152-153 (D. Mass. 2001) (knowingly causing the submission of claims that are ineligible for reimbursement can serve as a basis for liability under the FCA); *see also U.S. ex rel. Nowak v. Medtronic, Inc.*, Case Nos. 1:08-cv-10368 and 09-cv-11625 (D. Mass.) (United States' Statement of Interest, at 6)("[t]o the extent that a healthcare provider seeks reimbursement for a procedure that is ineligible for payment under a federal healthcare program ... because the program places other conditions on coverage that are not satisfied, the claim is false").

35.     Similarly, a claim for "worthless" medical care violates the FCA because the government believes it is paying for services or items that have medical value when, in fact, the services or items are essentially worthless. *See Mikes v. Straus*, 274 F.3d 687, 702-4 (2d Cir. 2001); *U.S. v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001).

36.     To be medically necessary, diagnostic lab tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a). *See also* 42 C.F.R. § 410.33(d) ("All procedures performed by the IDTF must be specifically ordered in writing by the physician who is treating the beneficiary, that is, the physician who is furnishing a consultation or treating

a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem").

37.    In addition, to comply with these regulations and justify the medical necessity of the tests performed, IDTFs must meet certain documentation requirements. *See generally* 42 C.F.R. §§ 410.32; 410.33.

38.    Specifically, 42 C.F.R. § 410.32(d)(2) provides that laboratories and other entities seeking reimbursement for laboratory and other diagnostic tests are required to keep records that accurately document the medical necessity of such tests. If the laboratory does not receive documentation sufficient to justify the medical necessity of a test from the prescribing physician, the laboratory or other entity "may request additional diagnostic and other medical information to document that the services it bills are reasonable and necessary." *Id.*

39.    42 C.F.R. § 410.32(d)(3) further provides,

(i) … Upon request by CMS, the entity submitting the claim must provide the following information:

> (A) Documentation of the order for the service billed (including information sufficient to enable CMS to identify and contact the ordering physician or nonphysician practitioner).
>
> (B) Documentation showing accurate processing of the order and submission of the claim.
>
> (C) Diagnostic or other medical information supplied to the laboratory by the ordering physician or nonphysician practitioner, including any ICD–9–CM code or narrative description supplied.

40.    If adequate documentation is not supplied, CMS must deny the claim. *Id.* at 410.32(d)(3)(ii)(C).

41.    Federal case law also confirms that Federal healthcare programs may require billing entities to supply such documentation as may be deemed necessary to support coverage.

12

*See KGV Easy Leasing Corp. v. Sebelius*, No. 09-56393, 2011 WL 490990 (9th Cir. 2011)

(upholding decision that Medicare could require documentation, from a laboratory or IDTF,

justifying the medical necessity of diagnostic tests as a condition of payment); *Gulfcoast Med.*

*Supply, Inc. v. Leavltt*, 468 F.3d 1347 (11th Cir. 2006); *Mackenzie Med. Supply v. Leavltt*, 506

F.3d 341 (4th Cir. 2007); *Maximum Comfort, Inc. v. Secretary of Health & Human Services*, 512

F.3d 1081 (9th Cir. 2007).

42.     Local Coverage Determination[3] L29195 reiterates the requirements of the above

regulations and sets forth specific documentation requirements. The LCD states that the

laboratory or other entity making a claim for reimbursement must maintain the following:

- A written order from the treating physician

- Hard copy documentation of the test results and interpretation; and

- The medical necessity (reason) for performing the diagnostic test(s).

LCD L29195.[4]

43.     In addition, LCD L29195 states,

Although all procedures performed by the IDTF must be specifically ordered in
writing by the practitioner treating the beneficiary as noted above, **the mere fact
that the test(s) were properly ordered does not reflect or imply Medicare
coverage for these services. Medical necessity must be apparent** and statutory
exclusions, national and local coverage determinations (LCDs) apply.

*As noted above, the results of any diagnostic test performed by the IDTF must
actually be used in the management of the beneficiary's specific medical problem.*

---

[3] Local coverage determinations (LCDS) are defined in Section 1869(f)(2)(B) of the Social
Security Act. This section states: "For purposes of this section, the term 'local coverage
determination' means a determination by a fiscal intermediary or a carrier under part A or part B,
as applicable, respecting whether or not a particular item or service is covered on an
intermediary- or carrier-wide basis under such parts, in accordance with section 1862(a)(1)(A)."
[4] LCD L29195 has been cited approvingly in several decisions of the Medicare Appeals Council.
*See, e.g., In the Case of Virtual Imaging Servs., Inc.* 2013 WL 871989, *4-*6 (Aug. 27, 2013); *In
the Case of Virtual Imaging Servs., Inc.* 2013 WL 8812402, *4-*6 (Aug. 23, 2013); *In the Case
of Mobile Quality Diagnostic*, 2012 WL 2343273, *4 (April 30, 2012).

> *If a beneficiary's medical care will not be significantly altered by the results of a test performed by an IDTF, even if properly ordered, it will not be paid.*

*Id.* (bold emphasis added) (italics emphasis in the original).

44.     Documentation is insufficient if the supplied documents lack clinical notes from the physicians to demonstrate why they ordered the IDTF services at issue, lack documentation from the physicians suggesting how they used, or intended to use, the test results in the management of the beneficiaries' conditions, or lack any indication as to whether the physician who ordered the IDTF services was actually the beneficiary's treating physician. *See, e.g., In the Case of Virtual Imaging Servs., Inc.* 2013 WL 8812402, *5 (Aug. 23, 2013).

45.     Thus, check the box physician order forms are insufficient to establish the medical necessity of IDTF services. *See, e.g., KGV Easy Leasing Corp*, No. 09-56393, 2011 WL 490990; *KGV Easy Leasing Corp. v. Sebelius*, No. 08-06281, 2010 WL 342598 (CD. Cal. 2010).

46.     Every Medicare supplier is charged with knowledge of Medicare regulations and with the understanding that Medicare does not provide reimbursement for services that are not properly documented. *KGV Easy Leasing Corp.*, No. 09-56393, 2011 WL 490990, *2 (9th Cir. 2011) (citing *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384-85 (1947); *Maximum Comfort Inc. v. Sec'y of Health & Human Servs.,* 512 F.3d 1081, 1088 (9th Cir. 2007).

47.     In addition, the Centers for Medicare & Medicaid Services (CMS) regulates all laboratory testing (except research) performed on humans in the U.S. through the Clinical Laboratory Improvement Amendments of 1988 (CLIA). The CLIA regulations include federal standards applicable to all U.S. facilities or sites that test human specimens for health assessment or to diagnose, prevent, or treat disease. The Division of Laboratory Services, within the Survey and Certification Group, under the Center for Clinical Standards and Quality (CCSQ), has the responsibility for implementing the CLIA Program. CLIA considers all entities that perform

14

even one test on "materials derived from the human body for the purpose of providing information for the diagnosis, prevention or treatment of any disease or impairment of, or the assessment of the health of, human beings" to be governed by CLIA and must register with the CLIA program.

48.     CLIA imposes an affirmative pre-analytic obligation on laboratories to monitor the medical necessity and completeness of test request information solicited and obtained by the laboratory. *See* 42 CFR 493, 3641, Federal Register / Vol. 68, No. 16 / Friday, January 24, 2003 / Rules and Regulations.

### C.     Relevant Definitions

49.     ICD-9 Code – International Classification of Disease-9 Code ("diagnosis code"):

International Classification of Diseases (ICD) is the international standard diagnostic tool for epidemiology, health management and clinical purposes and is maintained by the World Health Organization. The ICD is designed as a health care classification system, providing a system of diagnostic codes for classifying diseases, a wide variety of signs, symptoms, abnormal findings, complaints, social circumstances, and external causes of injury or disease. This system is designed to map health conditions to corresponding generic categories together with specific variations, assigning for these a designated code, up to six characters long.

50.     CPT Code – Current Procedure Terminology Code ("test procedure code"):

The Current Procedural Terminology (CPT) code is a medical code set maintained by the American Medical Association that describes medical, surgical, and diagnostic services and is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes.

51.     Screening, in medicine, is a strategy used to identify an unrecognized disease in individuals without signs or symptoms. In other words, screening is done with asymptomatic individuals. As such, screening tests are performed on persons apparently in good health. Screening interventions are designed to identify disease in a community early, thus enabling

earlier intervention and management in the hope to reduce mortality and suffering from a disease.

### D.     Billing For a Laboratory Test

52.     Boston Heart is in the business of conducting laboratory tests that are ordered by doctors and other healthcare providers.   To facilitate the ordering of those tests, Defendant supplies doctors with pre-printed test requisition forms which the doctor fills out and sends to the Defendant lab along with the patient's specimen that is to be tested.   Doctors can also order tests electronically through a website or system integrated with the physician's electronic health records (EHR) system.

53.     These test requisition forms include a list of the tests that the lab performs for the doctor to select based on the doctor's examination of the patient and subsequent diagnosis.   The form also groups certain tests together in test panels, which allows the doctor to easily order several tests at once simply by checking one box on the form.

