# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, )
THE STATE OF CALIFORNIA, THE )
STATE OF CONNECTICUT, THE )
STATE OF COLORADO, THE )
STATE OF DELAWARE, THE )
STATE OF FLORIDA, THE STATE )
OF GEORGIA, THE STATE OF )
HAWAII, THE STATE OF ILLINOIS, )
THE STATE OF INDIANA, THE )    **CASE NO. : 1:15-cv-00487 (RBW)**
STATE OF LOUISIANA, THE )
STATE OF MARYLAND, THE )        **FILED UNDER SEAL**
COMMONWEALTH  OF )
MASSACHUSETTS, THE STATE OF )   **RELATOR'S SECOND AMENDED**
MICHIGAN, THE STATE OF )        **COMPLAINT PURSUANT TO THE**
MINNESOTA, THE STATE OF )       **FEDERAL FALSE CLAIMS ACT, 31 U.S.C.**
MONTANA, THE STATE OF )         **§§ 3729 *ET SEQ.* AND PENDENT STATE**
NEVADA, THE STATE OF NEW )      **FALSE CLAIMS ACTS**
JERSEY, THE STATE OF NEW )
MEXICO, THE STATE OF NEW )      **DEMAND FOR JURY TRIAL**
YORK, THE STATE OF NORTH )
CAROLINA, THE STATE OF )
OKLAHOMA, THE STATE OF )
RHODE ISLAND, THE STATE OF )
TENNESSEE, THE STATE OF )
TEXAS, THE COMMONWEALTH )
OF VIRGINIA, THE STATE OF )
WASHINGTON, THE STATE OF )
WISCONSIN and DISTRICT OF )
COLUMBIA *ex rel*. TINA D. GROAT, )
M.D., M.B.A )
)
        Plaintiffs, )
)
        v. )
)
BOSTON HEART DIAGNOSTICS )
CORPORATION )
)
        Defendant. )
)
)
_____ )

TABLE OF CONTENTS

I.    SUMMARY OF THE ACTION ................................................................................. 2

II.   THE PARTIES ...................................................................................................... 5

III.  JURISDICTION AND VENUE ................................................................................ 9

IV.   APPLICABLE LAW ............................................................................................... 9

      A.   The False Claims Acts ................................................................................ 9

      B.   Only "Medically Necessary" Laboratory Tests are Reimbursable ...................... 10

      C.   Relevant Definitions ................................................................................. 16

      D.   Billing For a Laboratory Test ..................................................................... 16

V.    THE FALSE CLAIMS SCHEME: BILLING FOR MEDICALLY UNNECESSARY
      TESTS BOSTON HEART FALSELY CLAIMS PREDICT CARDIAC RISK .............. 18

      A.   Boston Heart Fraudulently Performs and Bills the Government for Medically
           Unnecessary Tests ................................................................................... 18

           1.   Boston Heart Performs the Vast Majority of its Tests to Screen for Current
                Heart Disease or to Assess the Risk of Future Heart Disease, Which Render
                Them Medically Unnecessary ............................................................ 20

           2.   These Tests are Medically Unnecessary Because They Are Being Used to
                Assess Cardiac Risk ........................................................................ 21

           3.   These Tests are Medically Unnecessary Because They Are Being Used for
                Screening Purposes ......................................................................... 22

      B.   Government and Scientific Authority Specifically State that Boston Heart's
           Genetic Tests are Not Medically Necessary ................................................. 24

           1.   Genetic tests for Hereditary Thrombophilia are Not Medically Necessary. 25

           2.   CYP2C19 Gene Analysis is Not Medically Necessary ............................. 27

           3.   CYP2C9 Gene Analysis is Not Medically Necessary .............................. 30

           4.   Apolipoprotein E Genotyping is Not Medically Necessary ....................... 30

      C.   Government and Scientific Authority Specifically State that Boston Heart's Non-
           Genetic Tests are Not Medically Necessary ................................................. 31

           1.   There is No Science Supporting Performing Tests for Additional Cholesterol
                Particles to Predict Cardiac Risk ....................................................... 33

           2.   There is No Science Supporting Performing Tests for hs-CRP to Predict
                Cardiac Risk ................................................................................. 38

           3.   There is No Science Supporting Performing Tests for Fibrinogen to Predict
                Cardiac Risk ................................................................................. 39

           4.   There is No Science Supporting Performing Tests for FFA/NEFA to Predict
                Cardiac Risk ................................................................................. 39

5.    There is No Science Supporting Performing Tests for Cystatin-C to Predict Cardiac Risk ............................................................................................. 40

6.    There is No Science Supporting Performing Tests for Omega 3 to Predict Cardiac Risk ............................................................................................. 40

7.    There is No Science Supporting Performing Tests for AspirinWorks to Predict Cardiac Risk ...................................................................... 40

D.    Boston Heart Is An Extreme Outlier in its Billing of Tests Purportedly Able to Predict Cardiac Risk ........................................................................... 43

E.    Boston Heart Claims Show the Fraudulent Billing ............................................. 45

F.    Boston Heart Targets General Practitioners and Other Non-Cardiology Physicians to Maximize its Test Revenues ........................................................... 46

G.    Boston Heart Made False Statements to Market its Scientifically-Unproven and Worthless Tests ...................................................................................... 48

H.    Boston Heart Submitted False Claims to Government-Sponsored Healthcare Insurance Programs ............................................................................... 53

VI.    COUNTS ...................................................................................................... 55

1.      The relator, Tina D. Groat, M.D., M.B.A, ("Relator") brings this action on behalf

of the United States of America, the State of California, the State of Colorado, the State of

Delaware, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the

State of Indiana, the State of Louisiana, the State of Maryland, the Commonwealth of

Massachusetts, the State of Michigan, the State of Minnesota, the State of Montana,  the State of

Nevada, the State of New Jersey, the State of New Mexico, the State of North Carolina, the State

of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the

Commonwealth of Virginia, and the State of Washington, (hereinafter referred to as the

"Plaintiff States"), brings this action against Boston Heart Diagnostics Corporation for violations

of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*., and for violations of the

following State False Claims Acts ("State FCAs"): The California False Claims Act, Cal. Gov't

Code §§12650 *et seq.*; The Colorado Medicaid False Claims Act, § 25.5-4-304, *et seq*.; The

Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; The District of Columbia False

Claims Act, D.C. Code Ann. §§2-308.03 *et seq.*; The Delaware False Claims and Reporting Act,

Del. Code Ann. tit. 6, §§1201 *et seq.*; The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*;

The Georgia False Medicaid Claims Act, Ga. Code Ann. §§49-4-168 *et seq.*; The Hawaii False

Claims Act, Haw. Rev. Stat. §§661-21 *et seq.*; The Illinois Whistleblower Reward and Protection

Act, 740 Ill. Comp. Stat. Ann. §§175/1 *et seq.*; The Indiana False Claims and Whistleblower

Protection Act, Indiana Code §5-11-5.5; The Iowa False Claims Act, §685.1, *et seq*.; The

Louisiana Medical Assistance Programs Integrity Law, La. R.S. 46:437.1 *et seq.*; The Maryland

False Health Claims Act, § 2-601, *et seq*.; The Massachusetts False Claims Act, Mass. Ann.

Laws. Ch. 12, §§5A *et seq.*; The Michigan Medicaid False Claims Act, MCLS §§400.601 *et seq.*;

Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; Montana False Claims Act, Mont.

1

Code Anno. §§17-8-401 et seq.; The Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; The New Jersey False Claims Act, N.J. Stat. §2A:32C-1 *et seq*.; The New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*; The New York False Claims Act, NY CLS St. Fin. §§187 *et seq.*; The North Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§1-605 *et seq.*; The Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§5053 *et seq.*; The Rhode Island False Claims Act, R.I. Gen. Laws §§9-1.1-1 *et seq*.; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-171 *et seq.*; The Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 *et seq.*; The Virginia Fraud Against Taxpayers Act, Va. Code §§8.01-216.1 *et seq.*; The Washington Medicaid Fraud False Claims Act, RCW 74.09.201 *et seq*.; and the Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§20.931 (hereinafter referred to as the "State False Claims Acts") to recover all damages, civil penalties and all other recoveries provided for under the Federal FCA and the State FCAs.

I.    **SUMMARY OF THE ACTION**

2.    Defendant Boston Heart Diagnostics Corporation ("Boston Heart" or the "lab"), in order to inflate its revenues at the expense of government and private insurers, systematically and fraudulently performed and billed for excessive and medically unnecessary laboratory tests that were purportedly able to screen for current heat disease or assess the risk of future heart disease ("cardiac risk").

3.    Boston Heart is a clinical diagnostic laboratory that is focused on heart health and provides, *inter alia*, cardiovascular disease-focused laboratory tests.  Thus, if a cardiovascular-related issue is suspected or diagnosed in a patient, such as hypertension (high blood pressure), hyperlipidemia (high cholesterol), or malaise and fatigue, the physician could draw a blood sample, fill out a laboratory test requisition form and send it to Boston Heart for testing.

4.       Boston Heart prominently displays on its test requisition form certain test panels that group together a significant number of varied and unrelated genetic and non-genetic laboratory tests purportedly able to assess or predict cardiac risk which, in fact, they cannot do. The lab marketed these tests to primary care physicians and general practitioners who are not experts in cardiology and duped them into ordering these tests by representing itself as the expert in the field and making false statements regarding the ability of those tests to predict cardiac risk. Boston Heart further promoted the use of these tests by placing them or the panels that contain them in a prominent position on the test requisition form.

5.       The genetic tests are worthless, of no therapeutic or predictive value whatsoever and known to be medically unnecessary because they (1) do not and cannot screen for any currently existing heart disease in the patient, (2) do not and cannot predict the patient's risk of future heart disease, (3) provide no additional information regarding the cardiovascular-related diagnoses used to justify the tests, such as hypertension, hyperlipidemia, or malaise and fatigue, and (4) have no bearing on any potential treatments for those diagnoses.  The same is true for all of the non-genetic tests at issue. Further, the tests did not comport with clear industry guidelines, including those of The American Heart Association, the American College of Cardiology, National Cholesterol Education Program and the National Academy of Clinical Biochemistry.  In addition, Medicare National and Local Coverage Determinations focus specifically on certain of these tests and state that they are not medically necessary, should not be billed to Medicare and are not covered.   Boston Heart ignored the known standards, promoted these medically unnecessary tests in easily-ordered test panels on their test requisition forms and falsely touted the efficacy of such tests to predict cardiac risk.

6.      As a result of Boston Heart's systematic and fraudulent scheme, it billed government insurers for these medically unnecessary tests far more often than other labs. Relator is a Medical Doctor with a Masters of Business Administration and an expert in the field of genetic laboratory testing. Relator, through her position at United Healthcare as National Medical Director of Women's Health and Genetics, has direct access to a wealth of data related to billing for tests purportedly performed to assess cardiac risk for hundreds of thousands of patients by hundreds of labs that have billed United Healthcare over the past six years.  Her unique background and her position as a National Medical Director at United Healthcare, the largest health insurer in America, give her a distinct ability to identify and understand issues surrounding laboratory billing and to objectively analyze the reams of data United Healthcare provides her. This data clearly shows that Boston Heart billed far more of these medically unnecessary tests per patient than almost all other labs, including Laboratory Corporation of America ("LabCorp"), one of the nation's two largest labs in terms of tests performed.  The data, which Relator has access to and has studied, clearly shows that Boston Heart is an extreme outlier in laboratory testing for common diagnoses in the cardiology area.

7.      All labs which directly or indirectly seek government reimbursement for their testing are also legally required, independent of the physician ordering the lab tests, to review and maintain sufficient diagnostic information and documentation to justify the medical necessity of all lab tests performed and billed.  Without having documentation that clearly verifies the medically necessity of the tests (which Boston Heart does not have and which simply does not exist for the vast majority of tests purportedly justified by a cardiovascular-related diagnosis), Boston Heart cannot legally bill government payors for those tests.

8.      Here, Boston Heart knowingly billed for lab tests that do not predict cardiac risk and were not justified by the common cardiovascular-related diagnoses given to the patients being tested.  Further, the results of the lab tests could not provide any useful information that could be utilized to treat the patient or prevent heart disease. In sum, these tests are not medically necessary.  In performing and submitting claims for such medically unnecessary lab tests to government insurers, Boston Heart violated the Federal and State False Claims Acts.

## II.      THE PARTIES

9.      The United States is a plaintiff to this action, which it brings on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and other federally funded healthcare programs, including Medicare, Medicaid, TRICARE, and the Veterans Administration.

10.      Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395- 1395ggg; 42 U.S.C. §§ 426 and 426A, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program. Medicare is a government health insurance program for people age 65 or older, certain disabled people under age 65, and people of all ages with end stage renal disease. See. The Medicare Program is comprised of four parts; Medicare Parts A through D.

11.      Part A of the Medicare program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care.

12.      Medicare Part B, which is particularly relevant to the allegations raised herein, authorizes payment for physician and ancillary services, including laboratory and diagnostic tests and procedures. Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. CMS contracts with private insurance companies to administer, process, and pay Part B claims from the Federal Supplementary

Medical Insurance Trust Fund. The private insurance companies that contract with CMS to provide these services are called Part B Carriers.

13.    Part C of the Medicare program is also known as Medicare Advantage. Medicare Advantage Plans stand in place of Medicare Parts A and B and are offered by private companies approved by Medicare. These plans are typically less expensive for the consumer, but limit covered beneficiaries to a network of covered providers.

14.    Currently, only 30% of people on Medicare obtain coverage through Medicare Part C. *Medicare Advantage Fact Sheet*, The Henry J. Kaiser Family Foundation, available at http://kff.org/medicare/fact-sheet/medicare-advantage-fact-sheet/ (last accessed September 22, 2014).

