**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, THE STATE OF CONNECTICUT, THE STATE OF COLORADO, THE STATE OF DELAWARE, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF HAWAII, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF LOUISIANA, THE STATE OF MARYLAND, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MINNESOTA, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OKLAHOMA, THE STATE OF RHODE ISLAND, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WASHINGTON, THE STATE OF WISCONSIN and DISTRICT OF COLUMBIA *ex rel.* TINA D. GROAT, M.D., M.B.A., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:15-cv-00487 (RBW) **HEARING REQUESTED** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| BOSTON HEART DIAGNOSTICS CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

**BOSTON HEART DIAGNOSTICS CORPORATION'S MOTION FOR**
**RECONSIDERATION OF THE COURT'S ORDER ON THE**
**MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

**PAGE**

INTRODUCTION ............................................................................................................1

ARGUMENT ...................................................................................................................2

I.     THERE IS NO LEGAL AUTHORITY OBLIGATING LABORATORIES TO
INDEPENDENTLY ESTABLISH MEDICAL NECESSITY. ...........................................2

       A.    According to OIG Guidance, Laboratories Do Not Establish Medical
Necessity. ...............................................................................................3

       B.    Recordkeeping Regulations Show That Laboratories Are Not Required to
Establish Medical Necessity. ...................................................................5

       C.    The Cited Case Law Does Not Support the Conclusion that Laboratories
Must Establish Medical Necessity. ..........................................................7

II.    THIS COURT'S OPINION IS BASED ON AN INCORRECT LEGAL
PREMISE AND SHOULD BE RECONSIDERED. ..........................................................9

CONCLUSION ...............................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Garcia v. Sebelius*,
No. CV 10-8820 PA, 2011 WL 5434426 (C.D. Cal. Nov. 8, 2011)......................................7, 8

*Nephropathology Assocs., PLC v. Sebelius*,
No. 4:12CV00233JLH, 2013 WL 3285685 (E.D. Ark. June 27, 2013) ..............................7, 8

*United States v. Mead*,
533 U.S. 218 (2001)..................................................................................................................3

**Other Authorities**

42 C.F.R. § 410.32(a)................................................................................................................6

*42 C.F.R. § 410.32(d)(2)......................................................................................................5, 6

*42 C.F.R. § 410.32(d)(2)(i)......................................................................................................5

*42 C.F.R. § 410.32(d)(2)(ii).....................................................................................................5

*42 C.F.R. § 410.32(d)(2)(iii)................................................................................................5, 6

42 C.F.R. § 411.15(k)(1)...........................................................................................................6

Publication of the OIG Compliance Program Guidance for Hospitals, 63 Fed.
Reg. 8,987 (Feb. 23, 1998) ..................................................................................................4

*Publication of OIG Compliance Program Guidance for Clinical Laboratories, 63
Fed. Reg. 45,076 (Aug. 24, 1998).................................................................................. *passim*

OIG Compliance Program for Individual and Small Group Physician Practices, 65
Fed. Reg. 59, 434 (Oct. 5, 2000).......................................................................................4, 5

Compliance Guidance, Office of the Inspector General, U.S. Department of
Health & Human Services, https://www.oig.hhs.gov/compliance/compliance-
guidance/index.asp (lasted visited June 14, 2017)...................................................................4

Rachel Graf, *Boston Heart Lab Still On Hook In False Claims Suit*,
https://www.law360.com/governmentcontracts/articles/933387/boston-heart-
lab-still-on-hook-in-false-claims-suit .....................................................................................2

## INTRODUCTION

Boston Heart Diagnostics Corporation ("Boston Heart") respectfully requests that this Court reconsider its denial of Boston Heart's Motion to Dismiss, because this Court's ruling is based squarely on an incorrect ruling of law.  The lynchpin of this Court's denial of the Motion to Dismiss was its adoption of Relator's assertion that Boston Heart was obligated to independently determine that the tests for which it sought payment were medically necessary.[1/]  This premise is simply wrong.  It conflicts directly with the longstanding position of the Office of the Inspector General for the Department of Health and Human Services ("OIG" and "HHS," respectively) that "laboratories do not and cannot treat patients or make medical necessity determinations."[2/]  Where the OIG has issued guidance directly contrary to Relator's fundamental assertion—and where the United States and twenty-seven states have declined to intervene in Relator's claims—Boston Heart asks this Court to reconsider the legal underpinning of its decision.

