# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al. ex rel*. TINA D. GROAT, M.D., M.B.A. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. : 1:15-cv-00487 (RBW) |
| BOSTON HEART DIAGNOSTICS CORPORATION | ) ) ) | |
| Defendant. | ) ) ) ) ) | |

## RELATOR'S OPPOSITION TO DEFENDANT'S MOTION FOR RECONSIDERATION

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ...................................................................................................... iii

**INTRODUCTION** ..........................................................................................................................1

**ARGUMENT** ................................................................................................................................1

     I.      Boston Heart Does Not Meet the Standard for Reconsideration .............................2

     II.     The Court's Opinion Should Stand .........................................................................6

         A.  Boston Heart's Imaginary Parade of Horribles is Not Based in Fact ...............6

         B.  The OIG Lab Guidance Establishes a Lab's Duty to Submit Claims Only for Tests that are Medically Necessary ...................................................................9

         C.  Boston Heart's Argument Based on Recordkeeping Regulations is Meritless.... ..........................................................................................................................11

         D.  Boston Heart's Challenge of Two of the Six Cases Cited by the Court is Meritless .........................................................................................................13

**CONCLUSION** ...........................................................................................................................17

# TABLE OF AUTHORITIES[1]

## Cases

Abulhawa v. United States Dep't of Treasury, 2017 WL 2465045 (D.D.C. June 7, 2017)............2

Estate of Gaither ex rel. Gaither v. District of Columbia, 771 F. Supp. 2d 5 (D.D.C. 2011) .........3

Garcia v. Sebelius, 2011 WL 5434426 (C.D. Cal. Nov. 8, 2011) ...............................14, 15, 16, 17

Lemmons v. Georgetown Univ. Hosp., 241 F.R.D. 15 (D.D.C. 2007) (Walton, J.) ..................2, 6

Lovely-Coley v. D.C., 2017 WL 2533339 (D.D.C. June 9, 2017) (Walton, J.) ..........................2, 3

Morales v. Quintiles Transnational Corp., 25 F. Supp. 2d 369 (S.D.N.Y. 1998)...........................2

Nephropathology Assocs., PLC v. Sebelius, 2013 WL 3285685 (E.D. Ark. June 27, 2013)............
.................................................................................................................................16, 17

Said v. Nat'l R.R. Passenger Corp., 191 F. Supp. 3d 55 (D.D.C. 2016) (Walton, J.).................2, 6

United States v. Berkeley Heartlab, Inc., 2016 WL 7851459 (D.S.C. Mar. 28, 2016) ................13

United States v. Dynamic Visions, Inc., 2017 WL 1476102 (D.D.C. Apr. 24, 2017) ...............4, 5

United States ex rel. Merena v. SmithKline Beecham Corp., 205 F.3d 97(3d Cir. 2000) ............13

United States v. Sessa, 2011 WL 867175 (E.D.N.Y. Mar. 8, 2011)................................................3

## Statutes, Regulations, and Rules

Fed. R. Civ. P. 54(b) ......................................................................................................................2

31 U.S.C. § 3729(b)(1)(A) ............................................................................................................8

42 U.S.C. § 1395y(a)(1)(A) ........................................................................................................10

42 C.F.R § 410.32 ................................................................................................ passim

## Other Authorities

Medicare Claims Processing Manual, CMS Pub. 100-4, Laboratory Services, Ch. 16, § 10 (Apr. 29, 2016) ......................................................................................................................7

Medicare Program Integrity Manual, Chapter 13 – Local Coverage Determinations (Aug. 14, 2015) ......................................................................................................................7

OIG Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 45,706, 1998 WL 517789 (Aug. 24, 1998).................................................................................3, 4, 8, 9, 10

---

[1] Local Civil Rule 7(a) provides that "[i]f a table of cases is provided, counsel shall place asterisks in the margin to the left of those cases or authorities on which counsel chiefly relies." Undersigned counsel respectfully suggests that Relator does not "chiefly rely" on any cases within the meaning of Local Civil Rule 7(a).