54.     These test panels are cash cows for the lab and the lab actively promotes their use through internet and direct marketing to doctors.   These test panels increase the number of tests that the lab conducts and, as detailed below, includes a number of medically unnecessary tests that should not be performed and should not be billed to government payors.

55.     During the patient's visit to the doctor, the patient is examined, a diagnosis is made and specimens (*e.g.* blood, urine, saliva, fluid samples) are drawn. The doctor uses the test requisition form to select the laboratory tests the doctor would like performed.   The test requisition form and the specimen are then sent to the lab.

56.     After receiving the test requisition form and the specimen, the lab conducts the tests ordered, including all of the tests included in any test panel that has been ordered.   As set

forth above, the lab may not perform medically unnecessary tests and must retain documentary evidence that each of the tests performed was medically necessary and justified by the patient's diagnosis. This means that the ICD-9 Code assigned to the patient must directly support and justify the CPT Code of the test performed.

57. After the lab conducts the tests ordered, it bills the government or government intermediary (such as Medicare Part C as discussed in ¶ 13 above) for tests performed for Medicare, Medicaid and TriCare patients. If a panel was ordered and the lab conducted the tests contained within that panel, the lab separately bills the government for each of those tests performed under its own CPT Code. As set forth below, most of the tests included in these panels are not medically necessary and should not be billed to the government.

## V.     THE FALSE CLAIMS SCHEME: BILLING FOR MEDICALLY UNNECESSARY TESTS BOSTON HEART FALSELY CLAIMS PREDICT CARDIAC RISK

### A.     The Common Diagnoses Boston Heart Falsely Uses to Justify the Medically Unnecessary Tests

58. Boston Heart conducts and bills for laboratory tests, including genetic and non-genetic tests, which purportedly assess the patient's risk of developing heart disease in the future. These tests are included in test panels to increase the frequency with which they are ordered. However, all of the genetic tests and nearly all of the non-genetic tests ordered through these panels or individually are not justified by the underlying diagnoses given to the patients on which they are performed, provide no information related to the risk of developing heart disease, provide no additional information related to blood cholesterol levels, and are not medically necessary.

59.     The following four diagnoses, along with their corresponding ICD-9 diagnosis codes, are commonly seen in patients whose specimens have been submitted to the Boston Heart lab for testing:

> a) Routine general medical examination at a health care facility (ICD-9 Code V70.0)
>
> b) Essential hypertension (high blood pressure) (ICD-9 Code 401)
> Hypertension, malignant (401.0)
> Hypertension, benign (401.1)
> Hypertension, Unspecified (401.9)
>
> c) Other and unspecified hyperlipidemia (high cholesterol) (ICD-9 Code 272.4)
>
> d) Other malaise and fatigue (ICD-9 Code 780.79)

60.     Boston Heart frequently uses these four diagnoses to justify certain genetic and non-genetic laboratory tests under the false premise that they assist in assessing cardiac risk. These laboratory tests, which are set forth below, do no such thing, and this is common knowledge in the medical and scientific community.

61.     **The American Heart Association and the American College of Cardiology, in a joint effort that resulted in publication of Guideline for Assessment of Cardiovascular Risk in Asymptomatic Adults in November 2010 ("Guideline"), specifically recommends against certain of these tests, as set forth below, to assess the risk of developing heart disease**. The Guideline focused on "the initial assessment of the apparently healthy adult for risk of developing cardiovascular events associated with atherosclerotic vascular disease." The Guideline investigated several genetic and non-genetic tests as predictors of cardiac risk under the following criteria:

> For any risk marker to be considered a useful candidate for risk prediction, it must, at the very least, have an independent statistical association with risk after accounting for established readily available and inexpensive risk markers. This

independent statistical association should be based on studies that include large numbers of outcome events.

…

In the absence of this evidence of "additive predictive information," the writing committee generally concluded that a new risk marker was not ready for routine use in risk assessment.

62.     The Guideline specifically states that genetic testing for cardiac heart disease risk in asymptomatic adults is not recommended, and that certain non-genetic tests (such as testing of lipid parameters beyond the standard fasting lipid profile and tests for natriuretic peptides) are also not recommended to predict cardiac risk.  Indeed, the Guideline **"recommends against their use for cardiovascular risk assessment."**

63.     This Guideline is the authority in the industry and is adhered to by major healthcare institutions, including the Mayo Clinic.  United Healthcare investigated the insurance industry and found that other major insurers, including Anthem, Blue Cross Blue Shield and Aetna, consider these tests experimental and investigational for assessing risk of cardiac heart disease because their clinical value has not been established.[5]

64.     Because there is no accepted science in the sense of any independent statistical association supporting the use of these tests to assess cardiac risk, and the scientific community and experts in the cardiology field specifically recommend against using these tests for that purpose, **these tests, when justified by the four common diagnoses and when used to assess cardiac risk, are worthless**.  As such, the lab cannot have received or have in its possession the

_____

[5] *See, e.g.*, http://www.aetna.com/cpb/medical/data/300_399/0381.html;
http://www.anthem.com/medicalpolicies/policies/mp_pw_a050309.htm;
https://www.bcbsnc.com/assets/services/public/pdfs/medicalpolicy/cardiovascular_disease_risk_tests.pdf

documentation required to justify the medically necessity of these tests, and billing government insurers for them violates the Federal and State False Claims Acts.

**B.**     **Genetic Tests that Boston Heart Falsely Claims Predict Cardiac Risk**

65.     When one or any combination of these four diagnoses is given to a patient, Boston Heart is conducting and billing for the following medically unnecessary genetic tests that are purportedly designed to identify and assess the risk of heart disease, but do not:

- Genetic tests for Hereditary Thrombophilia (blood clots), which are billed through the following CPT codes:

| CPT Code | Description |
|---|---|
| 81240 | F2 (prothrombin, coagulation factor II) (e.g., hereditary hypercoagulability) gene analysis, 20210G>A variant |
| 81241 | F5 (coagulation factor V) (e.g., hereditary hypercoagulability) gene analysis, Leiden variant |
| 81291 | MTHFR (5,10-methylenetetrahydrofolate reductase) (e.g., hereditary hypercoagulability) gene analysis, common variants (e.g., 677T, 1298C) |

**This genetic testing is specifically appropriate only for people with a diagnosis of Venous thromboembolism (deep vein thrombosis, pulmonary embolism) (ICD-9 codes 415.1, 452 and 453).**  Further, these tests only have FDA marketing clearance for use as an aid in the diagnosis of patients with suspected thrombophilia, but are not FDA approved for evaluation of cardiac risk.

- CYP2C19 gene analysis: This analysis tests for cytochrome P450 enzymes, which are a super-family of enzymes located in the liver and mucosal surface of the intestinal tract. They play important roles in the biosynthesis and metabolism of endogenous and exogenous compounds.   Allelic variations in the CYP2C19 gene results in the patient's markedly increased or decreased metabolism of certain drugs, leading to wide variations in clinical effect. **This genetic testing is specifically appropriate only for people with a diagnosis of**

20

**myocardial infarction (ICD-9 codes 410, 411, 412) who are taking the drug clopidogrel**
**(brand name: Plavix) to determine if the patient is able to metabolize that drug**
**properly.** Clopidogrel is used to prevent blood clots after a recent heart attack or
stroke.[6] **However, this test is being performed by Boston Heart to purportedly predict**
**future cardiac risk for patients who are not taking clopidogrel.** The exact CPT code used
is:

| CPT Code | Description |
|---|---|
| 81225 | CYP2C19 (cytochrome P450, family 2, subfamily C, polypeptide 19) (e.g., drug metabolism) gene analysis, common variants (e.g., *2, *3, *4, *8, *17) |

- CYP2C9 gene analysis: This analysis tests for the principal cytochrome P450 enzyme that
  modulates the anticoagulant activity of warfarin. Warfarin is an anticoagulant used to prevent
  heart attacks, strokes, and blood clots. **This genetic testing is specifically appropriate only**
  **for people taking the drug warfarin, which is sold under the brand names Coumadin,**
  **Jantoven, Marevan, Uniwarfin, if they are enrolled in a research study looking at**
  **pharmacogenomic testing of CYP2C9 or VKORC1 alleles to predict warfarin response.**
  *See* Medicare NCD 90.1 Pharmacogenomic Testing for Warfarin Response.[7]  However, this
  genetic test is being performed by Boston Heart to purportedly predict future cardiac risk for
  patients who are not taking warfarin. The exact CPT code used is:

| CPT Code | Description |
|---|---|
| 81355 | Genotyping to determine cytochrome p450 2C9 (CYP2C9) and  vitamin K epoxide reductase subunit C1 (VKORC1) genetic polymorphisms for the |

---

[6] This test can be used for other drugs metabolized by this same pathway as clopidogrel—PPIs (omeprazole), anticonvulsants (phenytoin and diazepam) and TCAs (amitriptyline and nortriptyline).