15.    Medicare Part D provides prescription drug coverage for Medicare beneficiaries.

16.    TRICARE is a federally funded program providing medical benefits to military personnel, their families, retired veterans, and reservists called to duty. See 32 C.F.R. § 19 et seq.

17.    The Veterans Administration is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

18.    Medicaid is a government health insurance program funded jointly by the Federal and State governments. See 42 U.S.C. § 1396 et seq. Each State administers its own Medicaid program. However, each State program is governed by Federal statutes, regulations and guidelines. The federal portion of each State's Medicaid payment – the Federal Medical Assistance Percentage – is based on that State's per capita income compared to the national average. During the relevant time period, the Federal Medical Assistance Percentage was between approximately 50% and 80%.

19.     Throughout the relevant time period, the services specified herein were provided to Medicaid beneficiaries in California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, Wisconsin, and the District of Columbia (hereinafter referred to as the "Plaintiff States").

20.     All of the Plaintiff States are plaintiffs in this action.

21.     Throughout the relevant time period, the services described herein were provided to beneficiaries of Medicare, Medicaid, Medicare Advantage and Managed Medicaid Plans, TRICARE, the Veterans Administration, and other federally and state funded healthcare programs (collectively referred to herein as "government payers" or "government insurers").

22.     Relator Dr. Tina Groat is a citizen of the United States and a resident of the state of Texas. She earned her medical degree at Harvard Medical School and was an obstetrics and gynecology resident at Duke University Medical Center, where she was the Assistant Administrative Chief Resident.  Dr. Groat also holds a Masters of Business Administration from the University of Michigan. She is a Fellow of the American College of Obstetricians and Gynecologists and a Diplomate of the American Board of Obstetrics and Gynecology. Dr. Groat has taught at the Indiana University School of Medicine as an Assistant Professor of Clinical Ob/Gyn and at the University of Michigan as a Clinical Instructor of Obstetrics and Gynecology. Dr. Groat was the National Medical Director of Women's Health and Genetics for United Healthcare.  In this position, Relator's duties included examining and evaluating the drivers of increased costs in women's care and genetic testing. Currently, she is the Senior Medical Director, Informatics and Consulting for Optum. Inc., a subsidiary of United Healthcare Group.

7

23.     United Healthcare ("UHC"), which is not a defendant in, or a party to, this action,[1] is the nation's largest health benefits company, offering health insurance in the following areas: State Medicaid and community programs; employer sponsored and individual health benefits plans; Medicare and all major senior health benefit product categories; Tricare insurance for military personnel and their families; and health care in the international marketplace. In total, UHC services 27 million commercial patients, 11 million Medicare patients, 4 million Medicaid patients and 3 million TriCare patients.

- UHC's Medicare & Retirement group provides three types of coverage; Medicare Advantage Plans, Medicare Part D prescription drug plans, and Medicare Supplemental and gap insurance.

- UHC's Community & State unit acts as a Managed Care Organizations ("MCO") in providing coverage to those patients insured by Medicaid.

- UHC's Military & Veterans division provides coverage to 3 million Tricare beneficiaries in Alaska, Arizona, California, Colorado, Hawaii, Idaho, Iowa, Kansas, Minnesota, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oregon, South Dakota and parts of Texas and Utah, Washington and Wyoming.

24.     Defendant Boston Heart Diagnostics Corporation is a privately held company based in Framingham, Massachusetts. The Company provides diagnostic testing related to cardiovascular health through its clinical laboratory, also in Framingham, Massachusetts, for specimens delivered from across the United States, including the District of Columbia. The Company states on its website that it is "committed to adding to our exclusive portfolio and suite of cardiovascular disease (CVD)-focused tests that are designed to improve outcomes for patients and save health dollars by tailoring a therapeutic regimen to the patient's particular circumstances" and that "We offer the most clinically advanced, scientifically relevant tools to

---

[1] In fact, UHC is completely unaware that this action exists.

help identify cardiovascular risk and select the treatment and care that's optimal for each patient." Its stated mission is to "improve heart health and prevent disease. [2]

## III.    JURISDICTION AND VENUE

25.    Jurisdiction is founded upon the Federal False Claims Act (the "Act" or the "False Claims Act"), 31 U.S.C. § 3729 *et seq*., specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.

26.    Venue in the District of Columbia is appropriate under 31 U.S.C. § 3732(a) in that, at all times material to this civil action, Defendant resided in and/or transacted business in the District of Columbia.

## IV.    APPLICABLE LAW

### A.    The False Claims Acts

27.    The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, inter alia, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

28.    The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

---

[2] http://www.bostonheartdiagnostics.com/about_business.php

29.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

30.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

31.     Each of the Plaintiff States has individually enacted a False Claims Act. Each of those Acts is modeled after the Federal FCA, and each contains provisions similar to those quoted above. Relator asserts claims under the State FCAs for the State portion of Medicaid false claims detailed in this Complaint.

### B.     Only "Medically Necessary" Laboratory Tests are Reimbursable

32.     Services provided to Medicare and other federal health care program beneficiaries are only reimbursable if they are medically necessary. *See* 42 U.S.C. § 1395y(a)(1)(A) ("no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services. . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member"); 42 C.F.R. § 411.15(k)(1); Medicare Carrier's Manual § 2049. That is, Medicare and other federal health care programs only cover medical services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." *Id.; See Strand Analytical Labs., LLC v. Burwell*, No. 1:13-CV-00645-LJM,

2015 WL 4603258, at *15 (S.D. Ind. July 30, 2015) (court upheld denial of coverage for defendant lab's DNA Specimen Provenance Assay ("DSPA") test because it was not reasonable and necessary for the diagnosis or treatment of an illness)

33.     Accordingly, providers may only submit claims for government healthcare reimbursement for "reasonable and necessary" medical services. In submitting claims, providers make certain express certifications, including an assurance that the services were "provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1); *see also* 42 U.S.C. § 1395n(a)(2)(B) (to receive payment for claims providers must certify that services were "medically required"). Moreover, in submitting reimbursement claim form CMS-1500 to obtain reimbursement from Medicare or other Federal health care programs, laboratories expressly certify **"that the services shown on [the] form were medically indicated and necessary for the health of the patient."** Thus, each time a claim for payment is submitted to a Federal healthcare program, the provider expressly certifies that the services performed were medically justified. In addition, each time a provider submits a claim, the provider impliedly certifies that the service was provided in accordance with Federal and State statutes, regulations, and program rules.

34.     The Medicare Program Integrity Manual ("MPIM"), which provides guidance on how to determine whether items or services are "reasonable and necessary for the diagnosis or treatment of illness",[3] instructs Medicare contractors to use the strongest evidence of medical necessity available and provides a list of evidence in order of preference:

- Published authoritative evidence derived from definitive randomized clinical trials or other definitive studies, and

---

[3] MPIM, CMS Pub. No. 100–08, Ch.13, **available at** http://www.cms.gov/Regualtions-and-Guidance/Manuals/Internet-Only-Manuals-IOMs.html.

- General acceptance by the medical community (standard of practice), as supported by sound medical evidence based on:

  ○ Scientific data or research studies published in peer-reviewed medical journals;

  ○ Consensus of expert medical opinion (i.e., recognized authorities in the field); or

  ○ Medical opinion derived from consultations with medical associations or other health care experts.

MPIM § 13.7.1. The MPIM further provides:

> **Acceptance by individual health care providers, or even a limited group of health care providers, normally does not indicate general acceptance by the medical community. Testimonials indicating such limited acceptance, and limited case studies distributed by sponsors with financial interest in the outcome, are not sufficient evidence of general acceptance by the medical community.** The broad range of available evidence must be considered and its quality shall be evaluated before a conclusion is reached.

35.     Knowingly causing the submission of claims that are ineligible for payment under a federal health care program constitutes a violation of the FCA. *See U.S. ex. rel. Franklin v. Parke-Davis*, 147 F. Supp. 147, 152-153 (D. Mass. 2001) (knowingly causing the submission of claims that are ineligible for reimbursement can serve as a basis for liability under the FCA); *see also U.S. ex rel. Nowak v. Medtronic, Inc.*, Case Nos. 1:08-cv-10368 and 09-cv-11625 (D. Mass.) (United States' Statement of Interest, at 6)("[t]o the extent that a healthcare provider seeks reimbursement for a procedure that is ineligible for payment under a federal healthcare program ... because the program places other conditions on coverage that are not satisfied, the claim is false").

36.     Similarly, a claim for "worthless" medical care violates the FCA because the government believes it is paying for services or items that have medical value when, in fact, the services or items are essentially worthless. *See Mikes v. Straus*, 274 F.3d 687, 702-4 (2d Cir. 2001); *U.S. v. SmithKline Beecham, Inc.,* 245 F.3d 1048, 1053 (9th Cir. 2001).

37.     To be medically necessary, diagnostic lab tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem **and who uses the results in the management of the beneficiary's specific medical problem.**" 42 C.F.R. § 410.32(a).

38.     In addition, to comply with these regulations and justify the medical necessity of the tests performed, labs must meet certain documentation requirements. *See generally* 42 C.F.R. §§ 410.32.

39.     Specifically, 42 C.F.R. § 410.32(d)(2) provides that laboratories and other entities seeking reimbursement for laboratory and other diagnostic tests are required to keep records that accurately document the medical necessity of such tests. If the laboratory does not receive documentation sufficient to justify the medical necessity of a test from the prescribing physician, the laboratory or other entity "may request additional diagnostic and other medical information to document that the services it bills are reasonable and necessary." *Id.*

40.     42 C.F.R. § 410.32(d)(3) further provides,

(i) … Upon request by CMS, the entity submitting the claim must provide the following information:

> (A) Documentation of the order for the service billed (including information sufficient to enable CMS to identify and contact the ordering physician or nonphysician practitioner).

> (B) Documentation showing accurate processing of the order and submission of the claim.

> (C) Diagnostic or other medical information supplied to the laboratory by the ordering physician or nonphysician practitioner, including any ICD–9–CM code or narrative description supplied.

41.     If adequate documentation is not supplied, CMS must deny the claim. *Id.* at 410.32(d)(3)(ii)(C).

42.     Federal case law also confirms that Federal healthcare programs may require billing entities to supply such documentation as may be deemed necessary to support coverage. *See KGV Easy Leasing Corp. v. Sebelius*, No. 09-56393, 2011 WL 490990 (9th Cir. 2011) (upholding decision that Medicare could require documentation, from a laboratory, justifying the medical necessity of diagnostic tests as a condition of payment); *Gulfcoast Med. Supply, Inc. v. Leavltt*, 468 F.3d 1347 (11th Cir. 2006); *Mackenzie Med. Supply v. Leavltt*, 506 F.3d 341 (4th Cir. 2007); *Maximum Comfort, Inc. v. Secretary of Health & Human Services*, 512 F.3d 1081 (9th Cir. 2007); *Druding v. Care Alternatives, Inc.*, 164 F. Supp. 3d 621, 631 (D.N.J. 2016) ("even if Defendant [hospice] has provided for each patient a certification signed by a physician, the claim is not reimbursable if the patient's medical record does not contain clinical information that supports the terminal prognosis.")

43.     Every Medicare supplier is charged with knowledge of Medicare regulations and with the understanding that Medicare does not provide reimbursement for services that are not properly documented. *KGV Easy Leasing Corp.*, No. 09-56393, 2011 WL 490990, *2 (9th Cir. 2011) (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-85 (1947); *Maximum Comfort Inc. v. Sec'y of Health & Human Servs.*, 512 F.3d 1081, 1088 (9th Cir. 2007).

44.     In addition, the Centers for Medicare & Medicaid Services (CMS) regulates all laboratory testing (except research) performed on humans in the U.S. through the Clinical Laboratory Improvement Amendments of 1988 (CLIA). The CLIA regulations include federal standards applicable to all U.S. facilities or sites that test human specimens for health assessment or to diagnose, prevent, or treat disease.  The Division of Laboratory Services, within the Survey and Certification Group, under the Center for Clinical Standards and Quality (CCSQ), has the responsibility for implementing the CLIA Program.  CLIA considers all entities that perform

even one test on "materials derived from the human body for the purpose of providing information for the diagnosis, prevention or treatment of any disease or impairment of, or the assessment of the health of, human beings" to be governed by CLIA and must register with the CLIA program.

45.     CLIA imposes an affirmative pre-analytic obligation on laboratories to monitor the medical necessity and completeness of test request information solicited and obtained by the laboratory. *See* 42 CFR 493, 3641, Federal Register / Vol. 68, No. 16 / Friday, January 24, 2003 / Rules and Regulations.

46.     Finally, the National and Local Coverage Determinations set forth below, which detail authoritative conditions of payment that must be met to avoid violating the False Claim Act, specifically and affirmatively state that the Boston Heart lab tests do not meet the criteria for medical necessity. "The Centers for Medicare & Medicaid Services ("CMS") contract with private intermediaries, known as Medicare Administrative Contractors, to reimburse health care providers...." 42 C.F.R. § 418.302(d)(1). Medicare Administrative Contractors establish LCDs [Local Coverage Determinations] to 'set forth and govern the conditions of coverage and reimbursement under Medicare' in a particular geographic region. *United States v. Space Coast Medical Associates, L.L.P.*, 94 F.Supp.3d 1250, 1260 (M.D.Fl.2015); *see also United States ex rel. Ryan v. Lederman*, Case No. 04–cv–2483, 2014 WL 1910096, at *1 (E.D.N.Y. May 13, 2014) ("Once an [LCD] is adopted by the carrier, it acts as a filter, or screen, to ensure that only claims meeting the [LCD] criteria for medical necessity are paid."). . .  **An LCD can be considered nothing if not a condition of payment.**" *Druding v. Care Alternatives, Inc.*, 164 F. Supp. 3d 621, 629–30 (D.N.J. 2016) (bold emphasis added) "Plaintiff-Relators can pursue False

Claims Act violations under an implied certification theory for violation of the Medicare statute and regulations, including violation of LCD criteria... *Id*. at 630.