Relator misdirected this Court in support of this core principle—in fact, she has misled this Court in her analysis of the applicable regulations and case law.  Relator has pointed to regulations and case law concerning a laboratory's obligation to obtain and maintain certain documentation the treating physician created in reaching a determination of medical necessity.  But there simply is no regulation, no OIG guidance, and no case law supporting the position that laboratories must second-guess physicians substantively and make independent determinations as to medical necessity.  And there is good reason for this.  Such a legal requirement would have

---

[1/]    *See* Memorandum Opinion ("Opinion," dkt. 54) at 16 ("The Court agrees with the relator that Boston Heart has an obligation to establish that the tests for which it seeks government reimbursement are medically necessary because when it submits the CMS-1500 form, it certifies that the tests performed were medically necessary.").

[2/]    Publication of OIG Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 45,076, 45,079 (Aug. 24, 1998) [hereinafter "OIG Lab Guidance"]; *see also* Boston Heart's Reply in Support of its Motion to Dismiss ("Reply," dkt. 52) at 4.

profound negative consequences, not only for laboratories, but also for treating physicians and in turn patients.[3/]  What Relator seeks to require, and the Opinion adopts, is that a laboratory must conduct an independent medical review of all requisition forms submitted by a treating physician with respect to each and every patient.  The negative consequences would include:

- A patient's medical care would no longer be left to the informed judgment of the treating physician but instead would hinge on the detached opinion of a laboratory employee who has never seen the patient.

- There would be substantial delays in laboratory results, as the treating physician and patient would have to wait for the laboratory to obtain the medical records, review the medical basis for the requisition form, potentially engage in a dialogue with the treating physician to gather additional information, and reach its own medical necessity decision prior to performing any test.

- Medical costs would dramatically increase as laboratories would have to hire scores of medical professionals to conduct this professional oversight of a treating physician's work and decisions.

- A laboratory could be subjected to a false claim allegation on every test it performs at the direction of a physician.

For these legal and public policy reasons, this Court should reconsider this legal conclusion, and in turn, grant the Motion to Dismiss as to the remaining claims.

## ARGUMENT

### I.    THERE IS NO LEGAL AUTHORITY OBLIGATING LABORATORIES TO INDEPENDENTLY ESTABLISH MEDICAL NECESSITY.

Treating physicians—not laboratories—make diagnostic and treatment decisions.  In making those decisions, physicians—not laboratories—determine whether certain tests are medically necessary.  It is the physician who sees the patient, knows the patient history, and has the clinical judgment to conclude which tests are necessary.  Laboratories are not, and should not

---

[3/]      Relator's counsel publicly acknowledged that the Court's Opinion would have a broad impact by stating to the press:  "This is an important decision that other courts will look hard at because it holds that laboratories can't just act as a pass through for doctors ordering tests that aren't medically necessary."  Rachel Graf, *Boston Heart Lab Still On Hook In False Claims Suit*, Law360, https://www.law360.com/governmentcontracts/articles/933387/boston-heart-lab-still-on-hook-in-false-claims-suit.

be, required to perform a substantive, medical oversight role that inevitably would lead to conflicting patient care and treatment delays.  However, Relator's entire case, and in turn the Opinion (e.g., pp. 15-19, 22-23), is based on Boston Heart being obligated to determine medical necessity.

Relator's position is expressly contradicted by OIG guidance, belied by relevant regulations, and not supported by the cases cited in Relator's Opposition to the Motion to Dismiss ("Opp.," dkt. 50).