OIG Compliance Program Guidance for Hospitals, 63 FR 8987-02, 1998 WL 68592 (Feb. 23, 1998) ....................................................................................................................................5

OIG Compliance Program for Individual and Small Group Physician Practices, 65 FR 59434-01, 2000 WL 1471420 (Oct. 5, 2000) ...............................................................................5, 10

**INTRODUCTION**

In its motion for reconsideration, Boston Heart asks the Court to reconsider the portion of its opinion in which it held that a laboratory has "an independent obligation to certify that the tests for which it requested government reimbursement were medically necessary." (Dkt. 54 ("Opinion") at 19). Tellingly, Boston Heart insists that "[t]his premise is simply wrong." (Dkt. 58 ("Motion") at 4).  As this Court has explained on countless occasions, there is a limited number of appropriate bases under which a party may move for reconsideration, and mere disagreement with a decision, *i.e.* saying that the Court was "simply wrong," is a quintessential example of an abuse of a motion for reconsideration.  Overall, Boston Heart rehashes the same arguments the Court has already considered and attempts to raise new arguments for the first time in a motion for reconsideration to convince the Court that it was "simply wrong."  Even more tellingly, Boston Heart's motion conveniently does not proffer the standard for reconsideration and instead presents the issue as if it was entitled to a *de novo* bite at the apple. Consequently, Boston Heart fails to proffer any appropriate basis for reconsideration, and the Court should deny Boston Heart's motion on that basis alone.  Even if the Court considers the merits of Boston Heart's arguments in support of reconsideration, all are meritless for the same reasons already addressed by the Court.

**ARGUMENT**

The Court should deny Boston Heart's motion for reconsideration, because (1) Boston Heart has not identified any appropriate basis for a motion for reconsideration and (2) even if the Court considers Boston Heart's arguments on the merits, the arguments are meritless for the same reasons already addressed by the Court, and Boston Heart fails to show that the Court should alter its prior analysis and decision.

### I.   Boston Heart Does Not Meet the Standard for Reconsideration.

As this Court has explained, "[u]nder Federal Rule of Civil Procedure 54(b), any order or decision that does not constitute a final judgment 'may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities' with the burden resting on the party moving for reconsideration." Lovely-Coley v. D.C., 2017 WL 2533339, at *2 (D.D.C. June 9, 2017) (Walton, J.) (quoting Fed. R. Civ. P. 54(b)).

Overall, "district courts grant motions for reconsideration of interlocutory orders only as justice requires" and "[i]n deciding whether justice requires reversal of a prior interlocutory order, courts assess circumstances such as whether the court patently misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or whether a controlling or significant change in the law has occurred." Id. at ** 2, 5 (internal quotation marks omitted).

Importantly, "motions for reconsideration are vehicles for neither reasserting arguments previously raised and rejected by the court nor presenting arguments that should have been raised previously with the court." Said v. Nat'l R.R. Passenger Corp., 191 F. Supp. 3d 55, 57 (D.D.C. 2016) (Walton, J.).  This is because "where litigants have once battled for the [C]ourt's decision, they should neither be required, nor without good reason permitted, to battle for it again." Lemmons v. Georgetown Univ. Hosp., 241 F.R.D. 15, 32 (D.D.C. 2007) (Walton, J.) (internal quotation marks omitted).  Put differently, a motion for reconsideration "is not a substitute for appeal." Morales v. Quintiles Transnational Corp., 25 F. Supp. 2d 369, 372 (S.D.N.Y. 1998).  Indeed, *"filing a motion of this kind is almost never appropriate."* Abulhawa

v. United States Dep't of Treasury, 2017 WL 2465045, at *3 (D.D.C. June 7, 2017) (emphasis added) (internal quotation marks omitted).

Although Boston Heart does not at all present or discuss the standards pursuant to which a district court will consider a motion for reconsideration, it is evident that Boston Heart makes no claim in its motion of an appropriate basis for reconsideration, *i.e.* that it was patently misunderstood, that the Court's decision went beyond the issues presented, that a change in the law occurred, or that the Court failed to consider "controlling decisions or data." See Lovely-Coley, 2017 WL 2533339, at *2. The only even plausible basis under which this Court can judge the motion for reconsideration is that the Court failed to consider "controlling decisions or data." As such, the motion must fail because the Court, in rendering its decision on the issue for which Boston Heart seeks reconsideration, did consider controlling court decisions and applicable regulations. Indeed, the Court cited six court decisions, Medicare regulations (42 C.F.R. § 410.32(d)(2)-(3)) and a Department of Justice press release in support of its holding that Boston Heart had "an independent obligation to certify that the tests for which it requested government reimbursement were medically necessary." (Opinion at 19).