[7] http://www.cms.gov/medicare-coverage-database/details/ncd-details.aspx?NCDId=333&ver=1

| | purpose of managing the administration and dosing of warfarin |
|---|---|

- Apolipoprotein E genotyping: This analysis is being used to test for the gene that directs the production of apolipoprotein E, a protein that helps transport lipids (fats and cholesterol) in the blood. Genetic tests for cardiac risk currently offer no proven benefit in risk assessment when added to other standard measures of cardiac risk like global risk scores. There is no data showing results of genetic testing alter management or improve outcomes for prevention of cardiac heart disease.[8] The exact CPT code used for this test is:

| 81401 | Molecular pathology procedure, Level 2, used for apolipoprotein E genotyping (ABL Kinase Domain Mutation in CML) |
|---|---|

66.     Government payors reimburse the labs at the rate of approximately $50-$100 for each one of these genetic tests conducted for government-insured patients.

### 1.   There is No Science Supporting Performing these Genetic Tests to Predict Cardiac Risk, and the Experts Specifically Recommend Against Doing So

67.     For each of the four common diagnoses above, there is absolutely no medical indication to perform genetic tests for Hereditary Thrombophilia or the CYP2C19 gene analysis, or any genetic testing at all. **The American Heart Association and American College of Cardiology Guideline specifically state "Genotype testing for CHD [Cardiac Heart Disease] risk assessment in asymptomatic adults is not recommended."**

68.     The two most common diagnoses of underlying medical conditions that justify the medical necessity of these two categories of genetic tests are (1) Venous thromboembolism for hereditary thrombophilia testing, and (2) myocardial infarction for CYP2C19 gene analysis. To

---

[8] *See* 2010 ACCF/AHA Guideline for Assessment of Cardiovascular Risk in Asymptomatic Adults ("Global risk scores (such as the Framingham Risk Score [FRS]) that use multiple traditional cardiovascular risk factors should be obtained for risk assessment in all asymptomatic adults without a clinical history of CHD.")

substantiate billing for these genetic tests, the lab falsely promotes genetic testing for hereditary thrombophilia and CYP2C19 gene analysis as a general way to predict cardiac risk, even when the patient does not have either of the two necessary underlying conditions to justify the medical necessity of these genetic tests.

69.     Furthermore, these genetic tests, in the rare instances when they are justified by a diagnosis of Venous thromboembolism or myocardial infarction and are, thus, medically necessary, are appropriate only once per lifetime for patients because a patient's genetic makeup does not change.  However, UHC data shows that in these cases, these genetic tests are being performed more than one time per patient.

70.     These genetic tests were also used, without any medical justification, to screen for hypercholesterolemia, which is the presence of high levels of cholesterol in the blood.   To screen for hypercholesterolemia, it is standard to test for LDL (low-density lipoprotein) and HDL (high-density lipoprotein) because LDL cholesterol and HDL cholesterol, along with one fifth of the triglyceride level, make up a person's total cholesterol count.  Such medically justified tests are properly billed under four or five distinct CPT Codes.  However, there is no medical justification to conduct genetic testing for either the CYP2C19 gene or for hereditary thrombophilia in order to screen for hypercholesterolemia.

71.     In addition, genetic tests for Hereditary thrombophilia were often billed together with the CYP2C19 gene analysis, meaning that they were performed on the same patient.  In fact, these two categories of tests would be performed on entirely distinct patient populations, such that it would rarely be medically indicated to perform both categories of tests on the same person. CYP2C19 gene analysis is indicated in people taking clopidogrel (Plavix) which is a blood thinner used to help prevent additional strokes and heart attacks in patients with

myocardial infarction and angina.  Hereditary thrombophilia testing is indicated in people with venous blood clots.  Having both of those conditions and thus being in both patient populations is very rare, less than 1% of the population.

72.     Boston Heart promotes these tests individually and through test panels that group together only a few medically justified tests with many medically unnecessary tests, including cardiac genetic tests, in order to increase the number of these medically unnecessary and worthless tests ordered by physicians and then performed and billed by the labs. The lab states on its website: "Boston Heart conducts genotyping for the following: SLCO1B1 (statin induced myopathy), apoE, clopidogrel response (CYP2C19), prothrombin (factor II) G20210A, factor V Leiden, and MTHFR. These tests aid in the selection of appropriate treatment options for individuals."[9]  In fact, these tests do not aid in the selection of appropriate treatment options for individuals.

### C.     Non-Genetic Tests that Boston Heart Falsely Claims Predict Cardiac Risk

73.     When a patient is given one or some combination of the four non-specific diagnoses (ICD-9 Codes) listed above (routine medical exam, hypertension, hyperlipidemia, or fatigue and malaise) and that patient's specimen is sent for testing to Boston Heart, the lab often performs and bills for, in addition to the medically unnecessary genetic tests discussed above, some combination of the following additional medically unnecessary non-genetic tests:

| CPT Code | Description |
|---|---|
| 83700 83704 83701 83695 82664 82172 82726 | Additional cholesterol particles through miscellaneous CPT Codes - Testing for LDL subspecies (small and large LDL particles), HDL subspecies, apolipoprotein E, apolipoprotein A-1, etc. |
| 82652 | Vitamin D |
| 86141 | CRP (C-reactive protein) |
| 83525 | Diabetes test (blood insulin) |

---

[9] http://www.bostonheartdiagnostics.com/science_tests_genetic.php

| 84439 84443 84480 | Thyroid tests |
| 84550 | Uric Acid |
| 83876 | MPO |
| 81506 | hs-CRP |
| 85384 | Fibrinogen |
| 83880 | NT-proBNP |
| 82726 | FFA/NEFA |
| 83090 | Homocysteine w/ rofle |
| 83036 | HbA1C |
| 82610 | Cystatin-C |
| 0111T | Omega 3 |
| 84431 | AspirinWorks |

### 1. There is No Science Supporting Performing these Non-Genetic Tests to Predict Cardiac Risk, and the Experts Specifically Recommend Against Doing So

74.     Relator's analysis of the UHC data shows that in nearly every case where the above tests were performed by Boston Heart, the patients' diagnoses (ICD-9 Codes) did not justify performing and billing for any of these additional tests because there is no scientific evidence at all that these tests predict cardiac risk.   For several of these tests, cardiovascular experts specifically recommend against performing these tests to assess cardiac risk.   Relator found similar patterns of billing by these labs for both unnecessary cardiac genetic and non-genetic testing in each of the commercial, Medicare and Medicaid populations.

75.     Lipoprotein particle tests (the first row in the chart in ¶ 73 above) are never medically necessary to predict cardiac risk.   These additional measurements of lipid parameters or modified lipids are no better at determining cardiac risk than the standard fasting lipid profile (total cholesterol, high-density lipoprotein (HDL) cholesterol, LDL cholesterol and triglycerides).   All lipid particles (e.g., LDL or HDL) are present in the blood circulation in a range of sizes.   However, additional measurements of lipid parameters or modified lipids vary in their interassay agreement, laboratory standardization, and established reference ranges.   Also,

the use of such measurements is generally limited because there are no clear thresholds that would trigger treatment, no therapeutic targets and no unique treatments beyond those already recommended by lipid treatment guidelines directed by the standard lipid profile. Therefore, there is no evidence that the assessment of additional lipid parameters leads to an improved net health outcome. The American Heart Association and the American College of Cardiology, in their joint Guideline, specifically state that **"Measurement of lipid parameters, including lipoproteins, apolipoproteins, particle size, and density, beyond a standard fasting lipid profile is not recommended for cardiovascular risk assessment in asymptomatic adults."** Such tests are labeled as having "**No Benefit**" (emphasis supplied).

76.     High blood pressure and high cholesterol can increase risk of a cardiac event or heart disease. If you have high blood pressure, the force exerted on your arteries is too high and can create microscopic tears in the artery walls that then turn into scar tissue. Damaged arteries accumulate circulating materials such as cholesterol. Acting like latticework inside your arteries, this scar tissue provides a lodging place for particles of fat, cholesterol and other substances, which are collectively called plaque. As the plaque builds up, the arteries slowly narrow and harden, causing conditions such as coronary artery disease (CAD). Also, a heart attack is the result of a blocked blood supply to the heart muscle tissue. This can happen when the arteries to the heart become thicker and harder from a buildup of plaque. High blood pressure can be diagnosed in a medical office and high cholesterol can be diagnosed through standard tests for LDL (low-density lipoprotein), HDL (high-density lipoprotein) and triglyceride levels. Thus. all of the  tests set forth in ¶73 above (except for HbA1C - CPT code 83036) are not considered medically necessary to screen for these medical conditions or to assess the risk that these conditions pose to a patient's future cardiac health. Furthermore, if a patient receives a diagnosis

26

of fatigue and malaise, two lab tests would be appropriate (*i.e.* Thyroid tests and Diabetes test), but all of the other tests set forth in ¶73 above would not be medically necessary.