### C. <u>Relevant Definitions</u>

47.    ICD-9 Code – International Classification of Disease-9 Code ("diagnosis code"):

International Classification of Diseases (ICD) is the international standard diagnostic tool for epidemiology, health management and clinical purposes and is maintained by the World Health Organization. The ICD is designed as a health care classification system, providing a system of diagnostic codes for classifying diseases, a wide variety of signs, symptoms, abnormal findings, complaints, social circumstances, and external causes of injury or disease. This system is designed to map health conditions to corresponding generic categories together with specific variations, assigning for these a designated code, up to six characters long.

48.    CPT Code – Current Procedure Terminology  Code ("test procedure code"):

The Current Procedural Terminology (CPT) code is a medical code set maintained by the American Medical Association that describes medical, surgical, and diagnostic services and is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes.

49.    Screening, in medicine, is a strategy used to identify an unrecognized disease in individuals without signs or symptoms. In other words, screening is done with asymptomatic individuals. As such, screening tests are performed on persons apparently in good health. Screening interventions are designed to identify disease in a community early, thus enabling earlier intervention and management in the hope to reduce mortality and suffering from a disease.

### D. <u>Billing For a Laboratory Test</u>

50.    Boston Heart is in the business of conducting laboratory tests that are ordered by doctors and other healthcare providers.  To facilitate the ordering of those tests, Defendant supplies doctors with pre-printed test requisition forms which the doctor fills out and sends to the Defendant lab along with the patient's specimen that is to be tested.  Doctors can also order tests

electronically through a website or system integrated with the physician's electronic health records (EHR) system.

51.     These test requisition forms include a list of the tests that the lab performs for the doctor to select based on the doctor's examination of the patient and subsequent diagnosis.  The form also groups certain tests together in test panels, which allows the doctor to easily order several tests at once simply by checking one box on the form.

52.     These test panels are cash cows for the lab and the lab actively promotes their use through internet and direct marketing to doctors.  These test panels increase the number of tests that the lab conducts and, as detailed below, includes a number of medically unnecessary tests that should not be performed and should not be billed to government payors.

53.     During the patient's visit to the doctor, the patient is examined, a diagnosis is made and specimens (*e.g.* blood, urine, saliva, fluid samples) are drawn. The doctor uses the test requisition form to select the laboratory tests the doctor would like performed.   The test requisition form and the specimen are then sent to the lab.

54.     After receiving the test requisition form and the specimen, the lab conducts the tests ordered, including all of the tests included in any test panel that has been ordered.  As set forth above, the lab may perform medically unnecessary tests but may not bill government healthcare insurers for them, and must retain documentary evidence that each of the tests performed was medically necessary and justified by the patient's diagnosis.  This means that the ICD-9 Code assigned to the patient must directly support and justify the CPT Code of the test performed.

55.     After the lab conducts the tests ordered, it bills the government or government intermediary (such as Medicare Part C as discussed in ¶ 13 above) for tests performed for

17

Medicare, Medicaid and TriCare patients. If a panel was ordered and the lab conducted the tests contained within that panel, the lab separately bills the government for each of those tests performed under its own CPT Code.  As set forth below, most of the tests included in these panels are not medically necessary and should not be billed to the government.

## V.     THE FALSE CLAIMS SCHEME: BILLING FOR MEDICALLY UNNECESSARY TESTS BOSTON HEART FALSELY CLAIMS PREDICT CARDIAC RISK

### A.     Boston Heart Fraudulently Performs and Bills the Government for Medically Unnecessary Tests

56.     Boston Heart conducts and bills for laboratory tests, including genetic and non-genetic tests, claiming that the tests are medically necessary because they relate to cardiac issues because they allegedly (1) screen for any currently existing heart disease in the patient, or (2) assess the patient's risk of developing heart disease in the future.  These tests are included in test panels to increase the frequency with which they are ordered.

57.     However, as set forth below, all of the genetic tests and nearly all of the non-genetic Boston Heart tests ordered through these test panels or individually outside of the panels are not medically necessary because government healthcare insurance program regulations and guidance, and medical field authority, clearly and unequivocally state that the tests at issue are either (1) rarely considered medically necessary and specifically not medically necessary for the patients on whom Boston Heart is conducting these tests, or (2) never medically necessary under any circumstance or for any diagnosis.   As such, these tests provide no additional information regarding any of the diagnoses used to justify the tests and have no bearing on any potential treatments for those diagnoses.  The specific Boston Heart tests at issue are:

| CPT Code | Description of Test |
|---|---|
| | **GENETIC TESTS:** |

| 81240 | F2 (prothrombin, coagulation factor II) (e.g., hereditary hypercoagulability) gene analysis, 20210G>A variant |
| 81241 | F5 (coagulation factor V) (e.g., hereditary hypercoagulability) gene analysis, Leiden variant |
| 81291 | MTHFR (5,10-methylenetetrahydrofolate reductase) (e.g., hereditary hypercoagulability) gene analysis, common variants (e.g., 677T, 1298C) |
| 81225 | CYP2C19 (cytochrome P450, family 2, subfamily C, polypeptide 19) (e.g., drug metabolism) gene analysis, common variants (e.g., *2, *3, *4, *8, *17) |
| 81355 | Genotyping to determine cytochrome p450 2C9 (CYP2C9) and  vitamin K  epoxide reductase subunit C1 (VKORC1) genetic polymorphisms for the purpose of managing the administration and dosing of warfarin |
| 81401 | Molecular pathology procedure, Level 2, used for apolipoprotein E genotyping (ABL Kinase Domain Mutation in CML) |

**NONGENETIC TESTS:**

| 83700 83704 83701 83695 82172 82664 82726 | Additional cholesterol particles through miscellaneous CPT Codes - Testing for LDL subspecies (small and large LDL particles), HDL subspecies, apolipoprotein E. apolipoprotein A-1, apolipoprotein B, etc. |
| 86141 | hsCRP (Hi-sensitivity C-reactive protein) |
| 85384 | Fibrinogen |
| 82726 | FFA/NEFA |
| 82610 | Cystatin-C |
| 0111T | Omega 3 |
| 84431 | AspirinWorks |

**1.  Boston Heart Performs the Vast Majority of its Tests to Screen for Current Heart Disease or to Assess the Risk of Future Heart Disease, Which Render Them Medically Unnecessary**

58.  The vast majority of the Boston Heart tests at issue here are being used for screening purposes (*i.e.* to discover whether the patient currently has heart disease) or to assess whether the patient has a risk of developing cardiac illness and potential cardiac complications in the future (cardiac risk).  This to known to be true because only one or some or all of the following four diagnoses, along with their corresponding ICD-9 diagnosis codes, are commonly seen in patients whose specimens have been submitted to the Boston Heart lab for testing:

   a)  Routine general medical examination at a health care facility (ICD-9 Code V70.0)

   b)  Essential hypertension (high blood pressure) (ICD-9 Code 401)
       Hypertension, malignant (401.0)
       Hypertension, benign (401.1)
       Hypertension, Unspecified (401.9)

   c)  Other and unspecified hyperlipidemia (high cholesterol) (ICD-9 Code 272.4)

   d)  Other malaise and fatigue (ICD-9 Code 780.79)

59.  However, when any of these four ICD-9 diagnosis codes are given to a patient in the absence of other diagnostic codes, the tests set forth above are worthless, of no therapeutic or predictive value whatsoever and known to be medically unnecessary because they (1) do not and cannot predict the patient's risk of future heart disease, (2) do not and cannot screen for any currently existing heart disease in the patient, and (3) provide no additional information regarding the cardiovascular-related diagnoses sometimes used to justify the tests, such as hypertension, hyperlipidemia, or malaise and fatigue, and (4) have no bearing on any potential treatments for those diagnoses.

20

**2.** **These Tests are Medically Unnecessary Because They Are Being Used to Assess Cardiac Risk**

60.     Boston Heart specifically claims that its tests are "innovative methodologies for cardiovascular risk assessment"[4] and necessary to obtain all knowledge of future cardiac risks and potential cardiac complications.  These laboratory tests, as set forth above, do no such thing, and this is common knowledge in the medical and scientific community.

61.     **The American Heart Association and the American College of Cardiology, in a joint effort that resulted in publication of Guideline for Assessment of Cardiovascular Risk in Asymptomatic Adults in November 2010 ("Guideline"), specifically recommends against certain of these tests to assess the risk of developing heart disease**.

62.     **The Guideline specifically states "Genotype testing for CHD [Cardiac Heart Disease] risk assessment in asymptomatic adults is not recommended."** Thus, none of the 6 genetic tests listed above should ever be performed to assess cardiac risk.

63.     The Guideline focused on "the initial assessment of the apparently healthy adult for risk of developing cardiovascular events associated with atherosclerotic vascular disease." The Guideline investigated several genetic and non-genetic tests as predictors of cardiac risk under the following criteria:

> For any risk marker to be considered a useful candidate for risk prediction, it must, at the very least, have an independent statistical association with risk after accounting for established readily available and inexpensive risk markers.  This independent statistical association should be based on studies that include large numbers of outcome events.
>
> …
>
> In the absence of this evidence of "additive predictive information," the writing committee generally concluded that a new risk marker was not ready for routine use in risk assessment.

---

[4] http://www.bostonheartdiagnostics.com/science_portfolio.php

64.     While the Guideline specifically states that genetic testing for cardiac heart disease risk in asymptomatic adults is not recommended, it also states that certain non-genetic tests (such as testing of lipid parameters beyond the standard fasting lipid profile and tests for natriuretic peptides) are also not recommended to predict cardiac risk.  Indeed, the Guideline **"recommends against their use for cardiovascular risk assessment."**

65.     This Guideline is the authority in the industry and is adhered to by major healthcare institutions, including the Mayo Clinic.  United Healthcare investigated the insurance industry and found that other major insurers, including Anthem, Blue Cross Blue Shield and Aetna, consider these tests experimental and investigational for assessing risk of cardiac heart disease because their clinical value has not been established.[5]

66.     Because there is no accepted science in the sense of any independent statistical association supporting the use of these tests to assess cardiac risk, and the scientific community and experts in the cardiology field specifically recommend against using these tests for that purpose, **these tests, when performed for cardiac risk assessment, are worthless**.  As such, the lab cannot have received or have in its possession the documentation required to justify the medically necessity of these tests, and billing government insurers for them violates the Federal and State False Claims Acts.

### 3.     These Tests are Medically Unnecessary Because They Are Being Used for Screening Purposes

67.     Title XVIII of the Social Security Act (SSA) §1862(a)(1)(A) states that no Medicare payment shall be made for items and services which are not reasonable and necessary for the diagnosis or treatment of illness or injury.  Based on this statute, CMS states that **"tests**

---

[5] *See, e.g.*, http://www.aetna.com/cpb/medical/data/300_399/0381.html

**that are performed in the absence of signs, symptoms, complaints, or personal history of disease or injury are non-covered unless explicitly authorized by statute.**" 66 CFR No. 226 at 58837, "Medicare Program; Negotiated Rulemaking: Coverage and Administrative Policies for Clinical Diagnostic Laboratory Services; Final Rule  (November 23, 2001); *see also* Medicare National Coverage Determinations (NCD) Coding Policy Manual and Change Report DRAFT ICD-10-CM Version,  p. 11 (July 2015) (same)[6]

68.     Local Coverage Determination L34506: "Molecular Pathology Procedure" (Effective March 1, 2014; Jurisdiction: New Hampshire) specifically states that "Screening services such as pre-symptomatic genetic tests and services used to detect an undiagnosed disease or disease predisposition are not a Medicare benefit and are not covered. Similarly, Medicare may not reimburse the costs of tests/examinations that assess the risk of a condition unless the risk assessment clearly and directly effects the management of the patient."

69.     Local Coverage Determination for MolDX: Biomarkers in Cardiovascular Risk Assessment (L36358) (Effective June 1, 2016; Jurisdiction: California, Nevada, Hawaii) specifically states that "There is no Medicare benefit for screening CV [Cardiovascular ] risk assessment testing for asymptomatic (without signs or symptoms of disease) patients.  Screening asymptomatic patients for cardiovascular risk is statutorily excluded by Medicare and will not be addressed in this policy."

70.     Because Boston Heart is using these tests for cardiovascular risk screening purposes (*i.e.* to discover whether the patient currently has heart disease) in the absence of signs, symptoms, complaints, or personal history of heart disease, the tests are not medically necessary,

---

[6]

https://www.cms.gov/Medicare/Coverage/CoverageGenInfo/Downloads/manual201507_ICD10.pdf

and any claim made on the government for payment of those tests is a false claim. Indeed, when Boston Heart uses some or all of the four common diagnosis codes listed above and no other diagnosis codes to justify the tests at issue here, there is no indication of signs or symptoms of heart disease and the test is necessarily being used for screening purposes only. When lab tests are used for general screening purposes, government healthcare programs will not pay for them.

71.     In addition, as shown below, there are government healthcare regulations and published medical industry guidance relating directly to the specific Boston Heart tests at issue here that specifically state that that there is no medical justification to use those tests for screening purposes.