### A.   According to OIG Guidance, Laboratories Do Not Establish Medical Necessity.

The OIG expressly "recognize[s] that **laboratories do not and cannot treat patients or make medical necessity determinations**."  OIG Lab Guidance, 63 Fed. Reg. at 45,079 (emphasis added).[4/]  This could not be clearer and is not superseded by the CMS Form 1500 certification, which is based on a **physician's** medical necessity determination.  Contrary to Form 1500, the OIG Lab Guidance is promulgated by the agency overseeing the health care industry, is published in the Federal Register, and has been in place for nearly 20 years.  As such, the OIG's recognition that laboratories do not determine medical necessity is entitled to greater weight than the Form 1500 certification.  *See United States v. Mead*, 533 U.S. 218, 227 (2001) ("[A]gencies . . . necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered … .")  The OIG has made it clear that it is only the physician who makes the medical necessity determination and who reviews and creates any documentation in support of that determination.

---

[4/]   Although discussed in Boston Heart's Reply, the Opinion does not address the relevance of the OIG Guidance.

The OIG Lab Guidance should be considered in the context of the overall OIG compliance guidance scheme.[5] Consistent with the OIG Lab Guidance, the OIG's guidance documents for physicians and hospitals specifically place the burden of establishing medical necessity on physicians:

- **Physicians' Guidance**: "Because Medicare **primarily relies on the professional judgment of the treating physician to determine the reasonable and necessary nature of a given service or supply**, it is important that **physicians provide complete and accurate information on any certifications** they sign." OIG Compliance Program Guidance for Individual & Small Group Physician Practices, 65 Fed. Reg. 59,434, 59,445 (Oct. 5, 2000) [hereinafter "OIG Physician Guidance"] (emphasis added).

- **Hospitals' Guidance**: "The hospital is in a unique position to deliver this information [about the standards for medical necessity] to the health care professionals on its staff.  Upon request, a hospital should be able to **provide documentation, such as patients' medical records and physicians' orders, to support the medical necessity** of a service that the hospital has provided." Publication of the OIG Compliance Program Guidance for Hospitals, 63 Fed. Reg. 8,987, 8,992 (Feb. 23, 1998) (emphasis added).

Read together, the OIG guidance for laboratories, physicians, and hospitals clearly delineate each group's responsibilities:  physicians determine whether laboratory testing is medically necessary; hospitals work to educate physicians to ensure that they order medically necessary services and maintain documentation supporting medical necessity; and laboratories perform tests ordered by physicians but do not "treat patients or make medical necessity determinations."  OIG Lab Guidance, 63 Fed. Reg. at 45,079.  Had the Government intended for laboratories to be responsible for establishing medical necessity, it certainly could have said so.  But it did not.

Contrary to the OIG's guidance documents—which laboratories have heeded in running their businesses for almost 20 years—the Opinion imposes on laboratories "an obligation to

---

[5]      Compliance Guidance, Office of the Inspector General, U.S. Department of Health & Human Services, https://www.oig.hhs.gov/compliance/compliance-guidance/index.asp (lasted visited June 14, 2017).

establish that the tests for which [they] seek[] government reimbursement are medically

necessary...."  Opinion at 16; *see also id*. at 22-23.  The Opinion countermands that guidance,

thereby creating uncertainty within the laboratory industry about potential False Claims Act

liability.  Boston Heart respectfully requests that this Court reconsider the Opinion, so that it

accurately reflects the government-mandated roles of laboratories and physicians in making

medical necessity determinations.

### B. Recordkeeping Regulations Show That Laboratories Are Not Required to Establish Medical Necessity.

Federal regulations that divide recordkeeping responsibilities between physicians and

laboratories also underscore that physicians, and not laboratories, establish the medical necessity

of patient tests.  *See* 42 C.F.R. § 410.32(d)(2)(ii); *see also* Opinion at 17 (describing

§ 410.32(d)(2) as "concern[ing] recordkeeping").  In particular, the ordering physician "must

maintain documentation of medical necessity in the beneficiary's medical record."  42 C.F.R.