Boston Heart simply does not like this Court's interpretation of the "controlling decisions or data." This is not a basis for reconsideration. "[I]t is well-established that 'motions for reconsideration,' whatever their procedural basis, cannot be used as an opportunity to reargue facts and theories upon which a court has already ruled." Estate of Gaither ex rel. Gaither v. District of Columbia, 771 F. Supp. 2d 5, 10 (D.D.C. 2011) (internal quotation marks omitted); see also United States v. Sessa, 2011 WL 867175, at *1 (E.D.N.Y. Mar. 8, 2011) ("Courts have repeatedly warned parties that motions for reconsideration should not be made reflexively in

3

order to reargue those issues already considered when a party does not like the way the original motion was resolved." (internal quotation marks omitted).

Boston Heart's first and main argument for reconsideration rests on guidance of the Office of Inspector General (OIG), namely Publication of OIG Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 45,706, 1998 WL 517789 (Aug. 24, 1998) ("OIG Lab Guidance").  (Motion at 2-5). Aside from the fact that Boston Heart misleads the Court by selectively quoting from the OIG Lab Guidance and misconstruing it (*see infra*.), Boston Heart has already presented the OIG Lab Guidance to the Court in its reply brief in support of its motion to dismiss.  (Dkt. 52 at 4). This Court need not consider the same argument again. See Said v. Nat'l R.R. Passenger Corp., Id. at 57 (Walton, J.) ("[M]otions for reconsideration are vehicles for neither reasserting arguments previously raised and rejected by the court."). Contrary to Boston Heart's suggestion otherwise (Motion at 6 n. 4), it is of no consequence that the Opinion does not specifically address Boston Heart's s argument in its reply brief based on the OIG Lab Guidance. "The Court need not specifically address in minute detail each argument presented when it is plain that there is no merit whatsoever to them." Campbell v. Poole, 2008 WL 2561998, at *2 (W.D.N.Y. June 26, 2008) (denying motion for reconsideration); see also Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 930 (1st Cir. 2014)  ("In any event, courts are not required to address every case cited by a litigant, and declining to distinguish a particular non-controlling decision can hardly constitute an abuse of discretion.").  This is particularly true given that, despite the fact that the OIG Lab Guidance was promulgated in 1998, Boston Heart mentioned it for the first time in its reply brief.  See United States v. Dynamic Visions, Inc., 2017 WL 1476102, at *4 (D.D.C. Apr. 24, 2017) (noting the "the impropriety of raising new arguments in reply").

Boston Heart then concocts a tenuous and specious argument out of other instances of OIG guidance *that it now asserts for the first time*.  (Motion at 4 (citing OIG Compliance Program Guidance for Hospitals, 63 FR 8987-02, 1998 WL 68592 (Feb. 23, 1998); OIG Compliance Program for Individual and Small Group Physician Practices, 65 FR 59434-01, 2000 WL 1471420 (Oct. 5, 2000)).  These guidance documents were issued in 1998 and 2000 respectively and as such were plainly available to Boston Heart at the time it filed its motion to dismiss.  Because this argument is being raised for the first time in a motion for reconsideration, the Court should not consider it. See Said, 191 F. Supp. 3d at 57 (Walton, J.) (explaining that motions for reconsideration are not "vehicle[s] for . . . presenting arguments that should have been raised previously with the court"); see Dynamic Visions, 2017 WL 1476102, at * 3 (denying motion for reconsideration where the moving party "provide[d] no reason why [previously available materials] were not provided during discovery or at least during the summary judgment briefing stage, or why the Court should nevertheless consider them now").  Further, as addressed herein (*infra* § II.B), it is arguable whether these first time arguments are even relevant to the issues at hand.

Boston Heart's next argument is that the "Court dismissed the import of § 410.32(d)(2)." (Motion at 9).  First, this is not true.  The Court carefully analyzed that regulation alongside the certifications required on CMS Form 1500 and concluded that "[t]he regulation simply does not state that only the ordering physician, and not the entity submitting the claim, has the obligation to certify medical necessity of the tests at issue when submitting claims for payment." (Opinion at 18).  Second, even if Boston Heart's mischaracterization of the Court's analysis was correct, dismissing the importance of a regulation or an argument based on a regulation does not meet the

standard required for a motion for reconsideration.  It certainly does not constitute a failure to consider controlling decisions or data.