77.     Although diabetes is a risk factor for heart disease, tests for blood insulin (CPT Code 83525 in the chart above) are not appropriate to screen for diabetes and do not predict the future risk of developing diabetes.  They are only appropriate to monitor patients who already have diabetes.  Thus, tests for blood insulin do not predict a patient's cardiac risk. The American Heart Association and the American College of Cardiology's joint Guideline make no mention at all of blood insulin tests when discussing diabetic patients because such tests are not remotely connected to or within the realm of possibility for predicting cardiac risk.  The Guideline only discusses a Hemoglobin A1C test in the context of asymptomatic adults without a diagnosis of diabetes.  Thus, a blood insulin test is not appropriate to screen for cardiovascular diseases whereas Hemoglobin AIC may be appropriate.  The Guideline recommends Hemoglobin AIC for screening in certain circumstances, but doesn't even mention a blood insulin test ever because the blood insulin test is not at all relevant to screen for cardiovascular risk.

78.     Uric Acid (CPT Code 84550 in the chart above) and Vitamin D (CPT Code 82652 in the chart above) tests together or separately cannot and do not predict a patient's future risk of developing heart disease, and they are not recommended by any medical body for that purpose.

79.     CRP (C-reactive protein) (CPT Code 86141 in the chart above) appears in higher amounts when there is swelling (inflammation) somewhere in the body.  Although a C-reactive protein test can also be used to evaluate the risk of developing coronary artery disease, according to the American Heart Association and as set forth in the joint Guideline, having a C-reactive

protein test isn't recommended for the general population to evaluate the risk of developing heart disease.[10]

80.     With respect to the NT-proBNP test (Natriuretic Peptides) listed (CPT Code 83880 in the chart above), The American Heart Association and the American College of Cardiology's joint Guideline specifically state that **"Measurement of natriuretic peptides is not recommended for CHD [cardiac heart disease] risk assessment in asymptomatic adults."**

81.     Relator estimates that UHC paid out millions of dollars to Boston Heart for medically unnecessary testing for Medicare and Medicaid patients for 2013 alone.  Prior to 2013, there were no CPT billing codes for these cardiac tests so Relator is unable to track outlier payments by UHC to these labs in any year prior to 2013.  Before 2013, these tests were billed using CPT stacking codes 83890 - 82914, which were deleted effective January 1, 2013.  However, there is evidence of similar billing patterns prior to 2013 for medically unnecessary cardiac genetic and related additional tests using these stacking codes.

**D.     Boston Heart Is An Extreme Outlier in its Billing of Tests Purportedly Able to Predict Cardiac Risk**

82.     Relator's regular duties as National Medical Director of Women's Health and Genetics for United Healthcare include examining and evaluating the drivers of increased costs in women's care and genetic testing. She and her team examined the volume and type of genetic testing purportedly related to cardiac risk performed for thousands of patients by hundreds of laboratories that bill to United Healthcare.   Separately, UHC's Fraud, Waste & Abuse Department similarly analyzed claims submission data of these labs.  In mid to late 2013, the two

---

[10] http://www.mayoclinic.org/tests-procedures/c-reactive-protein/basics/definition/prc-20014480

separate UHC teams - Dr. Groat's team and UHC's Fraud, Waste & Abuse Department - compared findings and discovered they each had similar results.

83.     United Healthcare gained more insight into the lab's billing patterns for genetic testing purportedly related to cardiac risk by examining data for the year 2013 because specific CPT codes for genetic tests became effective January 1, 2013. Before 2013, genetic tests were billed using stacking CPT codes 83890–83914, which described the test process (e.g., DNA analysis), but not the actual test being performed.

84.     UHC identified a combination of seven tests that are frequently performed and billed by Boston Heart and specifically compared Boston Heart's billing of that combination to other laboratories. This combination of seven tests included:

- 81225 - CYP2C19 (cytochrome P450)
- 81401 - Molecular pathology procedure, Level 2
- 81241 - F5 gene analysis, Leiden variant
- 81240 - F2 gene analysis
- 83880 - Brain Natriuretic Peptide (BNP) Level: for Congestive Heart Failure patients
- 86141 - C-Reactive Protein
- 83090 - homocysteine testing (measurements of plasma homocysteine)

85.     Compared to other laboratories, Boston Heart was an extreme outlier in the frequency of billing this combination of seven tests. Boston Heart billed this combination to UHC more than any other laboratory - a total of 2,384 times, and being reimbursed over $4 million in 2013. LabCorp, the much larger laboratory that services a significantly greater percentage of UHC customers, billed this combination of seven tests a total of 46 times. Thus Boston Heart, a much smaller lab than LabCorp, billed this combination of tests 51.8 times more often than LabCorp.

86.     While individually one or some of these tests could be indicated based on a certain diagnosis, the chance that someone has all of the diagnoses needed to justify all the tests

on the panel is extremely unlikely.  Further, because there is no medical basis to group these tests together, some or many of them are almost always medically unnecessary any time they are performed collectively.

### E.    Boston Heart Claims Show the Fraudulent Billing

87.    Examples of specific claims show that Boston Heart was billing for medically unnecessary tests to screen for cardiac-related issues and predict future cardiac risk.  As just one example, in claim # 1334422155981 dated December 10, 2013, the patient was given ICD-9 code 272.2 - Mixed hyperlipidemia (high cholesterol), 401.9 - Essential hypertension, unspecified (high blood pressure), and 250.00 – Type II Diabetes.  Based on those diagnoses, Boston Heart performed, *inter alia*, the following unnecessary tests that do not predict cardiac risk and do not provide any relevant medical information concerning high cholesterol, high blood pressure or diabetes:

- 81225 – CYP2C19 (cytochrome P450)
- 81400 – App E Genotype
- 81401 – Molecular pathology procedure, Level 2
- 81240 – F2 gene analysis
- 81241 – F5 gene analysis, Leiden variant
- 82172 – Apolipoprotein
- 82947 – Thyroid Test
- 83525 – Thyroid Test
- 83695 – Lipoprotein (a)
- 83698 – Lipoprotein-associated phospholipase A2 (Lp-PLA2)
- 83880 – Brain Natriuretic Peptide (BNP) Level: for Congestive Heart Failure patients
- 85384 – Fibrinogen; activity
- 82040 – Albumin
- 82550 – Creatine Kinase
- 82565– BUN/Creatinine
- 84075 – Alkaline Phosphatase
- 84450 – AST
- 84460 – ALT
- 84520 – BUN
- 84550 – Uric Acid

- 83090 – homocysteine testing (measurements of plasma homocysteine)
- 83704 – LDL-P and DL-P
- 84443 – Thyroid Test
- 86141 - C-Reactive Protein

At an average price of $50-$100 per test, the false claims in this example totaled approximately

$1200 to $2400.

**F.      Boston Heart Targets General Practitioners and Other Non-Cardiology Physicians to Maximize its Test Revenues**

88.      Boston Heart bills itself as a leader in the field of cardiovascular testing and on

the cutting edge of scientific knowledge in this area:

**Our Exclusive Tests**

Boston Heart is transforming the treatment of cardiovascular disease by providing healthcare providers and their patients with novel, personalized diagnostics and reports with integrated, customized lifestyle programs that have the power to change the way clinicians and patients communicate about disease and improve heart health.[11]

Our unique approach, which includes proprietary tests and the application of cardio-informatics, unlocks information not available through any other laboratory. We go beyond test results by providing a comprehensive cardiovascular disease risk assessment and personalized treatment plan for each patient, as well as support tools to guide positive lifestyle and nutrition changes that can impact heart health.[12]

Our company was founded by accomplished lipidologists, clinicians and scientists who have dedicated their careers to revealing the mechanisms of cardiovascular disease progression. Through extensive research and clinical studies, they showed that standard lipid profiling did not adequately identify individuals at risk for cardiovascular disease. They went on to develop and make available advanced methodologies to address this unmet medical need.[13]

Everything we do, from the tests we perform through our treatment recommendations, uses an evidence-based approach, grounded in over thirty years of <u>original scientific research</u>. . . We are passionate about ongoing

---

[11] http://www.bostonheartdiagnostics.com/

[12] http://www.bostonheartdiagnostics.com/about_overview.php

[13] http://www.bostonheartdiagnostics.com/about_overview.php

discovery that yields solutions to predict, prevent, manage and reverse cardiovascular disease (CVD).[14]

89.     General Practitioners and other non-cardiology physicians are Boston Heart's primary target.     They are less sophisticated in the field of cardiovascular testing than cardiologists and more easily swayed by Boston Heart's false marketing statements as to the benefits of and scientific validation of its tests, recommendations, purported leadership in the cardiac testing field and structure of its claim form.   Indeed, when Relator met with Boston Heart representatives via WebEx on August 15, 2014 to educate them that their test panels included many unnecessary tests, she saw that Boston Heart had as its model physician a family practice physician.

90.     In an email dated August 15, 2014 from Jeff Craven, Vice President, Payor Innovation and Strategy at Boston Heart to Shawn Schwartz, Director of the National Lab Program at United Healthcare, regarding the volume of testing from a family practice physician, Mr. Craven transmits data showing an unusually large number of a family physician's patients receiving cardiac tests from Boston Heart in a single year. 1,358 of that physician's patients received such testing in one year, or approximately 5 patients per day. In a follow-up internal UHC email on the same day, Relator properly deemed this volume of testing "suspect."