**B.      Government and Scientific Authority Specifically State that Boston Heart's Genetic Tests are Not Medically Necessary**

72.     Lab test coverage determinations may be made in several ways. First, the Secretary may issue binding guidance, such as a National Coverage Determination ("NCD").[7] Second, a Medicare contractor may issue its own guidance, which is known as a Local Coverage Determination or "LCD;" an LCD applies to a specific geographic region.[8] Third, if neither an NCD nor an LCD exists, a Medicare contractor makes an individual determination on whether the service is covered by deciding whether it falls within a Medicare benefit category and is "reasonable and necessary for the diagnosis or treatment of illness or injury...."[9] When making such an individual determination, a Medicare contractor is instructed to use the strongest evidence of medical necessity available and provides a list of evidence in order of preference:

- Published authoritative evidence derived from definitive randomized clinical trials or other definitive studies, and

---

[7] 42 U.S.C. §§ 1395y(l) (6)(A), 1395ff(a), 1395ff(f)(1)(B)
[8] 42 U.S.C. §§ 1395y(l) (6)(B), 1395ff(f) (2)(B)
[9] 42 U.S.C. §§ 1395(u), 1395ff(a)(1)(A)

- General acceptance by the medical community (standard of practice), as supported by sound medical evidence based on:

  ○ Scientific data or research studies published in peer-reviewed medical journals;

  ○ Consensus of expert medical opinion (i.e., recognized authorities in the field); or

  ○ Medical opinion derived from consultations with medical associations or other health care experts.

Medicare Program Integrity Manual ("MPIM") § 13.7.1.

73.     National Coverage Determinations, Local Coverage Determinations and the Joint Guideline from The American Heart Association and the American College of Cardiology specifically discuss the genetic tests that Boston Heart conducts and rule that such tests are not medically necessary and are not reimbursable by Medicare.  The American Heart Association and the American College of Cardiology are the most respected and recognized authorities in the cardiac field, including cardiac laboratory testing.

74.     In general, tests for genetic biomarkers to assess cardiovascular risk are not considered medically necessary and are not covered by Medicare. See Noridian LCD 36358: MolDX: Biomarkers in Cardiovascular Risk Assessment, "This policy denies coverage for all non-lipid biomarkers when used for CV risk assessment including but not limited to, biochemical, immunologic, and hematologic, and genetic biomarkers for CV risk assessment regardless of whether ordered in a panel or individually."

1.     **Genetic tests for Hereditary Thrombophilia are Not Medically Necessary**

75.     Genetic tests for Hereditary Thrombophilia (blood clots) are billed through the following CPT codes:

| CPT Code | Description |
| --- | --- |

| 81240 | F2 (prothrombin, coagulation factor II) (e.g., hereditary hypercoagulability) gene analysis, 20210G>A variant |
|---|---|
| 81241 | F5 (coagulation factor V) (e.g., hereditary hypercoagulability) gene analysis, Leiden variant |
| 81291 | MTHFR (5,10-methylenetetrahydrofolate reductase) (e.g., hereditary hypercoagulability) gene analysis, common variants (e.g., 677T, 1298C) |

76.     Various Local Coverage Determinations state that these 3 genetic tests are not considered medically necessary and are not covered by Medicare.

77.     Palmetto GBA Proposed LCD DL35912 (Genetic Testing for Hypercoagulability / Thrombophilia (Factor V Leiden, Factor II Prothrombin, and MTHFR) states that these 3 specific genetic tests (F2, F5, MTHFR) should not be performed because there is no evidence that the results of these tests affect treatment, even for patients with venous thromboembolism (VTE) ("There is no evidence that knowledge of FVL/F2 mutation status in patients with VTE affects anticoagulation treatment to avoid recurrence") (Comment Period End Date March 27, 2015; Jurisd: North Carolina)[10]  It further states that there most certainly is no basis to use these tests for screening purposes. Thus, these tests are never medically necessary.

78.     Noridian LCD 36358: MolDX: Biomarkers in Cardiovascular Risk Assessment states that for many genetic tests, including F2, F5 and MTHFR,  there is insufficient evidence to establish their ability to assess cardiac risk:

**Gene Mutations (any methodology) and Genomic Profiling**

Proponents of molecular CV profile testing argue that improvement in CVD [cardiovascular disease] risk classification leading to management changes that improve outcomes warrants coverage of these tests.  However, the Evaluation of Genomic Applications in Practice and Prevention Working Group (EWG) **found insufficient evidence to recommend testing for 9p21 genetic variant or 57 other variants in 28 genes to assess risk for CVD in the general population, specifically heart disease and stroke.**

---

[10] "Reason for Proposed LCD: Provider Education/Guidance" *Id*. at p. 3.

**The following genes were included in the EWG's assessment: …F2, F5…MTHFR…**
The EWG found that the magnitude of net health benefit from the use of any of these tests alone or in combination is negligible.

79.　　　Even if a diagnosis of Venous thromboembolism (VTE) [ICD-9 codes 415.1, 452 and 453: Venous thromboembolism (deep vein thrombosis, pulmonary embolism)] could possibly justify the F2, F5 and MTHFR genetic tests for hereditary thrombophilia, **Boston Heart falsely promotes and conducts these 3 genetic testing for hereditary thrombophilia as a general way to predict cardiac risk even when the patient does not have a diagnosis of VTE.**

80.　　　Furthermore, these genetic tests, in the rare instances when they are justified by a diagnosis of VTE, are appropriate only once per lifetime for patients because a patient's genetic makeup does not change.　However, Boston Heart is performing these genetic tests more than one time per patient.

81.　　　These genetic tests were also used, without any medical justification, to screen for hypercholesterolemia, which is the presence of high levels of cholesterol in the blood.　 To screen for hypercholesterolemia, it is standard to test for LDL (low-density lipoprotein) and HDL (high-density lipoprotein) because LDL cholesterol and HDL cholesterol, along with one fifth of the triglyceride level, make up a person's total cholesterol count.　Such medically justified tests are properly billed under four or five distinct CPT Codes.　However, there is no medical justification to conduct genetic testing for hereditary thrombophilia in order to screen for hypercholesterolemia.

### 2.　　　CYP2C19 Gene Analysis is Not Medically Necessary

82.　　　CYP2C19 gene analysis is billed through the following CPT Code:

| CPT Code | Description |
| --- | --- |
|  |  |

| 81225 | CYP2C19 (cytochrome P450, family 2, subfamily C, polypeptide 19) (e.g., drug metabolism) gene analysis, common variants (e.g., *2, *3, *4, *8, *17) |
|---|---|

83.     This genetic analysis tests for cytochrome P450 enzymes, which are a super-family of enzymes located in the liver and mucosal surface of the intestinal tract. They play important roles in the biosynthesis and metabolism of endogenous and exogenous compounds. Allelic variations in the CYP2C19 gene results in the patient's markedly increased or decreased metabolism of certain drugs, leading to wide variations in clinical effect.  **This genetic testing is specifically appropriate only for people with a diagnosis of myocardial infarction (ICD-9 codes 410, 411, 412) who are taking the drug clopidogrel (brand name: Plavix) to determine if the patient is able to metabolize that drug properly.**

84.     Indeed, Noridian LCD 35366 (CYP2C19, CYP2D6, CYP2C9, and VKORC1 Genetic Testing (eff. Nov. 3, 2014 LCD; Jursid: California, Hawaii, Nevada, at al.) specifically states that "genetic testing of the CYP2C19 gene [under CPT Code 81225] is considered medically necessary for patients with ACS [acute coronary syndrome] undergoing PCI [percutaneous coronary intervention] who are initiating or reinitiating Clopidogrel (Plavix) therapy."  When this LCD was originally proposed in draft form and comments were solicited, one provider commented: "We request that the LCD recognize individual medical review to allow coverage for CYP2C19 testing in the patient on clopidogrel who would be considered high risk based on clinical characteristics." Noridian's response was that "From the latest CPIC statement on CYP2C19 and CLOPIDOGREL (Scott, 2013), 'Current data do not support the use of CYP2C19 genotype data to guide treatment in other scenarios.'"

85.     **Clopidogrel is used to prevent blood clots after a recent heart attack or stroke.[11]  However, this test is being performed by Boston Heart to purportedly predict future cardiac risk for patients who do not have a diagnosis of myocardial infarction (ICD-9 codes 410, 411, 412), and even if they do, are not taking clopidogrel.**

86.     Furthermore, this genetic test, in the rare instances when it is justified by a diagnosis of myocardial infarction and the patient is taking clopidogrel, is appropriate only once per lifetime for patients because a patient's genetic makeup does not change.  However, Boston Heart is performing this genetic test more than one time per patient.

87.     This genetic test was also used, without any medical justification, to screen for hypercholesterolemia, which is the presence of high levels of cholesterol in the blood.   For the reasons state above with respect to genetic testing for hereditary thrombophilia, there is no medical justification to conduct genetic testing for the CYP2C19 gene in order to screen for hypercholesterolemia.

88.     In addition, genetic tests for Hereditary thrombophilia were often billed together with the CYP2C19 gene analysis, meaning that they were performed on the same patient.  In fact, these two categories of tests would be performed on entirely distinct patient populations, such that it would rarely be medically indicated to perform both categories of tests on the same person. CYP2C19 gene analysis is indicated in people taking clopidogrel (Plavix) which is a blood thinner used to help prevent additional strokes and heart attacks in patients with myocardial infarction and angina.  Hereditary thrombophilia testing is indicated in people with

---

[11] This test can be used for other drugs metabolized by this same pathway as clopidogrel—PPIs (omeprazole), anticonvulsants (phenytoin and diazepam) and TCAs (amitriptyline and nortriptyline).

venous blood clots.  Having both of those conditions and thus being in both patient populations is very rare, less than 1% of the population.

### 3.   CYP2C9 Gene Analysis is Not Medically Necessary

89.     CYP2C9 gene analysis is billed through the following CPT Code:

| CPT Code | Description |
| --- | --- |
| 81355 | Genotyping to determine cytochrome p450 2C9 (CYP2C9) and  vitamin K epoxide reductase subunit C1 (VKORC1) genetic polymorphisms for the purpose of managing the administration and dosing of warfarin |

90.     This analysis tests for the principal cytochrome P450 enzyme that modulates the anticoagulant activity of warfarin**.** Warfarin is an anticoagulant used to prevent heart attacks, strokes, and blood clots.  **This genetic testing is specifically appropriate only for people taking the drug warfarin, which is sold under the brand names Coumadin, Jantoven, Marevan, Uniwarfin, and if they are enrolled in a research study looking at pharmacogenomic testing of CYP2C9 or VKORC1 alleles to predict warfarin response.** *See* Medicare NCD 90.1 Pharmacogenomic Testing for Warfarin Response. (Effective August 3, 2009)[12]  However, this genetic test is being performed by Boston Heart to purportedly predict future cardiac risk for patients who are not taking warfarin.

### 4.   Apolipoprotein E Genotyping is Not Medically Necessary

91.     Apolipoprotein E genotyping is billed through the following CPT Code:

| | |
| --- | --- |
| 81401 | Molecular pathology procedure, Level 2, used for apolipoprotein E genotyping (ABL Kinase Domain Mutation in CML) |

92.      This analysis is being used to test for the gene that directs the production of apolipoprotein E, a protein that helps transport lipids (fats and cholesterol) in the blood. Genetic

---

[12] http://www.cms.gov/medicare-coverage-database/details/ncd-details.aspx?NCDId=333&ver=1

tests for cardiac risk currently offer no proven benefit in risk assessment when added to other standard measures of cardiac risk like global risk scores. There is no data showing that results of genetic testing alter management or improve outcomes for prevention of cardiac heart disease. *See* 2010 ACC/AHA Guideline for Assessment of Cardiovascular Risk in Asymptomatic Adults ("Global risk scores (such as the Framingham Risk Score [FRS]) that use multiple traditional cardiovascular risk factors should be obtained for risk assessment in all asymptomatic adults without a clinical history of CHD.")

93.     Government payors reimburse the labs at the rate of approximately $50-$100 for each one of these genetic tests conducted for government-insured patients.

94.     Boston Heart promotes each of these genetic tests individually and through test panels that group together only a few medically justified tests with many medically unnecessary tests, including cardiac genetic tests, in order to increase the number of these medically unnecessary and worthless tests ordered by physicians and then performed and billed by the labs. The lab states on its website: "Boston Heart conducts genotyping for the following: SLCO1B1 (statin induced myopathy), apoE, clopidogrel response (CYP2C19), prothrombin (factor II) G20210A, factor V Leiden, and MTHFR. **These tests aid in the selection of appropriate treatment options for individuals."[13]   In fact, these tests do not aid in the selection of appropriate treatment options for individuals.**

C.     **Government and Scientific Authority Specifically State that Boston Heart's Non-Genetic Tests are Not Medically Necessary**

95.     Boston Heart conducts and bills for non-genetic tests under the guise that they (1) screen for any currently existing heart disease in the patient, or (2) assessing the patient's risk of

---

[13] http://www.bostonheartdiagnostics.com/science_tests_genetic.php

developing heart disease in the future.  These tests are included in test panels to increase the frequency with which they are ordered.

96.     However, these tests are not medically necessary because government healthcare insurance program regulations and guidance, and medical field authority, clearly and unequivocally state that the tests at issue are either (1) rarely considered medically necessary and specifically not medically necessary for the patients on whom Boston Heart is conducting these tests, or (2) never medically necessary under any circumstance or for any diagnosis.   As such, these tests provide no additional information regarding any of the diagnoses used to justify the tests and have no bearing on any potential treatments for those diagnoses.  The specific Boston Heart nongenetic tests at issue are:

| CPT Code | Description |
|---|---|
| 83700 83704 83701 83695 82664 82172 82726 | Additional cholesterol particles through miscellaneous CPT Codes - Testing for LDL subspecies (small and large LDL particles), HDL subspecies, apolipoprotein E, apolipoprotein A-1, etc. |
| 86141 | hs-CRP |
| 85384 | Fibrinogen |
| 82726 | FFA/NEFA |
| 82610 | Cystatin-C |
| 0111T | Omega 3 |
| 84431 | AspirinWorks |

97.     When any of these four general ICD-9 diagnosis codes (routine medical exam, hypertension, hyperlipidemia, or fatigue and malaise) are given to a patient in the absence of other diagnostic codes, the nongenetic tests set forth above are worthless, of no therapeutic or predictive value whatsoever and known to be medically unnecessary because they (1) do not and cannot predict the patient's risk of future heart disease, (2) do not and cannot screen for any currently existing heart disease in the patient, and (3) provide no additional information regarding the cardiovascular-related diagnoses sometimes used to justify the tests, such as

hypertension, hyperlipidemia, or malaise and fatigue, and (4) have no bearing on any potential treatments for those diagnoses.