§ 410.32(d)(2)(i); *see also* OIG Physician Guidance, 65 Fed. Reg. at 59,439 - 440 ("Upon

request, the **physician** practice should be able to provide documentation, such as a patient's

medical records and physician's orders, to support the appropriateness of a service that the

physician has provided.") (emphasis added).

In contrast, the regulations simply require that a laboratory "maintain . . . (A) The

documentation that it receives from the ordering physician . . . [and] (B) The documentation that

the information that it submitted with the claim accurately reflects the information it received

from the ordering physician . . . "  *Id*. at § 410.32(d)(2)(ii).  A laboratory also "**may** request

additional diagnostic and other medical information to **document** that the services it bills are

reasonable and necessary."  *Id*. at § 410.32(d)(2)(iii) (emphasis added).  The plain text of this

regulation indicates that laboratories are not expected to reach their own medical necessity

determination.  Instead, laboratories are required to maintain the documentation physicians

provide and documentation showing that claims submitted for reimbursement reflect the tests

physicians ordered.[6/]  Laboratories **may**—but are not required to—request information from

treating physicians showing that the tests they requested are medically necessary, typically in

response to an audit or a declination of payment.  There is nothing in these regulations that

would lead one to believe that a laboratory is required to determine medical necessity.

In the Opinion, this Court dismissed the import of § 410.32(d)(2).  However, this was

only after it was misled by the Relator as to what this regulation actually says.  By its plain

language, the regulation **merely authorizes** laboratories to request from treating physicians

"additional diagnostic and other medical information **to document** that the services it bills are

reasonable and necessary."  *Id*. at § 410.32(d)(2)(iii) (emphasis added).  Yet, Relator misleads

this Court by twisting this permissive language concerning documentation into something very

different:  Relator argues that this language "**plainly requires** that laboratories review the ICD

diagnostic codes submitted by physicians to ensure that the ordered tests(s) [sic] are medically

necessary."  *See* Opp. at 13 (emphasis added).  The regulation contains no such requirement.  *See*

Reply at 5.  Relator further argues that "[i]f a lab was not required to review the information

provided by the ordering physician, then there would be no reason for an express authorization to

request additional information to substantiate medical necessity."  Opp. at 13.  This conclusion

ignores the plain language of the regulations, which simply allows laboratories to obtain medical

---

[6/]        In fact, federal regulations could not be clearer that physicians are the only ones authorized to order
diagnostic tests:  "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered
by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a
beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific
medical problem.  Tests not ordered by the physician who is treating the beneficiary are not reasonable and
necessary (see § 411.15(k)(1) of this chapter)."  42 C.F.R. § 410.32(a).

documentation from doctors if it is needed to respond to an audit or to challenge a Medicare reimbursement denial.

In finding that a laboratory must establish medical necessity, the Opinion relies almost exclusively on CMS Form 1500.  *See* Opinion at 16-17.  Although a laboratory, as supplier of physician-requested services, is required to certify that the services provided were "medically indicated and necessary to the health of this patient," in no way does Form 1500 state who must "establish" the medical necessity for that particular patient.  Particularly where Form 1500 speaks to both physicians and suppliers,[7] it is clear there was no intent to have this form override the OIG Lab Guidance.  And nowhere does this Form suggest that a laboratory's certification has to be based on its own determination of medical necessity.  Treating physicians make medical necessity determinations and order tests; laboratories perform the ordered tests and bill Medicare for them.[8]  Boston Heart has found **not one case** that has held that the Form 1500 creates a duty for laboratories to make an independent determination as to medical necessity.