Finally, Boston Heart argues that the case law does not support the Court's findings, and re-examines only two of the six cases cited by the Court in finding that Boston Heart was obligated to submit claims only for medically necessary tests.  However, requesting the Court to interpret the case law differently than it did in its Opinion is simply not a basis for reconsideration.  Further, contesting the interpretation of these two cases and simply stating that "none of the remaining cases the Opinion cites…supports the proposition that a laboratory must independently establish the medical necessity of tests" is merely Boston Heart's attempt to wage again a battle that it has already lost.  See Lemmons, 241 F.R.D. at 32 (Walton, J.) ("[W]here litigants have once battled for the [C]ourt's decision, they should neither be required, nor without good reason permitted, to battle for it again.")  As such, this argument should not be considered by the Court.

Consequently, Boston Heart has not set forth an appropriate basis for reconsideration, and its motion should be denied.

## II.     The Court's Opinion Should Stand.

Even if Boston Heart had identified any appropriate basis for reconsideration (which it has not), Boston Heart has not shown that the Court should alter its prior analysis and decision.

### A.     Boston Heart's Imaginary Parade of Horribles is Not Based in Fact

Boston Heart argues that the Opinion results in requiring a lab "to conduct an independent medical review of all requisition forms submitted by a treating physician with respect to each and every patient."  (Mot. at 2). This is simply not true.  The Opinion finds that a lab has "independent obligation to certify that the tests for which it bills the government are medically

necessary." (Opinion at 23). A lab's certification of medical necessity does not necessarily require an independent medical review of every test ordered, and the Court does not order such an independent medical review.

For those tests that are known to be never medically necessary under any circumstances or for any diagnoses, labs can quite easily and should remove them from their test requisition forms. (Relator's Second Amend. Compl. [Dkt. 38] ¶ 77 (describing specific genetic tests that are never medically necessary, including F2, F5 and MTHFR tests)). This would include the tests at issue here that "did not comport with clear industry guidelines, including those of the American Heart Association, the American College of Cardiology, National Cholesterol Education Program and the National Academy of Clinical Biochemistry. "General acceptance by the medical community" and "[c]onsensus of expert medical expert medical opinion (i.e., recognized authorities in the field)" are important considerations in evaluating whether a provided service is medically necessary.[2] Likewise, "[a]cceptance by individual health care providers, or even a limited group of health care providers, normally does not indicate general acceptance by the medical community." Id. In addition, Medicare National and Local Coverage Determinations focus specifically on certain of these tests and state that they are not medically necessary, should not be billed to Medicare and are not covered." (Dkt. 38 at ¶ 5).

For the tests that are rarely medically necessary and only so for certain specific diagnoses, labs can review test requisition forms when those specific tests are ordered to ensure that the required diagnoses are present. See e.g. id. at ¶¶ 82-83 (describing that CYP2C19 test is only appropriate in correlation with certain diagnosis codes); id. at ¶¶ 89-90 (describing that CYP2C9 test is only appropriate for people taking certain medications). This would include the tests at

---

[2] See Medicare Program Integrity Manual, Chapter 13 – Local Coverage Determinations, at § 13.7.1 (Aug. 14, 2015), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/pim83c13.pdf.

issue here that are specifically not medically necessary for the patients with only the four common diagnoses of (1) routine medical exam, (2) hypertension, (3) hyperlipidemia, or (4) fatigue and malaise. Id. at ¶ 70.

If diagnoses given to justify a test do not indicate "signs or symptoms of disease" then it is clear that the test would be for screening purposes and would not be reimbursable.  Id. at ¶ 69. As Relator explains in the operative complaint, "[s]creening services such as pre-symptomatic genetic tests and services used to detect an undiagnosed disease or disease predisposition are not a Medicare benefit and are not covered." Id. at ¶ 68; see also Medicare Claims Processing Manual, CMS Pub. 100-4, Laboratory Services, Ch. 16, § 10 (Apr. 29, 2016), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c16.pdf (explaining that "[t]ests that are performed in the absence of signs, symptoms, complaints, personal history of disease, or injury are not covered except when there is a statutory provision that explicitly covers tests for screening as described").

Thus, there are clear cases where labs, following medical industry guidelines and applicable NCDs and LCDs, can take simple actions that do not require a review of every claim.