91.     These non-cardiology physicians are more susceptible to Boston Heart's marketing message and more easily persuaded to accept its misrepresentations as a scientific leader in the field of cardiovascular testing, regarding the ability of its tests to predict cardiac risk.  As such, they were Boston Heart's target market.

### G.     Boston Heart Made False Statements to Market its Scientifically-Unproven and Worthless Tests

---

[14] http://www.bostonheartdiagnostics.com/science_overview.php

92. Boston Heart encourages providers to order these medically unnecessary tests through, *inter alia*, written marketing materials that claim these tests are "innovative methodologies for cardiovascular risk assessment"[15] and necessary to obtain all knowledge of future cardiac risks and potential cardiac complications. Those Boston Heart marketing materials specifically encourage the following medically unnecessary tests:

- Tests for HDL particles (CPT Codes 83704, 82664), including:

  - Apha-1: very large HDL particles
  - Alpha-2: large HDL particles
  - Alpha-3: medium HDL particles
  - Alpha-4: small HDL particles
  - Prebeta-1: very small HDL particles

As set forth in paragraph 75 above, these lipoprotein tests are not medically necessary and there is no data to support the finding that the results of these tests in any way inform how the provider would manage the patient's care.

- C-reactive protein (hs-CRP) (CPT Code 86141)

CRP (C-reactive protein) appears in higher amounts when there is swelling (inflammation) somewhere in the body. Although a C-reactive protein test can also be used to evaluate the risk of developing coronary artery disease, according to the American Heart Association, having a C-reactive protein test isn't recommended for the general population to predict risk of heart disease.[16] *See* paragraph 79 above.

- Tests for risk of developing diabetes (which could increase the risk of heart disease), including (with CPT Codes):

  - HbA1c – average blood sugar over 3 months      81506
  - Insulin Resistance – body's ability to process sugar      83525
  - Glucose – actual amount of sugar in the blood      82947

---

[15] http://www.bostonheartdiagnostics.com/science_portfolio.php
[16] http://www.mayoclinic.org/tests-procedures/c-reactive-protein/basics/definition/prc-20014480

|   |   |   |
|---|---|---|
| o | GSP – average blood sugar over 6 weeks | 82985 |
| o | Adinopectin – protective hormone produced by fat cells | 83516 |
| o | Insulin – hormone that controls blood sugar | 83525 |

Glucose and HbA1c can be used to screen for diabetes. The other tests are not appropriate to screen for diabetes and do not predict the future risk of developing diabetes. They are only appropriate to monitor patients who already have diabetes or other metabolic disorders. *See* paragraph 77 above. This is an example of Boston Heart combining 2 medically necessary tests (Glucose and HbA1c) with 4 medically unnecessary tests, but billing separately for each of the 6 tests.

- Liver, Kidney, Muscle, Thyroid and Other Tests, including (with CPT Codes):

|   |   |   |
|---|---|---|
| o | AST | 84450 |
| o | ALT | 84460 |
| o | Alkaline Phosphatase | 84075 |
| o | Creatine Kinase | 82550 |
| o | BUN/Creatinine | 82565 |
| o | NT-proBNP | 83880 |
| o | Uric Acid | 84550 |
| o | Homocysteine | 83090 |
| o | eGFR | 82565 |
| o | BUN | 84520 |
| o | TSH | 84443 |
| o | Albumin | 82040 |
| o | Vitamin D.25-OH | 82652 |

These tests together cannot and do not predict one's future risk of developing cardiac disease, and they are not recommended by any medical body for that purpose.

93.     Furthermore, these test results in no way change or affect the therapy that Boston Heart recommends, which includes proper diet, exercise, healthy body weight and no smoking.

94.     Below is a chart summarizing all of the medically unnecessary tests (both genetic and non-genetic) regularly performed by Boston Heart and falsely billed to Medicare, Medicaid and Tricare, either directly or indirectly. The chart shows in summary the reasons for the lack of

medical necessity in light of the 4 common diagnosis codes used.   In all cases the medically unnecessary tests do not change or affect the treatment of the patient or provide any useful information to evaluate the cardiac risk.

Tests which are unequivocally not medically necessary for the following diagnoses:

a) Routine general medical examination at a health care facility (ICD-9 Code V70.0)

b) Essential hypertension (high blood pressure) (ICD-9 Code 401)
   Hypertension, malignant (401.0)
   Hypertension, benign (401.1)
   Hypertension, Unspecified (401.9)

c) Other and unspecified hyperlipidemia (high cholesterol) (ICD-9 Code 272.4)

d) Other malaise and fatigue (ICD-9 Code 780.79)

| CPT Code | Description of Test | The ICD-9 Codes that Commonly Support Medical Necessity of the Test |
|---|---|---|
| 81240 81241 | F2 (prothrombin, coagulation factor II) (e.g., hereditary hypercoagulability) gene analysis, 20210G>A variant F5 (coagulation factor V) (e.g., hereditary hypercoagulability) gene analysis, Leiden variant | ICD-9 codes 415.1, 452 and 453: Venous thromboembolism (deep vein thrombosis, pulmonary embolism) These tests have FDA marketing clearance for use as an aid in the diagnosis of patients with suspected thrombophilia, but are not FDA approved for evaluation of cardiac risk. |
| 81291 | MTHFR (5,10-methylenetetrahydrofolate reductase) (e.g., hereditary hypercoagulability) gene analysis, common variants (e.g., 677T, 1298C) | ICD-9 codes 415.1, 452 and 453: Venous thromboembolism (deep vein thrombosis, pulmonary embolism) This test has FDA marketing clearance for use as an aid in the diagnosis of patients with suspected thrombophilia, but is not FDA approved for evaluation of cardiac risk |
| 81225 | CYP2C19 (cytochrome P450, family 2, subfamily C, polypeptide 19) (e.g., | ICD-9 codes 410, 411, 412: Myocardial infarction, which results |

| | | |
|---|---|---|
| | drug metabolism) gene analysis, common variants (e.g., *2, *3, *4, *8, *17) | in patients taking Plavix<br>(one test per patient per lifetime)<br><br>This test has FDA marketing clearance only to aid clinicians in determining therapeutic strategy for therapeutics that are metabolized by the CYP450 2C19 gene product (i.e. CYP2C19 with clopidogrel/Plavix) |
| 81355 | Genotyping to determine cytochrome p450 2C9 (CYP2C9) and  vitamin K epoxide reductase subunit C1 (VKORC1) genetic polymorphisms for the purpose of managing the administration and dosing of warfarin | This test is medically necessary only for patients taking the drug warfarin if they are enrolled in a research study looking at pharmacogenomic testing of CYP2C9 or VKORC1 alleles to predict warfarin response.<br><br>Warfarin is sold under the brand names Coumadin, Jantoven, Marevan, Uniwarfin.<br>(one test per patient per lifetime)<br><br>FDA approved only to evaluate people taking warfarin. |
| 81401 | Molecular pathology procedure, Level 2, used for apolipoprotein E genotyping (ABL Kinase Domain Mutation in CML) | ICD-9 codes: None.<br><br>There is **no** evidence that the assessment of additional lipid parameters leads to an improved net health outcome<br><br>Not FDA approved. |
| 83700<br>83704<br>83701<br>83695<br>82172<br>82664<br>82726 | Additional cholesterol particles through miscellaneous CPT Codes - Testing for LDL subspecies (small and large LDL particles), HDL subspecies, apolipoprotein E. apolipoprotein A-1, apolipoprotein B, etc. | ICD-9 codes: None.<br><br>There is **no** evidence that the assessment of additional lipid parameters leads to an improved net health outcome.<br><br>These tests have FDA marketing clearance to measure cholesterol particles. |
| 82652 | Vitamin D | ICD-9 code 268: |