### 1. There is No Science Supporting Performing Tests for Additional Cholesterol Particles to Predict Cardiac Risk

98.   Lipoprotein particle tests (the first row in the chart in ¶ 96 above) are never medically necessary to predict cardiac risk.  These additional measurements of lipid parameters or modified lipids are no better at determining cardiac risk than the standard fasting lipid profile (total cholesterol, high-density lipoprotein (HDL) cholesterol, LDL cholesterol and triglycerides).  All lipid particles (e.g., LDL or HDL) are present in the blood circulation in a range of sizes.  However, additional measurements of lipid parameters or modified lipids vary in their interassay agreement, laboratory standardization, and established reference ranges.  Also, the use of such measurements is generally limited because there are no clear thresholds that would trigger treatment, no therapeutic targets and no unique treatments beyond those already recommended by lipid treatment guidelines directed by the standard lipid profile.  Therefore, there is no evidence that the assessment of additional lipid parameters leads to an improved net health outcome.

99.   The American Heart Association and the American College of Cardiology, in their joint Guideline, specifically state that **"Measurement of lipid parameters, including lipoproteins, apolipoproteins, particle size, and density, beyond a standard fasting lipid profile is not recommended for cardiovascular risk assessment in asymptomatic adults."** Such tests are labeled as having "**No Benefit**" (emphasis supplied).

100.   Similarly, National Coverage Determination 190.23 denies payment for lipid panel tests used for any screening purposes: "Routine screening and prophylactic testing for lipid disorders are not covered by Medicare.  While lipid screening may be medically appropriate,

Medicare by statute does not pay for it. Lipid testing in asymptomatic individuals is considered to be screening regardless of the presence or other risk factors such as family history, tobacco use, etc."

101.    LCD 36358: MolDX: Biomarkers in Cardiovascular Risk Assessment provides that while a basic lipid panel every 5 years is covered, there is no coverage for any lipoprotein particle tests beyond the standard fasting lipid profile (total cholesterol, high-density lipoprotein (HDL) cholesterol, LDL cholesterol and triglyceride) for either asymptomatic or even symptomatic patients: "Under preventative services, Medicare Part B covers the basic lipid panel (total cholesterol, high density lipoprotein-cholesterol (HLD-C), triglycerides, and low density lipoprotein-cholesterol (LDL-C) for cardiovascular (CV) disease screening, every 5 years when ordered by a doctor. . . **This policy denies coverage for all CV risk assessment panels, except the basic lipid panel,** for symptomatic (with signs and symptoms) patients with suspected or documented CV disease because panel testing is not specific to a given patient's lipid abnormality or disease."

102.    While non-traditional lipid tests may alter a patient's category of risk, those tests are not considered medically necessary because they provide no additional actionable information:

> Clinicians have sought non-traditional lipid and other biomarker measurements to predict CV events. The most promising biomarkers are the ones that closely correlate with the pathophysiological process of the disease. **In general, there is evidence that some of these biomarkers may alter risk categorization (higher or lower) compared to traditional risk prediction, but it has not been established that changes in categorization provides clinically actionable information beyond that of traditional lipid measures. In addition, no study has provided high-quality evidence that measurement of non-traditional lipid and other biomarkers leads to changes in management that improve health outcomes**.

LCD 36358 at p. 3.

34

103.    More specifically, tests for LDL Particles (LDL-P) under CPT Codes 83701 or 83704 have been specifically shown to be medically unnecessary.   Per LCD 36358, which summarizes and explains the state of the science on this test:

**LDL Particles (LDL-P)**

Although great progress has been made in the development of refined lipoprotein assessment and such measurements have helped in understanding the atherosclerotic process, **it is not known whether measurements beyond traditional lipids can identify CV risk subgroups and how treatment would differ based on subgroup classification.** Furthermore, it is not known whether this additional information helps the health care provider to identify with greater precision and accuracy the person who will develop clinical or subclinical CVD.

**The NACB does not recommend testing as there is insufficient data that measurement of lipoprotein subclasses can identify CV risk subgroups, how treatment would differ based on subgroup classification and whether, over time, measurement is useful to evaluate the effects of treatments.**   In addition, the 2010 ACCFA/AHA guidelines for assessment of lipoprotein, other lipoprotein parameters and modified lipids state that "measurement of lipid parameters, including lipoproteins, apolipoproteins, particle size, and density, beyond standard fasting lipid profile is not recommended for cardiovascular disease risk assessment in asymptomatic in adults.

104.    Tests for Intermediate Density Lipoproteins (Remnant Proteins) under CPT Codes 83701 or 83704 have been specifically shown to be medically unnecessary.   Per LCD 36358, which summarizes and explains the state of the science on this test:

**Intermediate Density Lipoproteins (Remnant Proteins)**

Intermediate density lipoproteins (IDLs) have a density that falls between LDLs and VLDLs, and may be referred to as remnant lipoproteins because they vary in size and contain varying proportion of triglycerides and cholesterol.  Although there is abundant evidence the remnant lipoproteins are atherogenic, and a risk factor for CAD **there is no evidence how testing improves patient outcomes.**

105.    Tests for High Density Lipoprotein (HDL) Subclass under CPT Code 82664, 83701 or 83704 have been specifically shown to be medically unnecessary.   Per LCD 36358, which summarizes and explains the state of the science on this test:

**High Density Lipoprotein (HDL) Subclass**

35

HDL cholesterol (HDL) is the risk indicator most often used in associated with CHD risk, HDL subfractions have been used for risk prediction.  However data is lacking how the subfractions aid in the diagnosis and management of CHD.  **Neither the NCEP [National Cholesterol Education Program] nor ACCF/AHA guidelines recommend the routine measurement of HDL subspecies in CHD risk assessment.**

106.    Tests for Lipoprotein(a) (Lp(a))  under CPT Code 83695 have been specifically shown to be medically unnecessary.  Per LCD 36358, which summarizes and explains the state of the science on this test:

**Lipoprotein(a) (Lp(a))**

Lp(a) is a modified form of LDL.  However, the complete role of lipoprotein(a) is not fully understood.

There is no standardized scale for measuring Lp(a) because there is no level that is considered "normal."

**The NACB [Lipoprotein(a) (Lp(a))]**

Lp(a) is a modified form of LDL.  However, the complete role of lipoprotein(a) is not fully understood.

There is no standardized scale for measuring Lp(a) because there is no level that is considered "normal."

**The NACB [National Academy of Clinical Biochemistry] specifies that Lp(a) screening is not warranted for primary prevention and assessment of cardiovascular risk specifies that Lp(a) screening is not warranted for primary prevention and assessment of cardiovascular risk.**

**Similarly, the 2010 ACCF/AHA guidelines conclude that apolipoproteins is not recommended for CV disease risk assessment in asymptomatic adults.**

**Routine testing is not covered by Medicare.**

107.    Tests for Apolipoprotein B (Apo B), Apolipoprotein A-I (Apo AI) Apolipoprotein E (Apo E), all of which are most likely to be billed under CPT Code 82172 because there is no specific CPT code for measurement of each of these, have been specifically shown to be

medically unnecessary.  Per LCD 36358, which summarizes and explains the state of the science on these tests:

**Apolipoprotein B (Apo B), Apolipoprotein A-I (Apo AI), and Apolipoprotein E (Apo E)**

While Apo B and Apo A-I are thought to be the main structural proteins of atherogenic and anti-atherogenic lipoproteins and particles, testing for these compounds has not been validated as a tool for risk assessment.  **As such, the 2010 ACCF/AHA guidelines indicate that apolipoproteins testing is not recommended for CV risk assessment in asymptomatic adults.**

Although some individuals hypothesize that Apo E genotypes may be useful in the selection of drug therapy, **the value of Apo E testing in the diagnosis and management of CHD is insufficient and needs further evaluation.**

108.    Tests for Lipoprotein-Associated Phospholipase A2 (Lp-PLA2) under CPT Code 83698 have been specifically shown to be medically unnecessary.  Per LCD 36358, which summarizes and explains the state of the science on this test:

109.    **Lipoprotein-Associated Phospholipase A2 (Lp-PLA2)**

**The NCEP ATP III panel concluded that routine measurement of inflammatory markers (including Lp-PLA2) for the purpose of modifying LDL-cholesterol goals is primary prevention is not warranted**.  In the 2010 ACCF/AHA guidelines for assessment of CV risk, the experts concluded "lipoprotein-associated phospholipase (lp-PLA2) might be reasonable for cardiovascular risk assessment in intermediate risk asymptomatic adults."  However, at the current time, **it is not known whether Lp-PLA2 concentrations are clinically effective for motivating patients, guiding treatment, or improving outcomes.**

110.    Diagnoses of hypertension (high blood pressure) or hyperlipidemia (high cholesterol) specifically do NOT justify any of the nongenetic tests set forth in ¶96 above, including the tests for additional cholesterol particles.  High blood pressure and high cholesterol can increase risk of a cardiac event or heart disease.  If you have high blood pressure, the force exerted on your arteries is too high and can create microscopic tears in the artery walls that then turn into scar tissue. Damaged arteries accumulate circulating materials such as cholesterol.

37

Acting like latticework inside your arteries, this scar tissue provides a lodging place for particles of fat, cholesterol and other substances, which are collectively called plaque. As the plaque builds up, the arteries slowly narrow and harden, causing conditions such as coronary artery disease (CAD).  Also, a heart attack is the result of a blocked blood supply to the heart muscle tissue. This can happen when the arteries to the heart become thicker and harder from a buildup of plaque.  High blood pressure can be diagnosed in a medical office and high cholesterol can be diagnosed through standard tests for LDL (low-density lipoprotein), HDL (high-density lipoprotein) and triglyceride levels.   Thus, all of the tests set forth in ¶96 above are not considered medically necessary to screen for these medical conditions or to assess the risk that these conditions pose to a patient's future cardiac health.  Furthermore, if a patient receives a diagnosis of fatigue and malaise, only two lab tests would be appropriate (*i.e.* Thyroid tests and Diabetes test), but all of the tests set forth in ¶96 above would not be medically necessary.

### 2.        There is No Science Supporting Performing Tests for hs-CRP to Predict Cardiac Risk

111.     CRP (C-reactive protein) (CPT Code 86141 in the chart above) appears in higher amounts when there is swelling (inflammation) somewhere in the body.  Although a C-reactive protein test can also be used to evaluate the risk of developing coronary artery disease, according to the American Heart Association and as set forth in the joint Guideline, **having a C-reactive protein test isn't recommended for the general population to evaluate the risk of developing heart disease**.[14]

112.     In addition, LCD 36358 states that this test, in addition to not being covered to assess the future risk of cardiac disease, is not covered to screen for the existence of current heart

---

[14] http://www.mayoclinic.org/tests-procedures/c-reactive-protein/basics/definition/prc-20014480

disease in the patient: "Since screening (asymptomatic patient) is statutorily excluded from coverage, **hs-CRP testing for these individuals is not a Medicare benefit**."

### 3.    There is No Science Supporting Performing Tests for Fibrinogen to Predict Cardiac Risk

113.    There is currently no scientific evidence that finds a correlation between fibrinogen and risk of coronary heart disease. As such, the test for fibrinogen is not considered medically necessary and thus not covered by government health insurers to predict cardiac risk. Per LCD 36358:

> **Thrombogenic/Hematologic Factors**
>
> In 2009, the NACB guidelines reported there was sufficient data that fibrinogen is an independent marker of CVD risk.  In addition, measurement of fibrinogen was not recommended because they expressed analytical concerns regarding insufficient assay standardization and uncertainty in identifying treatment strategies.  Additionally, the NCEP expert panel concluded "**ATPIII does not recommend measurement of prothrombotic factors as part of routine assessment of CHD risk**."  They indicated that the strength of the association between thrombogenic/hematologic factors and CHD risk has not been defined and recommended clinical trials that target specific prothrombotic factors.

### 4.    There is No Science Supporting Performing Tests for FFA/NEFA to Predict Cardiac Risk

114.    The test for free fatty acids (FFA) and for non-esterified fatty acids (NEFA) are not considered medically necessary and thus not covered by government health insurers to predict cardiac risk because currently no science exists linking them to cardiac health issues. Per LCD 36358:

> **Free Fatty Acids (FFA, Saturated and Unsaturated)**
>
> The role of plasma FFA in thrombogenesis in humans is poorly established and no strong direct evidence is available.  Increasing plasma FFA concentration is known to induce endothelial activation, increase plasma MPO level and promote a prothrombotic state in non-diabetic healthy subjections.  Studies are ongoing to demonstrate the role of FFA in the pathogenesis of atherosclerosis.  However, at the current time, **there is sparse data**

39

**on its role in early atherosclerosis and no evidence how testing improves patient outcomes**.

> **5.**      **There is No Science Supporting Performing Tests for Cystatin-C to Predict Cardiac Risk**

115.      There is currently no scientific evidence that finds a correlation between Cystatin-C and risk of coronary heart disease. As such, the test for Cystatin-C is not considered medically necessary and thus not covered by government health insurers to predict cardiac risk. Per LCD 36358:

> **Cystatin C**
>
> **The NACB guidelines on Biomarkers of Renal Function and Cardiovascular Disease Risk do not recommend testing.** The NCEP advocates clinical studies to characterize the utility of these markers in the global assessment of CV disease risk.