### C.    The Cited Case Law Does Not Support the Conclusion that Laboratories Must Establish Medical Necessity.

As support for the conclusion that laboratories must "establish the medical necessity of diagnostic tests," the Opinion cites two cases:  *Garcia v. Sebelius*, No. CV 10-8820 PA (RZx), 2011 WL 5434426 (C.D. Cal. Nov. 8, 2011) and *Nephropathology Assocs., PLC v. Sebelius*, No.

---

[7]      The certification states in full:  "**Signature of Physician (or Supplier)**: I certify that the services listed above were medically indicated and necessary to the health of this patient and **were personally furnished by me or my employee under my personal direction**."  CMS Form 1500 at 2 (emphasis added).  But Relator selectively quotes the certification to make it appear that it applies only to laboratories.  Specifically, Relator characterizes the form as follows:  "laboratories expressly certify on the back of the form 'that the services shown on [the] form were medically indicated and necessary for the health of the patient.'"  Second Amended Complaint ("SAC," dkt. 38) ¶ 33, Opp. at 11, 39.  She purposefully ignores the interplay of the duties of physicians and laboratories in order to place a duty on laboratories that does not—and should not—exist.

[8]      It should be noted that Boston Heart's current requisition form **requires** that physicians "certify that any custom profile on file and/or the ordered tests requested on this test requisition form are reasonable and medically necessary for the diagnosis and/or treatment of this patient's condition on this date of service."  Ex. 1 to the Declaration of Hope S. Foster, Esq. in support of Boston Heart's Motion to Dismiss (dkt. 48-3).

4:12CV00233JLH, 2013 WL 3285685 (E.D. Ark. June 27, 2013).  But both cases actually confirm that it is the physician who determines medical necessity, and a laboratory's responsibility is confined to submitting that documentation to the government and maintaining the physician's documentation supporting such a determination.  In citing these two cases, Relator, and in turn the Opinion, have inappropriately conflated obligations as to **documentation of medical necessity** and obligations as to the **actual determination of medical necessity**.

*Garcia* involved a physician's challenge of an HHS decision to recoup overpayments for services that HHS found not to be medically necessary.  There was no discussion of whose role it was to determine the medical necessity of the services; instead there was discussion only with respect to the provision of supporting documentation.  And, as to that issue, the court found that if the entity submitting the claims does not provide sufficient documentation as to medical necessity, then HHS will request from the physician further information to support the claim. *See* 2011 WL 5434426 at *7, n.6.  Clearly, *Garcia* contemplates that a physician decides medical necessity and a claim submitter maintains (or requests) sufficient documentation of that physician's determination.

*Nephropathology Assocs.* involved a laboratory's challenge to the government's coverage denial for renal pathology services.  The court found that the laboratory could not demonstrate medical necessity because it did not submit evidence that physicians had actually ordered tests for which the laboratory billed.  *See* 2013 WL 3285685 at *3.  Notably, the court looked to whether the physician ordered the test, not whether the laboratory itself believed the test was necessary.  Once again, the opinion stands for the proposition that the substantive decision on medical necessity lies with the treating physician, and it is the laboratory's responsibility to perform the test and maintain documentation of the physician's order.

Meanwhile, none of the remaining cases the Opinion cites on pages 17 and 18 supports the proposition that a laboratory must independently establish the medical necessity of tests it performs on a physician's request.  None takes the incredible step of finding that although a physician has made a determination that a laboratory test is reasonable and medically necessary, a laboratory is required to second-guess that medical opinion.  What makes the Opinion such an "important decision" in the eyes of Relator's counsel (*see*, footnote 3) is that no other court has held that a laboratory is obligated to establish medical necessity.