For the remaining claims for noncontroversial tests for which there is not a plethora of industry and government guidance stating that the tests are not medically necessary, labs are and always have been required to be able to prove medical necessity, particularly if a claim for payment is challenged by CMS. 42 C.F.R. § 410.32(d).   For these claims, to satisfy its "independent obligation to certify that the tests for which it bills the government are medically necessary" (Opinion at 23), a lab can defer to the documentation and diagnosis given by the ordering provider in order to justify the medical necessity of the test.  Nothing in the Court's Opinion suggests that labs must question the accuracy of the diagnosis code submitted by a

physician.  A lab, as a for profit business, can decide to expend its own additional resources to ensure that a test it performs is medically necessary and will be reimbursable by Medicare.  But what it *cannot* do is stick its head in the sand and continue to perform tests that it knows predominant industry authority and government guidance conclude are not medically necessary.

Boston Heart argues that "a lab could be subjected to a false claim allegation on every test it performs at the direction of a physician." (Motion at 2)  This is not true.  Labs are protected from capricious false claim allegations by the scienter requirement of the False Claims Act, 31 U.S.C. § 3729(b)(1)(A).  The False Claims Act "defines the knowledge element of a false claim or false statement action as requiring a defendant to have 'actual knowledge of the information' or to 'act in deliberate ignorance ... [or] reckless disregard of the truth or falsity of the information." (Opinion at 22 (citing 31 U.S.C. § 3729(b)(1)(A)). Thus, not every test a lab performs could be challenged as a false claim.  Only those tests where a lab has actual knowledge that the tests were medically unnecessary or when the lab deliberately ignored or recklessly disregarded such knowledge could the tests be challenged as false claims.  All other tests ordered by physicians for which the lab has no basis to know that the tests are not medically necessary are insulated from a False Claims Act challenge by this scienter requirement.

**B.      The OIG Lab Guidance Establishes a Lab's Duty to Submit Claims Only for Tests that are Medically Necessary.**

Boston Heart's first argument for reconsideration rests on one sentence in the OIG Lab Guidance – "We recognize that laboratories do not and cannot treat patients or make medical necessity determinations." (Motion at 2-5 (quoting 63 Fed. Reg. at 45,079, 1998 WL 517789)). Boston Heart misleads the Court by selectively quoting from the OIG Lab Guidance and misconstruing it.  The entirety of this OIG Lab Guidance firmly establishes a lab's duty to only submit claims for medically necessary tests and directly aligns with the CMS Form 1500

requirement for "physician or supplier" that "that the services shown on [the] form were medically indicated and necessary for the health of the patient." (Dkt. 38 ¶ 33)  The OIG Lab Guidance states:

- A lab has a legal duty **to ensure that it is not submitting false or incorrect claims to Government and private payors.**  <u>See</u> 63 Fed. Reg. at 45,077 ("In addition to fulfilling its legal duty to ensure that it is not submitting false or incorrect claims to Government and private payors, a clinical laboratory may gain numerous additional benefits by implementing an effective compliance program.").

- Laboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable and necessary." <u>Id</u>. at 45,079.

- "…physicians must be made aware by *the billing laboratory* that Medicare will only pay for tests that meet the Medicare coverage criteria and are reasonable and necessary to treat or diagnose an individual patient" <u>Id</u>. (emphasis added).

- "Medicare may deny payment for a test that the physician believes is appropriate, but which does not meet the Medicare coverage criteria (e.g., **done for screening purposes**) or where documentation in the entire patient record, including that maintained in the physician's records, does not support that the tests were reasonable and necessary for a given patient." <u>Id</u>. (emphasis added)

- "Laboratories can and should advise their clients that tests submitted for Medicare reimbursement must meet program requirements or the claim may be denied." <u>Id</u>.

- "…labs are in a unique position to educate their physician clients. Therefore, laboratories should provide all of their physician clients with…The Medicare national policy and Medicare contractor local medical review policy for lab tests…" <u>Id</u>.

- "…if the laboratory discovers that it has in some way contributed to the ordering of unnecessary tests, the OIG believes the laboratory has a duty to modify its practices, as well as notify the physicians(s) or other authorized individual(s) of its concerns and recommend corrective action." <u>Id</u>.

This OIG Lab Guidance was promulgated to instruct each lab on how it might set up a compliance program.  The purpose of such a compliance program is to ensure that the lab is "fulfilling its legal duty to ensure that it is not submitting false or incorrect claims to Government … payors" (63 Fed. Reg. at 45,077), which comports with Medicare's overarching principle that

Medicare will only pay for medically necessary services.[3]  It is precisely because it is illegal for labs, as the service provider and the entity being reimbursed, to submit claims for medically unnecessary tests that such compliance programs are required.  While the Guidance does not suggest that a lab decide medical necessity in lieu of the physician, it is most definitely burdened with ensuring that its CMS-1500 certification is true.  This certainly includes ensuring that tests known to be medically unnecessary in all cases not be performed and billed to the Government, that required diagnoses are present for tests that are only necessary for those diagnoses, and that tests known to be only for screening purposes not be performed.