36

| | | Vitamin D deficiency |
| --- | --- | --- |
| | | This test has FDA marketing clearance for the assessment of vitamin D sufficiency, but is not FDA approved for evaluation of cardiac risk. |
| 86141 | hsCRP (Hi-sensitivity C-reactive protein) | This test is **never** medically necessary and is not FDA approved |
| 84550 | Uric Acid | ICD-9 code 274: Gout disease |
| | | This test has FDA marketing clearance to measure uric acid levels, but is not FDA approved for evaluation of cardiac risk. |
| 83876 | MPO | ICD-9 code 710.0: Autoimmune diseases |
| | | This test is FDA approved to aid in the evaluation of patients presenting with chest pain that are at risk for major adverse cardiac events, but is not FDA approved for evaluation of cardiac risk. |
| 81506 | Endocrinology assay (Type 2 diabetes) | ICD-9 code 250.02: Type 2 Diabetes |
| | | This test is not FDA approved. |
| 85384 | Fibrinogen | ICD-9 codes  571.4, 286.6: Liver disease and bleeding disorders |
| | | This test is FDA approved to evaluate for blood clotting disorders in people with excessive bleeding but is not FDA approved for evaluation of cardiac risk. |
| 83880 | NT-proBNP | ICD-9 code 428.0: Heart Failure |

| | | This test is FDA approved to test plasma BNP as an aid in the diagnosis of heart failure, but is not FDA approved for evaluation of cardiac risk. |
|---|---|---|
| 82726 | FFA/NEFA | ICD-9 code 277.86: peroxisomal diseases (a rare disease related to high levels of very long chain fatty acids mainly diagnosed in kids) |
| | | This test is not FDA approved. |
| 83090 | Homocysteine w/ rofle | ICD-9 codes 415.1, 452 and 453: Venous thromboembolism (deep vein thrombosis, pulmonary embolism); |
| | | ICD-9 code 266.2: vitamin B12 deficiency |
| | | This test is FDA approved to measure homocysteine levels, but is not FDA approved for evaluation of cardiac risk. |
| 83036 | HbA1C | ICD-9 code 250: Diabetes |
| | | This test is FDA approved for monitoring a patient's blood glucose (sugar) control and diagnosing diabetes, but is not FDA approved for evaluation of cardiac risk. |
| 82610 | Cystatin-C | ICD-9 code 584, 585: Kidney disease |
| | | This test is FDA approved for evaluating kidney disease, but is not FDA approved for evaluation of cardiac risk. |
| 0111T | Omega 3 | ICD-9 codes: None. |

| | | |
|---|---|---|
| | | Never medically necessary and not FDA approved. |
| 84431 | AspirinWorks | ICD-9 codes: None. |
| | | Never medically necessary and not FDA approved. |

## VI.   COUNTS

### COUNT I

#### Federal False Claims Act
#### 31 U.S.C. §§3729(a)(1)(A) and (a)(1)(B)

95.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

96.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

97.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval, within the meaning of 31 U.S.C. §3729(a)(1)(A).

98.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, within the meaning of 31 U.S.C. §3729(a)(1)(B).

99.     The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

100.    By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

101.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

## COUNT II

### Federal False Claims Act
### 31 U.S.C. §3729(a)(1)(G)

102.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

103.    This is a claim for penalties and treble damages under the Federal False Claims Act.

104.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government, within the meaning of 31 U.S.C. §3729(a)(1)(G).

105.    As a result, monies were lost to the United States through the non-payment or non-transmittal of money or property owed to the United States by the Defendant, and other costs were sustained by the United States.

106.    By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

107.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every false record or statement knowingly made, used, or caused to be made or used to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

## COUNT III

### California False Claims Act
### Cal Gov't. Code §12651(a)(1)-(2), (7)
### (Against All Defendant)

108.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

109.    This is a claim for treble damages and penalties under the California False Claims Act.

110.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

111.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the California State Government to approve and pay such false and fraudulent claims.

112.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the California State Government.

113.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

114.    By reason of the Defendant's acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

115.    Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

41

## COUNT IV

### Colorado Medicaid False Claims Act
### C.R.S. §25.5-4-303.5 et seq.

116.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

117.    This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

118.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

119.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Colorado State Government to approve and pay such false and fraudulent claims.

120.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Colorado State Government.

121.    The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

122.    By reason of the Defendant's acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

123.    Additionally, the Colorado State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT V

### Connecticut False Claims Act
### Conn. Gen. Stat. § 17b-301b

124.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

125.     This is a claim for treble damages and penalties under the Connecticut False Claims Act.

126.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

127.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Connecticut State Government to approve and pay such false and fraudulent claims.

128.     The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

129.     By reason of the Defendant's acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

130.     Additionally, the Connecticut State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT VI

### Delaware False Claims And Reporting Act
### 6 Del C. §1201(a)(1)-(2), (7)

131.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

132.    This is a claim for treble damages and penalties under the Delaware False Claims And Reporting Act.

133.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

134.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Delaware State Government to approve and pay such false and fraudulent claims.

135.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Delaware State Government.

136.    The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

137.    By reason of the Defendant's acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

138.    Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT VII

### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)(a)-(b), (g)

139.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

140.    This is a claim for treble damages and penalties under the Florida False Claims Act.

141.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

142.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Florida State Government to approve and pay such false and fraudulent claims.

143.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Florida State Government.

144.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

145.    By reason of the Defendant's acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

146.    Additionally, the Florida State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT VIII
### Georgia False Medicaid Claims Act
### Ga. Code Ann. §49-4-168.1(1)-(2), (7)

147.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

148.    This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

149.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

150.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to get the Georgia State Government to approve and pay such false and fraudulent claims.

151.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Georgia State Government.

152.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

153.    By reason of the Defendant's acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

154.    Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT IX

### Hawaii False Claims Act
### Haw. Rev. Stat. §661-21(a)(1)-(2), (7)

155.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

156.    This is a claim for treble damages and penalties under the Hawaii False Claims Act.

157.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

158.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Hawaii State Government to approve and pay such false and fraudulent claims.

159.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Hawaii State Government.

160.    The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

161.    By reason of the Defendant's acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

162.    Additionally, the Hawaii State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT X

### Illinois Whistleblower Reward And Protection Act
### 740 Ill. Comp. Stat. §175/3(a)(1)-(2), (7)

163.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

164.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act.

165.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

166.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

167.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Illinois State Government.

168.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

169.    By reason of the Defendant's acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

170.    Additionally, the Illinois State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XI

### Indiana False Claims and Whistleblower Protection Act
### IC 5-11-5.5-2(b)(2), (6)

171.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

172.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

173.    By virtue of the acts described above, Defendant knowingly made or used false records and statements to obtain payment or approval of a false claim from the Indiana State Government.

174.    By virtue of the acts described above, Defendant knowingly made or used false records or statements to avoid an obligation to pay or transmit property to the Indiana State Government.

175.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

176.    By reason of the Defendant's acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

177.    Additionally, the Indiana State Government is entitled to a penalty of at least $5,000 for each and every violation alleged herein.

## COUNT XII

### Iowa False Claims Act
### Iowa Code Ann. § 685.2(1)(A), (B), (G)

178.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

179.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

180.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

181.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

182.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Iowa State Government.

183.    The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

184.    By reason of the Defendant's acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

185.    Additionally, the Iowa State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIII

### Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat. § 46:438.3(A)-(C)

186.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

187.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

188.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government.

189.    By virtue of the acts described above, Defendant knowingly engaged in misrepresentation or made, used, or caused to be made or used false records and statements, to obtain payment for false and fraudulent claims from the Louisiana State Government.

190.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Louisiana State Government.

191.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

192.    By reason of the Defendant's acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

193.    Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### Count XIV

### The Maryland False Health Claims Act
### Md. Code Ann., Health-Gen. §§ 2-602(A)(1), (2)

194.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

195.    This is a claim for treble damages and penalties under the Maryland False Health Claims Act.

196.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

197.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

198.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Maryland State Government.

199.    The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

200.    By reason of the Defendant's acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

201.    Additionally, the Maryland State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XV

### Massachusetts False Claims Law
### Mass. Gen. Laws ch. 12 §5B(1)-(2), (8)

202.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

203.    This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

52

204.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

205.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

206.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Massachusetts State Government.

207.    The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

208.    By reason of the Defendant's acts, the State of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

209.    Additionally, the Massachusetts State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XVI

### Michigan Medicaid False Claims Act
### §400.603(1)-(2)

210.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

211.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

212.    By virtue of the acts described above, Defendant knowingly made or caused to be made a false statement or false representation of material fact in an application for Medicaid benefits to the Michigan State Government.

213.    By virtue of the acts described above, Defendant knowingly made or caused to be made a false statement or false representation of material fact for use in determining rights to a Medicaid benefit.

214.    The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

215.    By reason of the Defendant's acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

216.    Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Count XVII

### Minnesota False Claims Act
### Minn. Stat. §15c.02 et seq.

217.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

218.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

219.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

220.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Minnesota State Government to approve and pay such false and fraudulent claims.

221.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Minnesota State Government.

222.    The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

223.    By reason of the Defendant's acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

224.    Additionally, the Minnesota State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XVIII

### Montana False Claims Act
### Mont. Code Ann. 17-8-403(1)(a)-(b), (g)

225.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

226.    This is a claim for treble damages and penalties under the Montana False Claims Act.

227.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

228.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or  used false records and statements, to get the Montana State Government to approve and pay such false and fraudulent claims.

229.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Montana State Government.

230.    The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

231.    By reason of the Defendant's acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

232.    Additionally, the Montana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIX

### Nevada Submission of False Claims
### to State or Local Government Act
### Nev. Rev. Stat. Ann. §357.040(1)(a)-(b), (g)

233.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

234.    This is a claim for treble damages and penalties under the Nevada Submission of False Claims to State or Local Government Act.

235.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

236.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

237.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Nevada State Government.

238.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

239.    By reason of the Defendant's acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

240.    Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XX

### New Jersey False Claims Act
### N.J. Stat. §2A:32C-3(a)-(b), (g)

241.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

242.     This is a claim for treble damages and penalties under the New Jersey False Claims Act.

243.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

244.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the New Jersey State Government to approve and pay such false and fraudulent claims.