> **6.**      **There is No Science Supporting Performing Tests for Omega 3 to Predict Cardiac Risk**

116.      The test for Omega 3 fatty acids is not considered medically necessary and thus not covered by government health insurers to predict cardiac risk because it provides no useful information for the treatment of the patient. Per LCD 36358:

> **Long-chain Omega-3 Fatty Acids in Red Blood Cell (RBC) Membranes**
>
> Not only is there no association between fish intake and EPA+DHA levels regarding prevention of HF, **there is no scientific evidence regarding how measurements of RBC omega-3 fatty acids composition would affect management of individuals at risk for or patients with CHD.** A recent article (Marai, 2014) notes that the available data do not support testing for omega-3 polyunsaturated fatty acids (EPA + DHA) among healthy subjects and patients with specific cardiac diseases.

> **7.**      **There is No Science Supporting Performing Tests for AspirinWorks to Predict Cardiac Risk**

117.      There is currently no scientific evidence that finds a correlation between AspirinWorks and risk of coronary heart disease. As such, the test for AspirinWorks is not considered medically necessary and thus not covered by government health insurers to predict

cardiac risk.  The following is a summary of the state of the science of this test, showing that it

has no clinical utility:

The AspirinWorks Test Kit (Corgenix Medical Corp; Broomfield, CO) is an enzyme-linked immunoassay test that can be used to determine levels of 11 $dhTxB_2$ in human urine.  AspirinWorks received 510(k) marketing clearance from the FDA in May, 2007 and is intended to aid in the qualitative detection of aspirin in apparently healthy individuals post ingestion.

The AspirinWorks Test Kit was compared to the Accurnetrics VerifyNow Aspirin Assay as the predicate device.  The manual AspirinWorks Test Kit measures urinary 11 $dhTxB_2$, while the automated Accumetrics VerifyNow Aspirin Assay is a turbidimetric-based optical detection system, which measures platelet-induced aggregation in whole blood.  The two devices have similar intended uses in that they both measure aspirin effect.  The AspirinWorks kit detects a metabolite of $TxA_2$, a direct inducer of platelet aggregation, while the Accumetrics kit measures ex vivo platelet aggregation caused by $TxA_2$ by artificially inducing aggregation and measuring an optical signal.  Ultimately, both are analyzing aspirin's effect through the reduction of $TxA_2$ production or the resulting inhibition of platelet aggregation.

According to the FDA, 2 different clinical studies were employed for the evaluation of the AspirinWorks Test Kit.  Results from these studies established a cutoff for aspirin effect at less than 1500 pg 11d $hTxB_2$/mg creatinine.  Further analysis revealed that 180/204 (88.2 %) of samples from individuals not taking aspirin were above the cut-off value.  Analysis of samples from individuals taking various doses of aspirin revealed that 7/163 (4.3 %) of 81 mg/day aspirin users indicated a lack of aspirin effect (greater than 1500 pg 1 $ldhTxB_2$/mg creatinine) and 4/38 (10.5 %) of the 325 mg/day aspirin users indicated a lack of aspirin effect.  In total, 11/201 (5.5 %) of all aspirin users tested indicated a lack of aspirin effect.  These percentages are consistent with those in published literature for aspirin non-responsiveness or lack of aspirin effect.

Lordkipanidze et al (2007) compared the results obtained from 6 major platelet function tests in the assessment of the prevalence of aspirin resistance in patients with stable coronary artery disease.  Patients with stable coronary artery disease (n = 201) receiving daily aspirin therapy (80 mg or more) were recruited.  Platelet aggregation was measured by: (i) light transmission aggregometry (LTA) after stimulation with 1.6 mM of arachidonic acid (AA), (ii) LTA after adenosine diphosphate (ADP) (5, 10, and 20 microM) stimulation, (iii) whole blood aggregometry, (iv) PFA-100, (v) VerifyNow Aspirin; urinary 11 $dhTxB_2$ concentrations were also measured.  Eight patients (4 %, 95 % CI: 0.01 to 0.07) were deemed resistant to aspirin by LTA and AA.  The prevalence of aspirin resistance varied according to the assay used: 10.3 to 51.7 % for LTA using ADP as the agonist, 18.0 % for whole blood aggregometry, 59.5 % for PFA-100, 6.7 % for VerifyNow Aspirin, and finally, 22.9 % by measuring urinary 11 $dhTxB_2$ concentrations.  Results from these tests showed poor correlation and agreement between themselves.  **The authors concluded that platelet function tests are not equally effective in measuring aspirin's anti-platelet effect and correlate poorly amongst themselves**

**and that the clinical usefulness of the different assays to classify correctly patients as aspirin resistant remains undetermined.**

Hedegaard et al (2009) assessed the use of optical platelet aggregation versus thromboxane metabolites in healthy individuals and patients with stable coronary artery disease after low-dose aspirin administration. The authors investigated whether 75 mg of daily non-enteric coated aspirin would completely inhibit the platelet cyclooxygenase-1 activity to a comparable extent in healthy individuals and stable coronary artery disease (CAD) patients. Serum thromboxane $B_2$ (S-TxB$_2$), urinary 11 dhTxB$_2$ (U-TxM) and arachidonic acid-induced optical platelet aggregometry (OPA) were compared in 44 coronary artery disease (CAD) patients on aspirin and in 22 healthy individuals before and after aspirin. Optical platelet aggregometry was performed in duplicate for 4 consecutive days during aspirin treatment after 1 week of treatment. Compliance was optimized by face-to-face interviews and pill counting and confirmed by S-TxB$_2$ measurements. The authors found that aspirin inhibited S-TxB$_2$ in healthy individuals (greater than 99 %; median 1.1 ng/mL, inter-quartile range [IQR] = 0.8;1.9 after aspirin) and in patients, S-TxB$_2$ was reduced to a similar level (0.9 ng/mL (0.7;1.5)). Healthy individuals had a median U-TxM of 278.5 pg/mg creatinine (229.5;380.0) before aspirin and 68.5 pg/mg creatinine (59.0;99.7) on aspirin corresponding to an average 74 % inhibition of the endogenous TxA$_2$ biosynthesis. In patients median U-TxM was 67.5 pg/mg creatinine (54.0;85.5). Seven study participants (11 %) were aspirin low-responders according to OPA, but none had S-TxB$_2$ in the highest quartile. The authors concluded that low-dose aspirin suppressed S-TxB$_2$ to comparable levels in CAD patients and healthy individuals. The authors found that despite an almost complete inhibition of S-TxB$_2$, some participants were low-responders according to OPA. The authors concluded that thorough compliance control and use of thromboxane-specific assays are important when measuring platelet response to aspirin.

While some investigators believe that aspirin resistance can be detected by thromboxane metabolites in urine, other investigators support the view that aspirin resistance cannot be defined by the level of serum thromboxane or its urinary metabolites because these measurements do not correlate with the reduction of inhibition of platelet aggregation in response to multiple stimuli as well as various other factors. **Investigators have found a number of variables that may impact an individual's response to aspirin, including patient's compliance, dose, smoking, hyperlipidemia, hyperglycemia, acute coronary syndrome, percutaneous revascularization, recent stroke, extracorporeal circulation, heart failure, exercise, circadian rhythm, absorption, concomitant medications, and polymorphisms.**

Many issues are yet to be resolved in order to apply the concept of "aspirin resistance" to actual clinical practice. **The clinical usefulness of a test that measures thromboxane metabolites in urine has yet to be determined. The relevance of the various ex vivo functional indexes of platelet capacity to in vivo platelet activation and the precise mechanisms underlying**

aspirin resistance are still largely unknown.  Further investigation is needed regarding strategies to identify and treat patients resistant to aspirin.[15]

118.    Relator estimates that UHC paid out millions of dollars to Boston Heart for medically unnecessary testing for Medicare and Medicaid patients for 2013 alone.  Prior to 2013, there were no CPT billing codes for genetic cardiac tests so Relator is unable to track outlier payments by UHC to these labs in any year prior to 2013.  Before 2013, genetic tests were billed using CPT stacking codes 83890 - 82914, which were deleted effective January 1, 2013. However, there is evidence of similar billing patterns prior to 2013 for medically unnecessary cardiac genetic and related additional nongenetic tests using these stacking codes.

### D.    Boston Heart Is An Extreme Outlier in its Billing of Tests Purportedly Able to Predict Cardiac Risk

119.    Relator's regular duties as National Medical Director of Women's Health and Genetics for United Healthcare include examining and evaluating the drivers of increased costs in women's care and genetic testing. She and her team examined the volume and type of genetic testing purportedly related to cardiac risk performed for thousands of patients by hundreds of laboratories that bill to United Healthcare.  Separately, UHC's Fraud, Waste & Abuse Department similarly analyzed claims submission data of these labs.  In mid to late 2013, the two separate UHC teams - Dr. Groat's team and UHC's Fraud, Waste & Abuse Department - compared findings and discovered they each had similar results.

120.    United Healthcare had access to hundreds of thousands of patients by hundreds of labs that have billed United Healthcare over the past six years and gained more insight into Boston Heart's billing patterns for genetic testing purportedly related to cardiac risk by examining data for the year 2013 because specific CPT codes for genetic tests became effective

---

[15] http://www.aetna.com/cpb/medical/data/700_799/0715.html)

January 1, 2013.  Before 2013, genetic tests were billed using stacking CPT codes 83890–83914, which described the test process (e.g., DNA analysis), but not the actual test being performed.

121.     UHC identified a combination of seven tests that are frequently performed and billed by Boston Heart and specifically compared Boston Heart's billing of that combination to other laboratories.  This combination of seven tests included:

- 81225 - CYP2C19 (cytochrome P450)
- 81401 - Molecular pathology procedure, Level 2
- 81241 - F5 gene analysis, Leiden variant
- 81240 - F2 gene analysis
- 83880 - Brain Natriuretic Peptide (BNP) Level: for Congestive Heart Failure patients
- 86141 - C-Reactive Protein
- 83090 - homocysteine testing (measurements of plasma homocysteine)

122.     Compared to other laboratories, Boston Heart was an extreme outlier in the frequency of billing this combination of seven tests.  Boston Heart billed this combination to UHC more than any other laboratory - a total of 2,384 times, and being reimbursed over $4 million in 2013. LabCorp, the much larger laboratory that services a significantly greater percentage of UHC customers, billed this combination of seven tests a total of 46 times.  Thus Boston Heart, a much smaller lab than LabCorp, billed this combination of tests 51.8 times more often than LabCorp.

123.     While individually one or some of these tests could be indicated based on a certain very specific diagnosis (e.g., conducting a CYP2C9 genetic test only for patients taking warfarin), the chance that someone has all of the diagnoses needed to justify all the tests on the panel is extremely unlikely.  Further, because there is no medical basis to group these tests together, some or many of them are almost always medically unnecessary any time they are performed collectively.

### E.     Boston Heart Claims Show the Fraudulent Billing

124.     Examples of specific claims submitted to United Healthcareshow that Boston Heart was billing for medically unnecessary tests to screen for cardiac-related issues and predict future cardiac risk. As just one example, in claim # 1334422155981 dated December 10, 2013, the patient was given ICD-9 code 272.2 - Mixed hyperlipidemia (high cholesterol), 401.9 - Essential hypertension, unspecified (high blood pressure), and 250.00 – Type II Diabetes. Based on those diagnoses, Boston Heart performed, *inter alia*, the following unnecessary tests that do not predict cardiac risk and do not provide any relevant medical information concerning high cholesterol, high blood pressure or diabetes:

- 81225 – CYP2C19 (cytochrome P450)
- 81400 – App E Genotype
- 81401 – Molecular pathology procedure, Level 2
- 81240 – F2 gene analysis
- 81241 – F5 gene analysis, Leiden variant
- 82172 – Apolipoprotein
- 82947 – Thyroid Test
- 83525 – Thyroid Test
- 83695 – Lipoprotein (a)
- 83698 – Lipoprotein-associated phospholipase A2 (Lp-PLA2)
- 83880 – Brain Natriuretic Peptide (BNP) Level: for Congestive Heart Failure patients
- 85384 – Fibrinogen; activity
- 82040 – Albumin
- 82550 – Creatine Kinase
- 82565– BUN/Creatinine
- 84075 – Alkaline Phosphatase
- 84450 – AST
- 84460 – ALT
- 84520 – BUN
- 84550 – Uric Acid
- 83090 – homocysteine testing (measurements of plasma homocysteine)
- 83704 – LDL-P and DL-P
- 84443 – Thyroid Test
- 86141 - C-Reactive Protein

At an average price of $50-$100 per test, the false claims in this example totaled approximately $1200 to $2400.

**F.**   **Boston Heart Targets General Practitioners and Other Non-Cardiology Physicians to Maximize its Test Revenues**

125.   Boston Heart bills itself as a leader in the field of cardiovascular testing and on the cutting edge of scientific knowledge in this area:

**Our Exclusive Tests**

Boston Heart is transforming the treatment of cardiovascular disease by providing healthcare providers and their patients with novel, personalized diagnostics and reports with integrated, customized lifestyle programs that have the power to change the way clinicians and patients communicate about disease and improve heart health.[16]

Our unique approach, which includes proprietary tests and the application of cardio-informatics, unlocks information not available through any other laboratory. We go beyond test results by providing a comprehensive cardiovascular disease risk assessment and personalized treatment plan for each patient, as well as support tools to guide positive lifestyle and nutrition changes that can impact heart health.[17]

Our company was founded by accomplished lipidologists, clinicians and scientists who have dedicated their careers to revealing the mechanisms of cardiovascular disease progression. Through extensive research and clinical studies, they showed that standard lipid profiling did not adequately identify individuals at risk for cardiovascular disease. They went on to develop and make available advanced methodologies to address this unmet medical need.[18]

Everything we do, from the tests we perform through our treatment recommendations, uses an evidence-based approach, grounded in over thirty years of original scientific research. . . We are passionate about ongoing discovery that yields solutions to predict, prevent, manage and reverse cardiovascular disease (CVD).[19]

---

[16] http://www.bostonheartdiagnostics.com/

[17] http://www.bostonheartdiagnostics.com/about_overview.php

[18] http://www.bostonheartdiagnostics.com/about_overview.php

[19] http://www.bostonheartdiagnostics.com/science_overview.php

126.    Thus, Boston Heart admits that its support for the medical necessity of its tests is not based on industry standards like the Joint Guideline published by The American Heart Association and the American College of Cardiology or other sources showing general acceptance by the medical community, but is based on "original scientific research."