## II.   THIS COURT'S OPINION IS BASED ON AN INCORRECT LEGAL PREMISE AND SHOULD BE RECONSIDERED.

In sum, there is no authority for the premise the Court has adopted.  OIG guidance and regulations could not be clearer that physicians—not laboratories—establish medical necessity. ("We recognize that laboratories do not and cannot treat patients or make medical necessity determinations."  OIG Lab Guidance, 63 Fed. Reg. at 45,079.)  Boston Heart is not aware of any case law holding otherwise.  Indeed, the cases Relator cited do not support her argument.[9/]  That incorrect legal premise lies at the heart of the Court's Opinion and Relator's argument.  *See* Opp. at 5, 10-17.  The Court's adoption of this false premise underlies its conclusions with respect to both falsity (*see* Opinion at 15-19) and knowledge (*see id.* at 22-23) as to Relator's presentment allegations, as well as with respect to Relator's false statements allegations (*see id.* at 25-26). Without this lynchpin, Relator's argument fails.  In its Opinion, the Court stated, "Under either an express or implied false certification claim, the plaintiff must plead that the defendant 'knowingly violated a requirement that the defendant knows is material to the Government's

---

[9/]       And the consequences of this Court's decision could be dire.  Practically speaking, the Court's Opinion would result in a sea change in the health care industry by increasing the costs of and time required to perform lab testing.  And worse yet, a patient may not receive the laboratory testing his/her physician considers reasonable and necessary because a laboratory—perhaps with professional guidance, perhaps not—disagrees with the physician's assessment.

payment decision.'"  Opinion at 12 (*quoting Univ. Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1996 (2016)).  Here, where there is no requirement that a laboratory establish the medical necessity for a given test, the defendant could not knowingly violate a non-existent requirement and therefore could not violate the False Claims Act.  The SAC does not allege sufficient facts to allow the Court to reasonably infer that Boston Heart knew that it was submitting false claims. Opinion at 22-23 (Court based its decision that the SAC made sufficient allegations of knowledge on its adoption of Relator's incorrect assertion that Boston Heart had an independent duty to ensure the medical necessity of tests.)  The SAC should therefore be dismissed.

## CONCLUSION

For the foregoing reasons, Boston Heart respectfully requests that this Court reconsider its Opinion on Boston Heart's Motion to Dismiss and grant that motion in its entirety.

## REQUEST FOR ORAL HEARING

Pursuant to LCvR 7(f) and 78.1, Boston Heart respectfully requests an oral hearing on its Motion for Reconsideration.

## LCvR 7(m) STATEMENT

Pursuant to LCvR7(m), counsel for Boston Heart communicated with Relator's counsel regarding this Motion for Reconsideration and the parties agreed that they would be unable to reach an agreement on the sufficiency of Relator's claims at this point, and Relator's counsel further indicated that Relator plans to oppose this motion.

Dated:  June 23, 2017

Respectfully submitted,

BOSTON HEART DIAGNOSTICS
CORPORATION

By its attorneys


/s/ Hope S. Foster
Hope S. Foster (D.C. Bar No. 182998)
Karen S. Lovitch (D.C. Bar No. 452966)
Laurence J. Freedman (D.C. Bar No. 423099)
MINTZ LEVIN COHN FERRIS GLOVSKY
    AND POPEO, P.C.
701 Pennsylvania Ave. N.W., Suite 900
Washington, DC 20004
Telephone: (202) 434-7300
Facsimile: (202) 434-7400
HSFoster@mintz.com
KSLovitch@mintz.com
LJFreedman@mintz.com


Michael S. Gardener (*admitted pro hac vice*)
Samantha P. Kingsbury (*admitted pro hac vice*)
MINTZ LEVIN COHN FERRIS GLOVSKY
    AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
Facsimile: (617) 542-2241
MSGardener@mintz.com
SPKingsbury@mintz.com


Jonathan L. Kotlier
    (*admitted pro hac vice*)
Christopher H. Lindstrom
    (*admitted pro hac vice*)
Alison Holdway
    (*admitted pro hac vice*)
NUTTER, MCCLENNEN & FISH, LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone:    (617) 439-2000
Facsimile:    (617) 310-9000
jkotlier@nutter.com
clindstrom@nutter.com
aholdway@nutter.com

- 11 -

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on June 23, 2017, this document (filed through the ECF system) will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

 /s/ Hope S. Foster
Hope S. Foster

70073582v.2