Apart from the OIG Lab Guidance, Boston Heart also relies upon OIG guidance for physicians.  (Mot. at 58 (citing 65 Fed. Reg.at 59,445, 2000 WL 1471420)).  The portion of this guidance quoted by Boston Heart appears in an appendix and is designed to steer physicians away from fraudulent activities.  Id. at 59,445 ("Activities such as signing blank CMNs [Certificates of Medical Necessity], signing a CMN without seeing the patient to verify the item or service is reasonable and necessary, and signing a CMN for a service that the physician knows is not reasonable and necessary.").  It does not purport to unequivocally determine the entire universe of providers who bear the responsibility to bill only for medically necessary services.  Indeed, by stating that "Medicare **primarily** relies on the professional judgment of the treating physician" to determine medical necessity, the OIG tacitly acknowledges that Medicare will not solely rely on a physician's determination of medical necessity at all times. Id.  Thus, a lab cannot entirely insulate itself from False Claims Act liability by always deferring to a physician's order.

---

[3] See 42 U.S.C. § 1395y(a)(1)(A) ("no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services. . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member").

### C.     Boston Heart's Argument Based on Recordkeeping Regulations is Meritless.

Boston Heart argues that it can be inferred from the recordkeeping requirements for diagnostic laboratory tests set forth in 42 C.F.R. § 410.32(d)(2) that labs bear no responsibility to ensure that they are only billing the government for medically necessary tests.  (Mot. at 5-7)  Boston Heart argues that the plain language of the requirements show that labs are merely a pass-through entity, and that so long as they "maintain the documentation physicians provide" and "can show that the "claims [the labs] submitted for reimbursement reflect the tests physicians ordered," they have satisfied all of their legal obligations. Id. at 6. This is no more than an unsubstantiated leap in logic.  There is simply nothing in the record keeping requirements that: (1) absolves labs from their obligation to certify that its claims are for medically necessary tests; (2) indicates that the documentation provided by the ordering physician or nonphysician practitioner represents the entire universe of possible support for medical necessity, even if it is the primary source of such support; or (3) states that the mere existence of such physician or nonphysician practitioner documentation automatically supports a finding of medical necessity.

Contrary to Boston Heart's argument, the recordkeeping requirements support a lab's obligation to establish medical necessity.  The recordkeeping requirements mandate that the ordering practitioner "maintain documentation of medical necessity in the beneficiary's medical record" and that the lab maintain such documentation. 42 C.F.R. §§ 410.32(d)(2)(i), (d)(2)(ii). Furthermore, the lab "may request additional diagnostic and other medical information to document that the services it bills are reasonable and necessary." Id. at § 410.32(d)(2)(iii)).  All of this directly supports, and indeed confirms, the lab's independent obligation to certify that the tests for which it bills the government are medically necessary.   To argue otherwise makes the lab merely a storage facility for documentation, which cannot be the intent of these regulations.

12

For example, if the diagnosis code submitted by an ordering practitioner does not bear any relationship to the ordered test, laboratories are authorized to ask the physician to provide additional information to justify medical necessity.   If a lab was intended to have no obligation to certify medical necessity, there would be no reason to authorize it to request additional information from the ordering physician.   Certainly for tests that are never medically necessary or not medically necessary for the four common diagnoses, documentation of medical necessity simply does not exist, and Boston Heart cannot rely on the underlying medical records in fulfilling its certification obligation for such tests.

It must be noted that under this same regulation, there is a specific subsection concerning medical necessity:

> (iii) Medical necessity. The entity submitting the claim may request additional diagnostic and other medical information from the ordering physician or nonphysician **practitioner to document that the services it bills are reasonable and necessar**y. If the entity requests additional documentation, it must request material relevant to the medical necessity of the specific test(s), taking into consideration current rules and regulations on patient confidentiality. (§ 410.32(d)(3)(iii))

42 C.F.R. § 410.32(d)(3)(iii).   This subsection, which uses the exact same language of § 410.32(d)(2)(iii), also supports the lab's certification obligation.   Under the heading "Medical necessity," "[t]he entity submitting the claim" (the lab) may take certain actions to "**document that the services it bills are reasonable and necessar**y." Id. (emphasis added). This squarely places the onus on the lab, the entity providing the service and submitting the claim for reimbursement, to document the medical necessity of its tests.