245.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New Jersey State Government.

246.     The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

247.     By reason of the Defendant's acts, the New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

248.     Additionally, the New Jersey State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XXI

### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann. § 27-14-3(a)(1)-(2), (7)

249.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

250.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

251.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

252.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

253.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New Mexico State Government.

254.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

255.    By reason of the Defendant's acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

256.    Additionally, the New Mexico State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXII

### New York False Claims Act
### NY CLS St. Fin. §189(a)-(b), (g)

257.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

258.    This is a claim for treble damages and penalties under the New York False Claims Act.

259.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

260.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the New York State Government to approve and pay such false and fraudulent claims.

261.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New York State Government.

262.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

263.    By reason of the Defendant's acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

264.    Additionally, the New York State Government is entitled to the maximum penalty of $12,000 for each and every violation alleged herein.

## COUNT XXIII

### North Carolina False Claims Act
### 2009-554 N.C. Sess. Laws §1-607(a)(1)-(2), (7)

265.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

266.    This is a claim for treble damages and penalties under the North Carolina False Claims Act.

267.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

268.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the North Carolina State Government to approve and pay such false and fraudulent claims.

269.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the North Carolina State Government.

270.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

271.    By reason of the Defendant's acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

272.    Additionally, the North Carolina State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XXIV

### Oklahoma Medicaid False Claims Act
### Okla. Stat. tit. 63, §5053.1B (1)-(2), (7)

273.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

274.     This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

275.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

276.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Oklahoma State Government to approve and pay such false and fraudulent claims.

277.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Oklahoma State Government.

278.     The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

279.     By reason of the Defendant's acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

280.     Additionally, the Oklahoma State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXV

### Rhode Island State False Claims Act
### R.I. Gen. Laws §9-1.1-3(1)-(2), (7)

281.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

282.    This is a claim for treble damages and penalties under the Rhode Island State False Claims Act.

283.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

284.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Rhode Island State Government to approve and pay such false and fraudulent claims.

285.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Rhode Island State Government.

286.    The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

287.    By reason of the Defendant's acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

288.    Additionally, the Rhode Island State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXVI

### Tennessee False Claims Act and Medicaid False Claims Act
### Tenn. Code Ann. §§ 4-18-103(a)(1)-(2), (7)
### and 71-5-181(a)(1)(A), (B) and (D)

289.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

290.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Law.

291.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

292.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

293.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Tennessee State Government.

294.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

295.    By reason of the Defendant's acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

296.     Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXVII

### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. §36.002(4)(B), (12)

297.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

298.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act.

299.     By virtue of the acts described above, Defendant knowingly made, caused to be made, induced or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program.

300.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Texas State Government.

301.     The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

302.     By reason of the Defendant's acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

303.     Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXVIII

### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §8.01-216.3(a)(1)-(2), (7)

304.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

305.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

306.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

307.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

308.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Virginia State Government.

309.    The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

310.    By reason of the Defendant's acts, the State of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

311.    Additionally, the Virginia State Government is entitled to the maximum penalty $11,000 for each and every violation alleged herein.

## COUNT XXIX

### Washington Health Care False Claim Act
### Wash. Rev. Code §§ 48.80.030(1), (2), (3)

312.   Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

313.   This is a claim for treble damages and penalties under the Washington Health Care False Claims Act.

314.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

315.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Washington State Government to approve and pay such false and fraudulent claims.

316.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Washington State Government.

317.   The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

318.   By reason of the Defendant's acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

319.   Additionally, the Washington State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XXX

### Wisconsin False Claims For Medical Assistance Act
### Wis. Stat. §20.931(2)(a)-(b), (g)

320.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

321.    This is a claim for treble damages and penalties under the Wisconsin False Claims for Medical Assistance Act.

322.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

323.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Wisconsin State Government to approve and pay such false and fraudulent claims.

324.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Wisconsin State Government.

325.    The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

326.    By reason of the Defendant's acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

327.    Additionally, the Wisconsin State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXXI

### District of Columbia False Claims Act
### D.C. Code Ann. §2-308.14(a)(1)-(2), (7)

328.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

329.    This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

330.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

331.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the District of Columbia Government to approve and pay such false and fraudulent claims.

332.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the District of Columbia Government.

333.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

334.    By reason of the Defendant's acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

335.    Additionally, the District of Columbia Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## REQUESTS FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and the Plaintiff States, demands that judgment be entered in their favor and against Defendant for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

This Request also includes, with respect to the state statutes cited above, the maximum damages permitted by those statutes and the maximum fine or penalty permitted by those statutes, and any other recoveries or relief provided for under the State FCA's.

Further, Relator requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the Plaintiff States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated: May 1, 2015     **THE EMPLOYMENT LAW GROUP, P.C.**

By:   /s/ David L. Scher      
R. Scott Oswald (D.C. Bar No. 458859)
David L. Scher (D.C. Bar No. 474996)
The Employment Law Group, P.C.
888 17th Street NW, 9th Floor
Washington, D.C.  20006
Tel: (202) 331-2802
Fax: (202) 261-2835

**BERGER & MONTAGUE, P.C.**

Sherrie R. Savett (to be admitted *pro hac vice*)
Russell D. Paul (to be admitted *pro hac vice*)
Benjamin A. Waters (to be admitted *pro hac vice*)
1622 Locust Street
Philadelphia, PA  19103
Tel: (215) 875-3000
Fax: (215) 875-4636

**RECEIVED**

MAY - 1 2015

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,        )
THE STATE OF CALIFORNIA, THE     )
STATE OF CONNECTICUT, THE        )
STATE OF COLORADO, THE           )
STATE OF DELAWARE, THE           )
STATE OF FLORIDA, THE STATE      )
OF GEORGIA, THE STATE OF         )
HAWAII, THE STATE OF ILLINOIS,   )
THE STATE OF INDIANA, THE        )
STATE OF LOUISIANA, THE          )
STATE OF MARYLAND, THE           )
COMMONWEALTH  OF                 )
MASSACHUSETTS, THE STATE OF      )
MICHIGAN, THE STATE OF           )
MINNESOTA, THE STATE OF          )
MONTANA, THE STATE OF            )
NEVADA, THE STATE OF NEW         )
JERSEY, THE STATE OF NEW         )
MEXICO, THE STATE OF NEW         )
YORK, THE STATE OF NORTH         )
CAROLINA, THE STATE OF           )
OKLAHOMA, THE STATE OF           )
RHODE ISLAND, THE STATE OF       )
TENNESSEE, THE STATE OF          )
TEXAS, THE COMMONWEALTH          )
OF VIRGINIA, THE STATE OF        )
WASHINGTON, THE STATE OF         )
WISCONSIN and DISTRICT OF        )
COLUMBIA *ex rel.* TINA D. GROAT, )
M.D., M.B.A.                     )
                                 )
        Plaintiffs,              )
                                 )
    v.                           )
                                 )
BOSTON HEART DIAGNOSTICS         )
CORPORATION AND HEALTH           )
DIAGNOSTIC LABORATORIES          )
INCORPORATED                     )
                                 )
        Defendants.              )

**CASE NO**. 1:15-CV-00487 (RBW)

**FILED UNDER SEAL**

**RELATOR'S NOTICE OF PARTIAL
DISMISSAL UNDER F. R. C. P. 41 OF ALL
CLAIMS AGAINST HEALTH
DIAGNOSTIC LABORATORIES
INCORPORATED WITH PREJUDICE**

**DEMAND FOR JURY TRIAL**

**RELATOR'S NOTICE OF PARTIAL DISMISSAL UNDER F. R. C. P. 41 OF ALL
CLAIMS AGAINST HEALTH DIAGNOSTIC LABORATORIES
INCORPORATED WITH PREJUDICE**

Relator Tina D. Groat, M.D. ("Relator") pursuant to Rule 41(a)(1)(A)(i) of the Federal

Rules of Civil Procedure, files this Notice of Partial Dismissal ("Notice") of all claims asserted

against Defendant Health Diagnostic Laboratories Incorporated ("Health Diagnostics"), with

prejudice.

## I.    <u>Introduction</u>

1.     On February 3, 2015, Relator  filed this civil action against Health Diagnostics

and Boston Heart Diagnostics Corporation ("Boston Heart) for violations of the Federal False

Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, and for violations of the following State False

Claims Acts ("State FCAs"): The California False Claims Act, Cal. Gov't Code §§12650 *et seq.*;

The Colorado Medicaid False Claims Act, § 25.5-4-304, *et seq.*; The Connecticut False Claims

Act, Conn. Gen. Stat. § 17b-301b; The District of Columbia False Claims Act, D.C. Code Ann.

§§2-308.03 *et seq.*; The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§1201

*et seq.*; The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*; The Georgia False Medicaid

Claims Act, Ga. Code Ann. §§49-4-168 *et seq.*; The Hawaii False Claims Act, Haw. Rev. Stat.

§§661-21 *et seq.*; The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat.