127.    General Practitioners and other non-cardiology physicians are Boston Heart's primary target.    They are less sophisticated in the field of cardiovascular testing than cardiologists and more easily swayed by Boston Heart's false marketing statements as to the benefits of and scientific validation of its tests, recommendations, purported leadership in the cardiac testing field and structure of its claim form.

128.    Indeed, when Relator met with Boston Heart representatives via WebEx on August 15, 2014 to educate them that their test panels included many unnecessary tests, she saw that Boston Heart had as its model physician a family practice physician.

129.    This WebEx meeting was attended by Relator, Shawn Schwartz (Director, National Lab Program) and Dr. Marshall Dawer (Market Medial Director for Texas) on behalf of UHC and Jeff Crave and Susan Hertzberg on behalf of Boston Heart.    During the meeting, Relator and the other UHC representatives discussed with the Boston Heart representatives how Boston Heart was conducting medically unnecessary tests in the areas of genetic testing and lipoprotein particle testing and specifically referred to the Joint AHA/ACC Guideline.    Relator also discussed a family practice physician whose patients were receiving an unusually large number of cardiac tests from Boston Heart in a single year.

130.    On August 15, 2014, as a follow-up from the WebEx meeting, Jeff Craven, Vice President, Payor Innovation and Strategy at Boston Heart emailed Shawn Schwartz, Director of the National Lab Program at United Healthcare, regarding the volume of testing from the same

47

family practice physician. In this email, Mr. Craven transmitted data showing an unusually large number of this family physician's patients receiving cardiac tests from Boston Heart in a single year. 1,358 of that physician's patients received such testing in one year, or approximately 5 patients per day. In a follow-up internal UHC email on the same day, Relator properly deemed this volume of testing "suspect."

131.    These non-cardiology physicians are more susceptible to Boston Heart's marketing message and more easily persuaded to accept its misrepresentations as a scientific leader in the field of cardiovascular testing, regarding the ability of its tests to predict cardiac risk.  As such, they were Boston Heart's target market.

### G.    Boston Heart Made False Statements to Market its Scientifically-Unproven and Worthless Tests

132.    Boston Heart encourages providers to order these medically unnecessary tests through, *inter alia*, written marketing materials that claim these tests are "innovative methodologies for cardiovascular risk assessment"[20] and necessary to obtain all knowledge of future cardiac risks and potential cardiac complications.   Those Boston Heart marketing materials specifically encourage the following medically unnecessary tests:

- Tests for HDL particles (CPT Codes 83704, 82664), including:

  - Apha-1: very large HDL particles
  - Alpha-2: large HDL particles
  - Alpha-3: medium HDL particles
  - Alpha-4: small HDL particles
  - Prebeta-1: very small HDL particles

As set forth in paragraph 96 above, these lipoprotein tests are not medically necessary and there is no data to support the finding that the results of these tests in any way inform how the provider would manage the patient's care.

---

[20] http://www.bostonheartdiagnostics.com/science_portfolio.php

48

- C-reactive protein (hs-CRP) (CPT Code 86141)

As set forth in paragraphs 111-112 above, although a C-reactive protein test can also be used to evaluate the risk of developing coronary artery disease, according to the American Heart Association, having a C-reactive protein test isn't recommended for the general population to predict risk of heart disease.[21]

- Tests for risk of developing diabetes (which could increase the risk of heart disease), including (with CPT Codes):

  - o  HbA1c – average blood sugar over 3 months          81506
  - o  Insulin Resistance – body's ability to process sugar     83525
  - o  Glucose – actual amount of sugar in the blood        82947
  - o  GSP – average blood sugar over 6 weeks            82985
  - o  Adinopectin – protective hormone produced by fat cells   83516
  - o  Insulin – hormone that controls blood sugar         83525

Although Glucose and HbA1c can be used to screen for diabetes, the other tests are not appropriate to screen for diabetes and do not predict the future risk of developing diabetes.  They are only appropriate to monitor patients who already have diabetes or other metabolic disorders.  This is an example of Boston Heart combining 2 medically necessary tests (Glucose and HbA1c) with 4 medically unnecessary tests, but billing separately for each of the 6 tests.

133.    Results from all of these tests in no way change or affect the therapy that Boston Heart recommends, which includes proper diet, exercise, healthy body weight and no smoking.

134.    Below is a chart summarizing the medically unnecessary tests (both genetic and non-genetic) cited in ¶ 96 above and regularly performed by Boston Heart and falsely billed to Medicare, Medicaid and Tricare, either directly or indirectly.  The chart shows in summary the reasons for the lack of medical necessity in light of the 4 common diagnosis codes used.  In all

---

[21] http://www.mayoclinic.org/tests-procedures/c-reactive-protein/basics/definition/prc-20014480

cases the medically unnecessary tests do not screen for existing disease, change or affect the treatment of the patient or provide any useful information to evaluate cardiac risk.

135.     The tests, as indicated on the chart below, are either not FDA approved at all or FDA approved in only limited prescribed circumstances.   Per LCD 36358, "FDA approval/clearance means that a test/assay has analytical and clinical validity.  The FDA does not review clinical utility (that the test/assay demonstrates improved patient outcomes).  To meet Medicare's "reasonable and necessary" criteria for coverage, a test/ assay must have proven clinical utility."  Thus, without FDA approval, a test does not meet the more minimal standard of clinical validity, let alone Medicare's more stringent requirement of clinical utility. Without any FDA approval at all or any FDA approval of the test for the diagnoses given, the test cannot be considered medically necessary and is not covered.

## **CHART**

Tests which are unequivocally not medically necessary for the following diagnoses:

   a)  Routine general medical examination at a health care facility (ICD-9 Code V70.0)

   b)  Essential hypertension (high blood pressure) (ICD-9 Code 401)
          Hypertension, malignant (401.0)
          Hypertension, benign (401.1)
          Hypertension, Unspecified (401.9)

   c)  Other and unspecified hyperlipidemia (high cholesterol) (ICD-9 Code 272.4)

   d)  Other malaise and fatigue (ICD-9 Code 780.79)

   e)

| CPT Code | Description of Test | The ICD-9 Codes that Commonly Support Medical Necessity of the Test |
|---|---|---|
| | **GENETIC TESTS:** | |
| 81240 81241 | F2 (prothrombin, coagulation factor II) (e.g., hereditary | Never medically necessary, per LCD 35912 |

50

| | | |
|---|---|---|
| | hypercoagulability) gene analysis, 20210G>A variant<br>F5 (coagulation factor V) (e.g., hereditary hypercoagulability) gene analysis, Leiden variant | There may be an argument only for ICD-9 codes 415.1, 452 and 453: Venous thromboembolism (deep vein thrombosis, pulmonary embolism)<br><br>These tests have FDA marketing clearance for use as an aid in the diagnosis of patients with suspected thrombophilia, but are not FDA approved for evaluation of cardiac risk. |
| 81291 | MTHFR (5,10-methylenetetrahydrofolate reductase) (e.g., hereditary hypercoagulability) gene analysis, common variants (e.g., 677T, 1298C) | Never medically necessary, per LCD 35912<br><br>There may be an argument only for ICD-9 codes 415.1, 452 and 453: Venous thromboembolism (deep vein thrombosis, pulmonary embolism)<br><br>This test has FDA marketing clearance for use as an aid in the diagnosis of patients with suspected thrombophilia, but is not FDA approved for evaluation of cardiac risk |
| 81225 | CYP2C19 (cytochrome P450, family 2, subfamily C, polypeptide 19) (e.g., drug metabolism) gene analysis, common variants (e.g., *2, *3, *4, *8, *17) | ICD-9 codes 410, 411, 412: Myocardial infarction, which results in patients taking Plavix<br>    (one test per patient per lifetime)<br><br>This test has FDA marketing clearance only to aid clinicians in determining therapeutic strategy for therapeutics that are metabolized by the CYP450 2C19 gene product (i.e. CYP2C19 with clopidogrel/Plavix) |
| 81355 | Genotyping to determine cytochrome p450 2C9 (CYP2C9) and  vitamin K epoxide reductase subunit C1 (VKORC1) genetic polymorphisms for the purpose of managing the administration and dosing of warfarin | This test is medically necessary only for patients taking the drug warfarin if they are enrolled in a research study looking at pharmacogenomic testing of CYP2C9 or VKORC1 alleles to predict warfarin response. |

| | | Warfarin is sold under the brand names Coumadin, Jantoven, Marevan, Uniwarfin.    (one test per patient per lifetime)<br><br>FDA approved only to evaluate people taking warfarin. |
|---|---|---|
| 81401 | Molecular pathology procedure, Level 2, used for apoliprotein E genotyping (ABL Kinase Domain Mutation in CML) | ICD-9 codes: None.<br><br>There is **no** evidence that the assessment of additional lipid parameters leads to an improved net health outcome<br><br>Not FDA approved. |
| | **NONGENETIC TESTS:** | |
| 83700<br>83704<br>83701<br>83695<br>82172<br>82664<br>82726 | Additional cholesterol particles through miscellaneous CPT Codes - Testing for LDL subspecies (small and large LDL particles), HDL subspecies, apolipoprotein E. apolipoprotein A-1, apolipoprotein B, etc. | ICD-9 codes: None.<br><br>There is **no** evidence that the assessment of additional lipid parameters leads to an improved net health outcome.<br><br>These tests have FDA marketing clearance to measure cholesterol particles. |
| 86141 | hsCRP (Hi-sensitivity C-reactive protein) | This test is **never** medically necessary and is not FDA approved |
| 85384 | Fibrinogen | ICD-9 codes  571.4, 286.6:<br>Liver disease and bleeding disorders<br><br>This test is FDA approved to evaluate for blood clotting disorders in people with excessive bleeding but is not FDA approved for evaluation of cardiac risk. |
| 82726 | FFA/NEFA | ICD-9 code 277.86: |

| | | |
|---|---|---|
| | | peroxisomal diseases (a rare disease related to high levels of very long chain fatty acids mainly diagnosed in kids)<br><br>This test is not FDA approved. |
| 82610 | Cystatin-C | ICD-9 code 584, 585: Kidney disease<br><br>This test is FDA approved for evaluating kidney disease, but is not FDA approved for evaluation of cardiac risk. |
| 0111T | Omega 3 | ICD-9 codes: None.<br><br>Never medically necessary and not FDA approved. |
| 84431 | AspirinWorks | ICD-9 codes: None.<br><br>Never medically necessary and not FDA approved. |

**H.    Boston Heart Submitted False Claims to Government-Sponsored Healthcare Insurance Programs**

136.    Relator, in her position at UHC, had access to data regarding Boston Heart's submission of claims to UHC for the genetic and non-genetic purported cardiac-related tests at issue here.   Because UHC provides and services Medicare Advantage Plans and Managed Medicaid Plans, which are funded by Medicare and Medicaid dollars, Relator received and evaluated UHC data that showed that Boston Heart submitted claims to UHC on behalf of patients insured under Medicare Advantage Plans and Managed Medicaid Plans for the tests at issue here.

137.    By way of example, the following table, taken directly from a UHC internal report,   summarizes the amount of the Medicare Advantage Plan claims that Boston Heart

submitted to UHC for the genetic tests listed below and that were paid by UHC to Boston Heart

during 2013:

**UnitedHealthCare: Genetic Testing Quarterly Summary Report - M&R Pivot
Summary (FI Only)**
Data Sources: MIDM (ODM, PHS, SIERRA), CDW (OHP)
Prepared by HCE Medical Informatics on 6/23/2014
Period: Dates of Service from January 1, 2013 through December 31, 2013

| Procedure Code | Procedure Code Description | |
|---|---|---|
| 81225 | CYP2C19 GENE ANALYSIS COMMON VARIANTS | $94,561 |
| 81240 | F2 GENE ANALYSIS 20210G >A VARIANT | $49,264 |
| 81241 | F5 COAGULATION FACTOR V ANAL LEIDEN VARIANT | $53,940 |
| 81400 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 1 | $31,413 |
| 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $111,023 |
| 81479 | UNLISTED MOLELCULAR PATHOLOGY PROCEDURE | $25,197 |
| | **Grand Total** | **$365,398** |

138.    By way of further example, the following table, taken directly from a UHC

internal report, summarizes the amount of the Managed Medicaid Plan claims that Boston Heart

submitted to UHC for the genetic tests listed below and that were paid by UHC to Boston Heart

during the first 6 months of 2013:

**UnitedHealthCare: Genetic Testing Quarterly Summary Report - C&S Pivot Summary (FI Only)**
Data Sources: MIDM
Prepared by HCE Medical Informatics on 12/30/2013
Period: Dates of Service from January 1, 2013 June 30, 2013

| Procedure Code | Procedure Code Description | Total Net Paid Amount |
|---|---|---|
| 81225 | CYP2C19 GENE ANALYSIS COMMON VARIANTS | $1,345 |
| 81240 | F2 GENE ANALYSIS 20210G >A VARIANT | $595 |
| 81241 | F5 COAGULATION FACTOR V ANAL LEIDEN VARIANT | $595 |
| 81401 | MOLECULAR PATHOLOGY PROCEDURE LEVEL 2 | $1,398 |
| 81479 | UNLISTED MOLELCULAR PATHOLOGY PROCEDURE | $173 |
| | **Grand Total** | **$4,107** |

139.     Relator received and evaluated similar UHC data that showed that Boston Heart submitted claims to UHC on behalf of patients insured under Medicare Advantage Plans and Managed Medicaid Plans for the nongenetic tests at issue here.