**D.      Boston Heart's Challenge of Two of the Six Cases Cited by the Court is Incorrect.**

Finally, Boston Heart contends that two of six the cases relied upon the Court in the section of its opinion addressing this issue "confirm that it is the physician who determines medical necessity, and a laboratory's responsibility is confined to submitting that documentation to the government and maintaining the physician's documentation supporting such a determination." (Motion at 11). These cases do not support this proposition, nor do these cases undermine the proposition for which the Court cited them in its opinion.

As a starting point, Boston Heart only substantively addresses two of the six cases that the Court cited in the section of its opinion addressing laboratories' obligation to establish medical necessity. (Opinion at 15-19). With respect to the other cases, Boston Heart simply dismisses these cases in saying that "[n]one of the remaining cases the Opinion cites on pages 17 and 18 supports the proposition that a laboratory must independently establish the medical necessity of tests it performs on a physician's request." (Motion at 12). Suffice it to say, Boston Heart's failure to discuss these cases appears to be an acknowledgement that the cases stand for the propositions for which the Court cited them. For example, the Court said that Boston Heart's argument is "belied . . . by other False Claims Act actions against laboratories for allegedly submitting claims for medically unnecessary tests." (Opinion at 18). In support of that proposition, the Court cited United States ex rel. Merena v. SmithKline Beecham Corp., 205 F.3d 97 (3d Cir. 2000) and United States v. Berkeley Heartlab, Inc., 2016 WL 7851459 (D.S.C. Mar. 28, 2016). Both of these cases expressly support the proposition for which the Court cited them, *i.e.* both cases are examples of the imposition of FCA liability against labs in connection with billing for medically unnecessary tests.

Turning to the cases specifically discussed by Boston Heart, the first is <u>Garcia v. Sebelius,</u> 2011 WL 5434426 (C.D. Cal. Nov. 8, 2011).  In <u>Garcia</u>, a physician worked with a sleep lab.  The sleep lab billed Medicare for services under the physician's Medicare provider number, and the Government initially paid for the billed services.  As part of a post-payment audit, the Government reviewed medical records and determined that the records "were insufficient to support the reasonableness and medical necessity of the services billed."  <u>Id</u>. at *3. Accordingly, the Government sought recoupment of the payments made for these services as overpayments.  The physician contended that the sleep lab should be held liable for any overpayment because "he had nothing to do with billing Medicare" even though the services were billed under his Medicare provider number.  <u>Id</u>. The physician "never attempted to defend or establish the reasonableness and necessity of the services at issue."  <u>Id</u>. at *5.  After exhausting his administrative remedies, the physician sought relief in the district court, which affirmed the imposition of overpayment liability upon the physician. <u>Id</u>. at *7.

According to Boston Heart, <u>Garcia</u> "contemplates that a physician decides medical necessity and a claim submitter maintains (or requests) sufficient documentation of that physician's determination." (Motion at 11).  Nothing in *Garcia* supports this proposition.  *Garcia* explains, in language cited by the Court in its Opinion, that the "regulatory scheme places the burden of establishing the medical necessity of diagnostic tests on the entity submitting the claim." 2011 WL 5434426, at *7.  It further notes, essentially tracking the language of 42 C.F.R. § 410.32(d):

> Upon request by CMS, the entity submitting the claim must provide information about the claims.  If this information does not demonstrate that the service is reasonable and necessary, CMS provides the physician with information sufficient to identify the claim being reviewed; requests from the physician those parts of the beneficiary's medical record that are relevant to the specific

> claim(s) being reviewed; and, if the physician does not supply the
> documentation requested, informs the entity submitting the
> claim(s) that the documentation has not been supplied and denies
> the claim.

Id. at *7 n. 6.

Garcia does not say that "the entity submitting the claim," *i.e.* the lab in the present case, has no independent obligation with respect to its certification of medical necessity. Rather, *Garcia* correctly explains that under § 410.32(d), the Government can request documentation from the billing entity to support medical necessity, and if the billing entity does not provide sufficient information, the Government can directly request the information from the physician. The Government's ability to request information from the physician does not somehow absolve the billing entity of any responsibility with respect to certifying medical necessity. Indeed, as the Court explained in its opinion, "Boston Heart's reliance on the Medicare regulation regarding documentation and recordkeeping requirements is unavailing because that provision does not address the entity's certification of medical necessity on the CMS-1500 form." (Opinion at 16).