Ann. §§175/1 *et seq.*; The Indiana False Claims and Whistleblower Protection Act, Indiana Code

§5-11-5.5; The Iowa False Claims Act, §685.1, *et seq.*; The Louisiana Medical Assistance

Programs Integrity Law, La. R.S. 46:437.1 *et seq.*; The Maryland False Health Claims Act, § 2-

601, *et seq.*; The Massachusetts False Claims Act, Mass. Ann. Laws. Ch. 12, §§5A *et seq.*; The

Michigan Medicaid False Claims Act, MCLS §§400.601 *et seq.*; Minnesota False Claims Act,

Minn. Stat. § 15C.01 *et seq.*; Montana False Claims Act, Mont. Code Anno. §§17-8-401 et *seq.*;

The Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; The New Jersey False Claims

Act, N.J. Stat. §2A:32C-1 *et seq.*; The New Mexico Medicaid False Claims Act, N.M. Stat. Ann.

§§ 27-14-1 *et seq.*; The New York False Claims Act, NY CLS St. Fin. §§187 *et seq.*; The North

Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§1-605 *et seq.*; The Oklahoma Medicaid

False Claims Act, Okla. Stat. tit. 63, §§5053 *et seq.*; The Rhode Island False Claims Act, R.I.

Gen. Laws §§9-1.1-1 *et seq.*; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§

71-5-171 *et seq.*; The Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 *et

seq.*; The Virginia Fraud Against Taxpayers Act, Va. Code §§8.01-216.1 *et seq.*; The

Washington Medicaid Fraud False Claims Act, RCW 74.09.201 *et seq.*; and the Wisconsin False

Claims for Medical Assistance Act, Wis. Stats. §§20.931.

     2.      On or about April 2, 2015, this case was transferred from the Eastern District of

Virginia (Case No. 1:15-CV-121) to the District of Columbia pursuant to a request of the United

States Department of Justice, which Relator consented to.

     3.      Health Diagnostics has not appeared in this lawsuit by answering the complaint or

any amended complaint or by filing any responsive pleading or motion.

     4.      This case is not subject to Federal Rule of Civil Procedure 23(e), 23.1(c), 23.2 or

66, nor does it involve a federal statute requiring the Court to dismiss the action, once filed.

## II.   Dismissal of Defendant Health Diagnostics

     5.      Pursuant to Rule 41(a)(1)(A)(i), Relator now dismisses her claims and causes of

action, with prejudice, against Defendant Health Diagnostics, without costs to any party as

against the other, through the filing of this Notice of Partial Dismissal.

     6.      Prior to the filing of this Notice, Relator has not dismissed an action against

Health Diagnostics based on or including the same claims as those presented in this action.

7.     Relator has been informed by the United States Department of Justice that the United States consents to this dismissal of Defendant Health Diagnostics, and will separately file its own formal Consent to Dismissal.

## III.     Defendant Boston Heart is Not Dismissed

8.     The filing of this Notice is not effective on, nor does it dismiss, any claims asserted against Defendant Boston Heart, nor does it dismiss Boston Heart as a defendant in this action.

9.     Relator has filed, simultaneously with her filing this Notice of Partial Dismissal, a Motion for Leave to File a First Amended Complaint, which attaches an Amended Complaint in this action that alleges violations of the FCA and State FCAs by Defendant Boston Heart alone. Health Diagnostics is not named as a Defendant in the Amended Complaint and there are no allegations at all against Health Diagnostics contained in the Amended Complaint.


Dated: May 1, 2015                    **THE EMPLOYMENT LAW GROUP, P.C.**


                                      By:___/s/ David L. Scher_____
                                      R. Scott Oswald (D.C. Bar No. 458859)
                                      David L. Scher (D.C. Bar No. 474996)
                                      The Employment Law Group, P.C.
                                      888 17th Street NW, 9th Floor
                                      Washington, D.C.  20006
                                      Tel: (202) 331-2802
                                      Fax: (202) 261-2835

                                      **BERGER & MONTAGUE, P.C.**

                                      Sherrie R. Savett (to be admitted *pro hac vice*)
                                      Russell D. Paul (to be admitted *pro hac vice*)
                                      Benjamin A. Waters (PA I.D. #313494)
                                      1622 Locust Street
                                      Philadelphia, PA  19103
                                      Tel: (215) 875-3000
                                      Fax: (215) 875-4636

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2015 a true and correct copy of the Relator's Rule 41

Motion to Dismiss of All Claims Against Health Diagnostic Laboratories Incorporated with

Prejudice was served on the following via certified mail:

| | | |
|---|---|---|
| Hon. Eric H. Holder, Jr. Attorney General United States Department of Justice 950 Pennsylvania Avenue, N.W. Washington D.C. 20530-0001 | Kamala D. Harris Attorney General Office of the Attorney General 1300 "I" Street, Suite 1740 Sacramento, CA 95814 | Ken Paxton, Attorney General Office of the Attorney General Capitol Station P.O. Box 12548 Austin, TX 78711-2548 |
| Robert B. Teitelman Assistant Attorney General State of Connecticut 55 Elm Street Hartford, CT 06141-0120 | Joseph R. Biden, III Attorney General Carvel State Office Building 820 N. French Street Wilmington, DE 19801 | Brad Schimel Attorney General Wisconsin Department of Justice State Capitol, Room 114 East P.O. Box 7857 Madison, WI 53707-7857 |
| Pam Bondi, Attorney General State of Florida The Capitol PL-01 Tallahassee, FL 32399-1050 | Jeff Atwater Chief Financial Officer Florida Dept. Of Financial Services 200 East Gaines Street Tallahassee, FL 32399-0300 | Sam Olens Attorney General 40 Capitol Square SW Atlanta, GA 30334-1300 |
| Lisa Madigan Attorney General James R. Thompson Ctr. 100 W. Randolph Street Chicago, IL 60601 | Greg Zoeller Attorney General Indiana Government Center South 302 W. Washington Street, 5th Fl. Indianapolis, IN 46204 | Russell Suzuki Attorney General 425 Queen Street Honolulu, HI 46813 |
| James D. Caldwell Attorney General P.O. Box 94095 Baton Rouge, LA 70804-4095 | Maura Healey Attorney General One Ashburton Place Boston, MA 02108-1698 | Bill Schuette Attorney General 525 W. Ottawa Street P.O. Box 30212 Lansing, MI 48908-0212 |

| | | |
|---|---|---|
| Herbert H. Slatery III<br>Attorney General<br>425 5th Avenue North<br>Nashville, TN 37243 | Roy Cooper<br>Attorney General<br>Department of Justice<br>P.O. Box 629<br>Raleigh, NC 27602-0629 | John Jay Hoffman<br>Acting Attorney General<br>Richard J. Hughes Justice<br>Complex<br>25 Market Street<br>P.O. Box 080<br>Trenton, NJ 08625 |
| Hector Balderas<br>Attorney General<br>State of New Mexico<br>P.O. Drawer 1508<br>Santa Fe, NM 87504-1508 | Adam Paul Laxalt<br>Attorney General<br>Office of the Attorney General<br>Old Supreme Ct. Building<br>100 North Carson Street<br>Carson City, NV 89701 | Niki Batt<br>Medicaid Fraud Control Unit<br>Office of the Attorney<br>General<br>313 N.E. 21st Street<br>Oklahoma City, OK 73105 |
| Karl Racine<br>Attorney General<br>441 4th Street, NW<br>Suite 1100S<br>Washington, DC 20001 | Mark Herring<br>Attorney General<br>Office of the Attorney General<br>900 East Main Street<br>Richmond, VA 23219 | Brent Earnest<br>Cabinet Secretary<br>New Mexico Human<br>Services Department<br>Office of the Secretary<br>P.O. Box 2348<br>Santa Fe, NM 87504 |
| Tim Fox<br>Attorney General<br>Justice Building<br>215 N. Sanders<br>Helena, MT 59620-1401 | Eric Schneiderman<br>Attorney General<br>Department of Law<br>The Capitol, 2nd Floor<br>Albany, NY 12224 | Peter Kilmartin<br>Attorney General<br>150 S. Main Street<br>Providence, RI 02903 |
| Walter Smith<br>Assistant Attorney<br>General<br>Medicare Fraud Control<br>Unit<br>2425 Bristol Court, SW<br>P.O. Box 40114<br>Olympia, WA 98504 | Douglas F. Gansler<br>Attorney General<br>200 St. Paul Place<br>Baltimore, MD 21202-22012 | Lori Swanson<br>Attorney General<br>State Capitol, Suite 102<br>St. Paul, MN 55155 |
| John Suthers<br>Attorney General<br>1300 Broadway 10th Floor | Dana J. Boente<br>U.S. Attorney for the Eastern<br>District of Virginia | |

| Denver, CO  80203 | Gerard Mene<br>Affirmative Civil Enforcement<br>Supervisor<br>Justin W. Williams U.S.<br>Attorneys Building<br>2100 Jamieson Avenue<br>Alexandria, VA  22314 | |

/s/ David L. Scher
David L. Scher