140.     Upon information and belief, Boston Heart, which was in the business of conducting laboratory tests on patients with all types of health insurance and earned revenue by being paid by health insurers for the tests it conducted, submitted claims for the genetic and nongenetic tests at issue here directly to Medicare and Medicaid, just as it submitted Medicare Advantage Plan and Managed Medicaid Plan claims to UHC.

## VI.     COUNTS

### COUNT I

### Federal False Claims Act
### 31 U.S.C. §§3729(a)(1)(A) and (a)(1)(B)

141.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

142.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

143.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval, within the meaning of 31 U.S.C. §3729(a)(1)(A).

144.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, within the meaning of 31 U.S.C. §3729(a)(1)(B).

145.    The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

146.    By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

147.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

## COUNT II

### Federal False Claims Act
### 31 U.S.C. §3729(a)(1)(G)

148.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

149.    This is a claim for penalties and treble damages under the Federal False Claims Act.

150.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government, within the meaning of 31 U.S.C. §3729(a)(1)(G).

151.    As a result, monies were lost to the United States through the non-payment or non-transmittal of money or property owed to the United States by the Defendant, and other costs were sustained by the United States.

152.     By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

153.     Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every false record or statement knowingly made, used, or caused to be made or used to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

## COUNT III

### California False Claims Act
### Cal Gov't. Code §12651(a)(1)-(2), (7)
**(Against All Defendant)**

154.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

155.     This is a claim for treble damages and penalties under the California False Claims Act.

156.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

157.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the California State Government to approve and pay such false and fraudulent claims.

158.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the California State Government.

159.     The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

160.     By reason of the Defendant's acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

161.     Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT IV

### Colorado Medicaid False Claims Act
### C.R.S. §25.5-4-303.5 et seq.

162.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

163.     This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

164.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

165.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Colorado State Government to approve and pay such false and fraudulent claims.

166.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Colorado State Government.

58

167.    The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

168.    By reason of the Defendant's acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

169.    Additionally, the Colorado State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT V

### Connecticut False Claims Act
### Conn. Gen. Stat. § 17b-301b

170.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

171.    This is a claim for treble damages and penalties under the Connecticut False Claims Act.

172.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

173.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Connecticut State Government to approve and pay such false and fraudulent claims.

174.    The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

175.    By reason of the Defendant's acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

176.    Additionally, the Connecticut State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT VI

### Delaware False Claims And Reporting Act
### 6 Del C. §1201(a)(1)-(2), (7)

177.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

178.    This is a claim for treble damages and penalties under the Delaware False Claims And Reporting Act.

179.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

180.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Delaware State Government to approve and pay such false and fraudulent claims.

181.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Delaware State Government.

182.     The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

183.     By reason of the Defendant's acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

184.     Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT VII

### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)(a)-(b), (g)

185.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

186.     This is a claim for treble damages and penalties under the Florida False Claims Act.

187.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

188.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Florida State Government to approve and pay such false and fraudulent claims.

189.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Florida State Government.

190.     The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

191.     By reason of the Defendant's acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

192.     Additionally, the Florida State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT VIII

### Georgia False Medicaid Claims Act
### Ga. Code Ann. §49-4-168.1(1)-(2), (7)

193.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

194.     This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

195.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

196.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to get the Georgia State Government to approve and pay such false and fraudulent claims.

197.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Georgia State Government.

198.     The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

199.     By reason of the Defendant's acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

200.     Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT IX

### Hawaii False Claims Act
### Haw. Rev. Stat. §661-21(a)(1)-(2), (7)

201.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

202.     This is a claim for treble damages and penalties under the Hawaii False Claims Act.

203.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

204.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Hawaii State Government to approve and pay such false and fraudulent claims.

205.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Hawaii State Government.

63

206.     The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

207.     By reason of the Defendant's acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

208.     Additionally, the Hawaii State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT X

### Illinois Whistleblower Reward And Protection Act
### 740 Ill. Comp. Stat. §175/3(a)(1)-(2), (7)

209.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

210.     This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act.

211.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

212.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

213.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Illinois State Government.

214.     The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

215.     By reason of the Defendant's acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

216.     Additionally, the Illinois State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XI

### Indiana False Claims and Whistleblower Protection Act
### IC 5-11-5.5-2(b)(2), (6)

217.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

218.     This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

219.     By virtue of the acts described above, Defendant knowingly made or used false records and statements to obtain payment or approval of a false claim from the Indiana State Government.

220.     By virtue of the acts described above, Defendant knowingly made or used false records or statements to avoid an obligation to pay or transmit property to the Indiana State Government.

221.     The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

65

222.     By reason of the Defendant's acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

223.     Additionally, the Indiana State Government is entitled to a penalty of at least $5,000 for each and every violation alleged herein.

## COUNT XII

### Iowa False Claims Act
### Iowa Code Ann. § 685.2(1)(A), (B), (G)

224.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

225.     This is a claim for treble damages and penalties under the Iowa False Claims Act.

226.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

227.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

228.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Iowa State Government.

229.     The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

230.     By reason of the Defendant's acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

66

231.     Additionally, the Iowa State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIII

### Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat. § 46:438.3(A)-(C)

232.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

233.     This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

234.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government.

235.     By virtue of the acts described above, Defendant knowingly engaged in misrepresentation or made, used, or caused to be made or used false records and statements, to obtain payment for false and fraudulent claims from the Louisiana State Government.

236.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Louisiana State Government.

237.     The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

238.     By reason of the Defendant's acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

239.     Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XIV**

**The Maryland False Health Claims Act**
**Md. Code Ann., Health-Gen. §§ 2-602(A)(1), (2)**

240.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

241.     This is a claim for treble damages and penalties under the Maryland False Health Claims Act.

242.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

243.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

244.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Maryland State Government.

245.     The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

246.     By reason of the Defendant's acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

247.     Additionally, the Maryland State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XV

### Massachusetts False Claims Law
### Mass. Gen. Laws ch. 12 §5B(1)-(2), (8)

248.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

249.    This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

250.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

251.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

252.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Massachusetts State Government.

253.    The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

254.    By reason of the Defendant's acts, the State of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

255.    Additionally, the Massachusetts State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XVI

### Michigan Medicaid False Claims Act
### §400.603(1)-(2)

256.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

257.     This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

258.     By virtue of the acts described above, Defendant knowingly made or caused to be made a false statement or false representation of material fact in an application for Medicaid benefits to the Michigan State Government.

259.     By virtue of the acts described above, Defendant knowingly made or caused to be made a false statement or false representation of material fact for use in determining rights to a Medicaid benefit.

260.     The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

261.     By reason of the Defendant's acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

262.     Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## **Count XVII**

### **Minnesota False Claims Act**
### **Minn. Stat. §15c.02 et seq.**

263.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

264.     This is a claim for treble damages and penalties under the Minnesota False Claims Act.

265.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

266.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or  used false records and statements, to get the Minnesota State Government to approve and pay such false and fraudulent claims.

267.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Minnesota State Government.

268.     The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

269.     By reason of the Defendant's acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

270.     Additionally, the Minnesota State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

71

## COUNT XVIII

### Montana False Claims Act
### Mont. Code Ann. 17-8-403(1)(a)-(b), (g)

271.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

272.     This is a claim for treble damages and penalties under the Montana False Claims Act.

273.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

274.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or  used false records and statements, to get the Montana State Government to approve and pay such false and fraudulent claims.

275.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Montana State Government.

276.     The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

277.     By reason of the Defendant's acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

278.     Additionally, the Montana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIX

### Nevada Submission of False Claims
### to State or Local Government Act
### Nev. Rev. Stat. Ann. §357.040(1)(a)-(b), (g)

279.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

280.     This is a claim for treble damages and penalties under the Nevada Submission of False Claims to State or Local Government Act.

281.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

282.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

283.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Nevada State Government.

284.     The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

285.     By reason of the Defendant's acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

286.     Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XX

### New Jersey False Claims Act
### N.J. Stat. §2A:32C-3(a)-(b), (g)

287.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

288.     This is a claim for treble damages and penalties under the New Jersey False Claims Act.

289.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

290.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the New Jersey State Government to approve and pay such false and fraudulent claims.

291.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New Jersey State Government.

292.     The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

293.     By reason of the Defendant's acts, the New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

294.     Additionally, the New Jersey State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XXI

### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann. § 27-14-3(a)(1)-(2), (7)

295.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

296.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

297.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

298.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

299.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New Mexico State Government.

300.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

301.    By reason of the Defendant's acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

302.    Additionally, the New Mexico State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXII

### New York False Claims Act
### NY CLS St. Fin. §189(a)-(b), (g)

303.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

304.     This is a claim for treble damages and penalties under the New York False Claims Act.

305.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

306.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the New York State Government to approve and pay such false and fraudulent claims.

307.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New York State Government.

308.     The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

309.     By reason of the Defendant's acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

310.     Additionally, the New York State Government is entitled to the maximum penalty of $12,000 for each and every violation alleged herein.

## COUNT XXIII

### North Carolina False Claims Act
### 2009-554 N.C. Sess. Laws §1-607(a)(1)-(2), (7)

311.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

312.    This is a claim for treble damages and penalties under the North Carolina False Claims Act.

313.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

314.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the North Carolina State Government to approve and pay such false and fraudulent claims.

315.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the North Carolina State Government.

316.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

317.    By reason of the Defendant's acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

318.    Additionally, the North Carolina State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

77

## COUNT XXIV

### Oklahoma Medicaid False Claims Act
### Okla. Stat. tit. 63, §5053.1B (1)-(2), (7)

319.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

320.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

321.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

322.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Oklahoma State Government to approve and pay such false and fraudulent claims.

323.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Oklahoma State Government.

324.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

325.    By reason of the Defendant's acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

326.    Additionally, the Oklahoma State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

78

## COUNT XXV

### Rhode Island State False Claims Act
### R.I. Gen. Laws §9-1.1-3(1)-(2), (7)

327.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

328.     This is a claim for treble damages and penalties under the Rhode Island State False Claims Act.

329.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

330.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Rhode Island State Government to approve and pay such false and fraudulent claims.

331.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Rhode Island State Government.

332.     The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

333.     By reason of the Defendant's acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

334.     Additionally, the Rhode Island State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXVI

### Tennessee False Claims Act and Medicaid False Claims Act
### Tenn. Code Ann. §§ 4-18-103(a)(1)-(2), (7)
### and 71-5-181(a)(1)(A), (B) and (D)

335.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

336.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Law.

337.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

338.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

339.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Tennessee State Government.

340.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

341.    By reason of the Defendant's acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

342.     Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXVII

### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. §36.002(4)(B), (12)

343.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

344.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act.

345.     By virtue of the acts described above, Defendant knowingly made, caused to be made, induced or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program.

346.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Texas State Government.

347.     The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

348.     By reason of the Defendant's acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

349.     Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXVIII

### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §8.01-216.3(a)(1)-(2), (7)

350.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

351.     This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

352.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

353.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

354.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Virginia State Government.

355.     The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

356.     By reason of the Defendant's acts, the State of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

357.     Additionally, the Virginia State Government is entitled to the maximum penalty $11,000 for each and every violation alleged herein.

## COUNT XXIX

### Washington Health Care False Claim Act
### Wash. Rev. Code §§ 48.80.030(1), (2), (3)

358.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

359.    This is a claim for treble damages and penalties under the Washington Health Care False Claims Act.

360.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

361.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Washington State Government to approve and pay such false and fraudulent claims.

362.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Washington State Government.

363.    The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

364.    By reason of the Defendant's acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

365.    Additionally, the Washington State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XXX

### Wisconsin False Claims For Medical Assistance Act
### Wis. Stat. §20.931(2)(a)-(b), (g)

366.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

367.    This is a claim for treble damages and penalties under the Wisconsin False Claims for Medical Assistance Act.

368.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

369.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the Wisconsin State Government to approve and pay such false and fraudulent claims.

370.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Wisconsin State Government.

371.    The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

372.    By reason of the Defendant's acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

373.    Additionally, the Wisconsin State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXXI

### District of Columbia False Claims Act
### D.C. Code Ann. §2-308.14(a)(1)-(2), (7)

374.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

375.    This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

376.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

377.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the District of Columbia Government to approve and pay such false and fraudulent claims.

378.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the District of Columbia Government.

379.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

380.    By reason of the Defendant's acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

381.    Additionally, the District of Columbia Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## REQUESTS FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and the Plaintiff States, demands that judgment be entered in their favor and against Defendant for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

This Request also includes, with respect to the state statutes cited above, the maximum damages permitted by those statutes and the maximum fine or penalty permitted by those statutes, and any other recoveries or relief provided for under the State FCA's.

Further, Relator requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the Plaintiff States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated: October 24, 2016                    MEHRI & SKALET, PLLC


                                   By:____s/ Steven A. Skalet_____
                                        Steven A. Skalet
                                        1250 Connecticut Ave. NW Suite 300
                                        Washington, DC  20036
                                        Tel: 202.822.5100 ext. 105
                                        Fax 202.822.4997
                                        Fax: (202) 261-2835

                                        BERGER & MONTAGUE, P.C.
                                        Sherrie R. Savett (PA I.D. #17646)
                                        Russell D. Paul (PA I.D. #71220)
                                        1622 Locust Street
                                        Philadelphia, PA  19103
                                        Tel: (215) 875-3000
                                        Fax: (215) 875-4636


Kal7579804