The second case addressed by Boston Heart is Nephropathology Assocs., PLC v. Sebelius, 2013 WL 3285685 (E.D. Ark. June 27, 2013). In Nephropathology Assocs., physicians performed biopsies and sent them to a lab for testing and diagnosis services. The lab then submitted reimbursement claims for the provided services to the Government. A separate regulatory provision, not directly at issue in this case, provides that "[t]ests not ordered by the physician who is treating the beneficiary are not reasonable and necessary" and thus not reimbursable. 42 C.F.R. § 410.32(a). The Government denied the lab's reimbursement claims, because the lab failed to demonstrate that physicians had actually ordered the services it provided. The lab challenged this denial in court on the basis that physicians had in fact ordered the services. The court rejected this argument. First, the court noted that "[t]he burden is on the

provider of services—here, Nephropath [the lab] —to furnish sufficient information for the decision maker to determine whether payment should be made and how much should be made." Id. at *3.  The court went on to hold that the lab failed to carry its burden because it "did not provide any documents that it received from an ordering physician, nor did it produce documentation of telephone calls from treating physicians ordering the services in question." Id.

As with Garcia, the Court cited Nephropathology Assocs. for the limited purpose of pointing out that the burden to establish compliance with regulatory criteria rests with the entity submitting a reimbursement claim, *i.e.* the lab in the context of lab testing services.  (Opinion at 17).  A review of Nephropathology Assocs. confirms that a lab indeed has the burden. Somehow, Boston Heart claims that Nephropathology Assocs. "stands for the proposition that the substantive decision on medical necessity lies with the treating physician, and it is the laboratory's responsibility to perform the test and maintain documentation of the physician's order." (Mot. at 8).  This is simply not true.  Nephropathology Assocs. found that the lab failed to show that the treating physician ordered the tests, which is required since "[t]ests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."  42 C.F.R. § 410.32(a).  Of course, the fact that tests *not* ordered by the treating physician are *not* considered reasonable and necessary does not mean that, as Boston Heart appears to contend, all tests ordered by treating physicians are reasonable and necessary.  This is flawed logic and an attempt to rewrite the regulation to say what Boston Heart wishes it said.  Simply put, the fact that one of the requirements is that a treating physician must order a test in the first place does not eliminate the lab's requirement to certify that the test ordered by the physician and performed by the lab be reasonable and necessary.

In sum, the Court's reliance on <u>Garcia</u> and <u>Nephropathology Assocs.</u> for the proposition that a lab (as the entity submitting the claim) bears to burden to establish compliance with the reimbursement requirements, including that the provided services were medically necessary, was entirely appropriate.

## **CONCLUSION**

For the reasons stated herein, Relator respectfully requests that this Court deny Boston Heart's motion for reconsideration.

Dated:  July 14, 2017                                    Respectfully submitted,

                                                        **MEHRI & SKALET, PLLC**

                                                        */s/      Steven A. Skalet*
                                                        Steven A. Skalet
                                                        Mehri & Skalet, PLLC
                                                        1250 Connecticut Ave. NW Suite 300
                                                        Washington, DC  20036
                                                        Telephone: 202.822.5100 ext. 105
                                                        Facsimile: 202.822.4997 |
                                                        sskalet@findjustice.com

                                                        Sherrie R. Savett (admitted *pro hac vice)*
                                                        (PA Bar No. 17646)
                                                        Russell D. Paul (admitted *pro hac vice)*
                                                        (PA Bar No. 71220)
                                                        **BERGER & MONTAGUE, P.C.**
                                                        1622 Locust Street
                                                        Philadelphia, PA  19103-6305
                                                        Telephone: (215) 875-3000
                                                        Facsimile: (215) 875-4604
                                                        ssavett@bm.net
                                                        rpaul@bm.net

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 14, 2017 a true and correct copy of the foregoing has been

served electronically on all parties of record via the court's CM/ECF system..

*/s/ Steven A. Skalet*  
Steven A. Skalet  
**MEHRI & SKALET, PLLC**  
1250 Connecticut Avenue, NW  
Suite 300  
Washington, DC 20036-1609  
(202) 822-5100  
Fax: (202) 822-4997