**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al. ex rel*. TINA D. GROAT, M.D., M.B.A.<br><br>Plaintiffs,<br><br>v.<br><br>BOSTON HEART DIAGNOSTICS CORPORATION<br><br>Defendant. | CASE NO. : 1:15-cv-00487 (RBW) |

**RELATOR'S SUBSTITUED OPPOSTION**
**<u>TO DEFENDANT'S MOTION FOR RECONSIDERATION</u>**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ iii

**INTRODUCTION** ........ 1

**ARGUMENT** ........ 1

I. Boston Heart Does Not Meet the Standard for Reconsideration ........ 1

II. The Court's Opinion Should Stand ........ 4

A. Boston Heart's Imaginary Parade of Horribles is Not Based in Fact ........ 4

B. The OIG Lab Guidance Establishes a Lab's Duty to Submit Claims Only for Tests that are Medically Necessary ........ 6

C. Boston Heart's Argument Based on Recordkeeping Regulations is Meritless ........ 7

D. The Court Correctly Cited Case Law to Support Its Holding ........ 9

**CONCLUSION** ........ 10

# TABLE OF AUTHORITIES[1]

## Cases

Estate of Gaither ex rel. Gaither v. District of Columbia, 771 F. Supp. 2d 5 (D.D.C. 2011) .........2

Garcia v. Sebelius, 2011 WL 5434426 (C.D. Cal. Nov. 8, 2011) ............................................9, 10

Lemmons v. Georgetown Univ. Hosp., 241 F.R.D. 15 (D.D.C. 2007) (Walton, J.) .......................2

Lovely-Coley v. D.C., 2017 WL 2533339 (D.D.C. June 9, 2017) (Walton, J.) ......................1, 2, 3

Nephropathology Assocs., PLC v. Sebelius, 2013 WL 3285685 (E.D. Ark. June 27, 2013)........10

United States v. Dynamic Visions, Inc., 2017 WL 1476102 (D.D.C. Apr. 24, 2017) ...................3

## Statutes, Regulations, and Rules

31 U.S.C. § 3729(b)(1)(A) ..........................................................................................................5

42 C.F.R § 410.32 .......................................................................................................... *passim*

## Other Authorities

Medicare Program Integrity Manual, Chapter 13 – Local Coverage Determinations (Aug. 14, 2015) ..............................................................................................................................4

OIG Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 45,706, 1998 WL 517789 (Aug. 24, 1998) .............................................................................................2, 3, 6, 7

OIG Compliance Program Guidance for Hospitals, 63 FR 8987-02, 1998 WL 68592 (Feb. 23, 1998) ..............................................................................................................................3

OIG Compliance Program for Individual and Small Group Physician Practices, 65 FR 59434-01, 2000 WL 1471420 (Oct. 5, 2000) ..........................................................................................3, 7

[1] Local Civil Rule 7(a) provides that "[i]f a table of cases is provided, counsel shall place asterisks in the margin to the left of those cases or authorities on which counsel chiefly relies." Undersigned counsel respectfully suggests that Relator does not "chiefly rely" on any cases within the meaning of Local Civil Rule 7(a).

## INTRODUCTION

Boston Heart asks the Court to reconsider the portion of its opinion in which it held that a laboratory has "an independent obligation to certify that the tests for which it requested government reimbursement were medically necessary." (Dkt. 54 ("Op.") at 19). Tellingly, Boston Heart insists that "[t]his premise is simply wrong." (Dkt. 58 ("Mot.") at 4). Mere disagreement with a decision, *i.e.* saying that the Court was "simply wrong," is a quintessential example of an abuse of a motion for reconsideration. Overall, Boston Heart rehashes the same arguments the Court has already considered and now attempts to raise new arguments for the first time. Consequently, Boston Heart fails to proffer any appropriate basis for reconsideration. Even if the Court considers the merits of Boston Heart's arguments, all are meritless for the same reasons already addressed by the Court.

## ARGUMENT

### I. Boston Heart Does Not Meet the Standard for Reconsideration.

"[D]istrict courts grant motions for reconsideration of interlocutory orders only as justice requires" and "[i]n deciding whether justice requires reversal of a prior interlocutory order, courts assess circumstances such as whether the court patently misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or whether a controlling or significant change in the law has occurred." Lovely-Coley v. D.C., 2017 WL 2533339, at *2 (D.D.C. June 9, 2017) (Walton, J.) (internal quotation marks omitted). Importantly, "motions for reconsideration are not vehicles for either reasserting arguments previously raised and rejected by the court or presenting arguments that should have been raised previously with the court." Id. This is because "where litigants have once battled for the [C]ourt's decision, they should neither be required, nor without good reason permitted, to battle

for it again." Lemmons v. Georgetown Univ. Hosp., 241 F.R.D. 15, 22 (D.D.C. 2007) (Walton, J.) (internal quotation marks omitted).

Although Boston Heart does not address the standards applicable to reconsideration, it is evident that Boston Heart makes no claim of an appropriate basis for reconsideration, *i.e.* that it was patently misunderstood, that the Court's decision went beyond the issues presented, that a change in the law occurred, or that the Court failed to consider "controlling decisions or data." Lovely-Coley, 2017 WL 2533339, at *2. The only even plausible basis for reconsideration, that the Court failed to consider "controlling decisions or data," does not at all apply. Indeed, the Court cited six court decisions, Medicare regulations and a Department of Justice press release in support of the holding Boston Heart now asks it to reconsider. (Op. at 19). Boston Heart simply does not like this Court's interpretation of the "controlling decisions or data." This is not a basis for reconsideration. Estate of Gaither ex rel. Gaither v. District of Columbia, 771 F. Supp. 2d 5, 10 (D.D.C. 2011) (explaining that motions for reconsideration "cannot be used as an opportunity to reargue facts and theories upon which a court has already ruled").

Boston Heart's primary argument for reconsideration rests on the Publication of OIG Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 45,706 (Aug. 24, 1998) ("OIG Lab Guidance"). (Mot. at 2-5). Aside from the fact that Boston Heart misleads the Court by selectively quoting from the OIG Lab Guidance and misconstruing it (*see infra*.), Boston Heart has already presented the OIG Lab Guidance to the Court in its reply brief in support of its motion to dismiss. (Dkt. 52 at 4). This Court need not consider the same argument again on a motion for reconsideration. See Lovely-Coley, 2017 WL 2533339, at *2. Contrary to Boston Heart's suggestion otherwise (Motion at 6 n. 4), it is of no consequence that the Opinion does not specifically address the OIG Lab Guidance. "The Court need not specifically address in minute

detail each argument presented when it is plain that there is no merit whatsoever to them." Campbell v. Poole, 2008 WL 2561998, at *2 (W.D.N.Y. June 26, 2008). This is particularly true given that, although the OIG Lab Guidance was promulgated in 1998, Boston Heart mentioned it for the first time in its reply brief. See U.S. v. Dynamic Visions, Inc., 2017 WL 1476102, at *4 (D.D.C. Apr. 24, 2017) (noting the "the impropriety of raising new arguments in reply").

Boston Heart then concocts a tenuous argument out of other instances of OIG guidance ***that it now asserts for the first time***. (Mot. at 4 (citing OIG Compliance Program Guidance for Hospitals, 63 FR 8987-02 (Feb. 23, 1998); OIG Compliance Program for Individual and Small Group Physician Practices, 65 FR 59434-01 (Oct. 5, 2000)). These guidance documents were issued in 1998 and 2000 respectively and as such were available to Boston Heart at the time it filed its motion to dismiss. Because this argument is being raised for the first time in a motion for reconsideration, the Court should not consider it. See Lovely-Coley, 2017 WL 2533339, at *2

Boston Heart's also argues that the "Court dismissed the import of § 410.32(d)(2)." (Mot. at 9). First, this is not true. The Court carefully analyzed the regulation alongside the certifications required on CMS Form 1500 and concluded that "[t]he regulation simply does not state that only the ordering physician, and not the entity submitting the claim, has the obligation to certify medical necessity of the tests at issue when submitting claims for payment." (Op. at 18). Second, "dismissing the import" of a regulation does not meet the standard required for reconsideration. Again, this is another way of saying that the Court was "simply wrong."

Finally, Boston Heart argues that the case law does not support the Court's findings, and re-examines only two of the six cases cited by the Court in finding that Boston Heart had an independent obligation to certify medical necessity. As above, requesting the Court to interpret the case law differently than it did in its Opinion is not a basis for reconsideration.

Consequently, Boston Heart has not set forth an appropriate basis for reconsideration, and its motion should be denied.

## II. The Court's Opinion Should Stand.

Even if Boston Heart had identified any appropriate basis for reconsideration (which it has not), Boston Heart has not shown that the Court should alter its prior analysis and decision.

### A. Boston Heart's Imaginary Parade of Horribles is Not Based in Fact

Boston Heart argues that the Opinion requires a lab "to conduct an independent medical review of all requisition forms submitted by a treating physician with respect to each and every patient." (Mot. at 2). This is simply not true. The Opinion finds that a lab has "independent obligation to certify that the tests for which it bills the government are medically necessary." (Op. at 23). A lab's certification of medical necessity does not necessarily require an independent medical review of every test ordered, and the Court does not order such an independent medical review.

For those tests that are known to be never medically necessary under any circumstances or for any diagnoses, labs can quite easily and should remove them from their test requisition forms. (Dkt. 38 at ¶ 77 (describing specific genetic tests that are never medically necessary).[2] For the tests that are rarely medically necessary and only so for certain specific diagnoses, labs can review test requisition forms when those specific tests are ordered to ensure that the required diagnoses are present. See e.g. id. at ¶¶ 82-83, 89-90 (describing tests that are justified only by certain diagnosis codes). If diagnoses given to justify a test do not indicate "signs or symptoms of disease" then it is clear that the test would be for screening purposes and would not be reimbursable. Id. at

[2] This would include tests that do "not comport with clear industry guidelines." Id. at ¶ 5. This is because "[g]eneral acceptance by the medical community" and "[c]onsensus of expert medical expert medical opinion (i.e., recognized authorities in the field)" are important considerations in evaluating whether a service is medically necessary. See Medicare Program Integrity Manual, at § 13.7.1 (Aug. 14, 2015), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/pim83c13.pdf. Likewise, "[a]cceptance by individual health care providers, or even a limited group of health care providers, normally does not indicate general acceptance by the medical community." Id.

¶ 69. "Screening services such as pre-symptomatic genetic tests and services used to detect an undiagnosed disease or disease predisposition are not a Medicare benefit and are not covered." Id. at ¶ 68. Thus, there are clear cases where labs, following medical industry guidelines and other applicable guidance, can take simple actions that do not require a review of every claim.

For the remaining claims for noncontroversial tests for which there is not a plethora of guidance stating that the tests are not medically necessary, labs are required to be able to prove medical necessity, particularly if a claim for payment is challenged by CMS. 42 C.F.R. § 410.32(d). For these claims, to satisfy its "independent obligation to certify that the tests for which it bills the government are medically necessary," (Op. at 23), a lab can defer to the documentation and diagnosis given by the ordering provider in order to justify the medical necessity of the test. Nothing in the Court's Opinion suggests that labs must question the accuracy of the diagnosis code submitted by a physician. A lab, as a for profit business, can decide to expend its own additional resources to ensure that a test it performs is medically necessary and will be reimbursable. But what it *cannot* do is stick its head in the sand and continue to perform tests that it knows predominant industry authority and government guidance conclude are not medically necessary.

Boston Heart argues that "a lab could be subjected to a false claim allegation on every test it performs at the direction of a physician." (Mot. at 2). This is not true. Labs are protected from capricious false claim allegations by the scienter requirement of the False Claims Act, 31 U.S.C. § 3729(b)(1)(A).[3] Thus, not every test a lab performs could be challenged as a false claim. Only those tests where a lab has actual knowledge that the tests were medically unnecessary or where the lab deliberately ignored or recklessly disregarded such knowledge are false claims.

[3] The False Claims Act "defines the knowledge element of a false claim or false statement action as requiring a defendant to have 'actual knowledge of the information' or to 'act in deliberate ignorance ... [or] reckless disregard of the truth or falsity of the information." (Op. at 22 (citing 31 U.S.C. § 3729(b)(1)(A)).

### B. The OIG Lab Guidance Establishes a Lab's Duty to Submit Claims Only for Tests that are Medically Necessary.

Boston Heart's first argument for reconsideration rests on one sentence in the OIG Lab Guidance – "We recognize that laboratories do not and cannot treat patients or make medical necessity determinations." (Mot. at 2-5 (quoting 63 Fed. Reg. at 45,079). Boston Heart misleads the Court by selectively quoting from the OIG Lab Guidance. The entirety of this OIG Lab Guidance firmly establishes a lab's duty to only submit claims for medically necessary tests and directly aligns with the CMS Form 1500 requirement for "physician or supplier" to certify that that "that the services shown on [the] form were medically indicated and necessary for the health of the patient." (Dkt. 38 ¶ 33). The OIG Lab Guidance states:

- A lab has a legal duty **to ensure that it is not submitting false or incorrect claims to Government and private payors.** See 63 Fed. Reg. at 45,077 ("In addition to fulfilling its legal duty to ensure that it is not submitting false or incorrect claims to Government and private payors, a clinical laboratory may gain numerous additional benefits by implementing an effective compliance program.").

- "Laboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable and necessary." Id. at 45,079.

- "…physicians must be made aware by *the billing laboratory* that Medicare will only pay for tests that meet the Medicare coverage criteria and are reasonable and necessary to treat or diagnose an individual patient" Id. (emphasis added).

- "Medicare may deny payment for a test that the physician believes is appropriate, but which does not meet the Medicare coverage criteria (e.g., **done for screening purposes**) or where documentation in the entire patient record, including that maintained in the physician's records, does not support that the tests were reasonable and necessary for a given patient." Id. (emphasis added)

- "Laboratories can and should advise their clients that tests submitted for Medicare reimbursement must meet program requirements or the claim may be denied." Id.

- "…if the laboratory discovers that it has in some way contributed to the ordering of unnecessary tests, the OIG believes the laboratory has a duty to modify its practices, as well as notify the physicians(s) or other authorized individual(s) of its concerns and recommend corrective action." Id.

This OIG Lab Guidance was promulgated to instruct each lab on how it might set up a compliance program. The purpose of such a compliance program is to ensure that the lab is "fulfilling its legal duty to ensure that it is not submitting false or incorrect claims to Government … payors." 63 Fed. Reg. at 45,077. It is precisely because it is illegal for labs to submit claims for medically unnecessary tests that such compliance programs are required. While the OIG Lab Guidance does not suggest that a lab decide medical necessity in lieu of the physician, it must ensure that its CMS-1500 certification is true. This certainly includes ensuring that (1) tests known to never be medically unnecessary are not billed to the Government, (2) required diagnoses are present for tests that are only medically necessary for certain diagnoses, and (3) tests known to be only for screening purposes are not billed to the Government.

Apart from the OIG Lab Guidance, Boston Heart also relies upon OIG guidance for physicians. (Mot. at 58 (citing 65 Fed. Reg. at 59,445)). The portion of this guidance quoted by Boston Heart appears in an appendix and is designed to steer physicians away from fraudulent activities. Id. at 59,445 ("Activities such as signing blank CMNs [Certificates of Medical Necessity], signing a CMN without seeing the patient to verify the item or service is reasonable and necessary, and signing a CMN for a service that the physician knows is not reasonable and necessary."). This guidance does not purport to unequivocally determine the entire universe of providers who bear the responsibility to bill only for medically necessary services. Indeed, by stating that "Medicare **primarily** relies on the professional judgment of the treating physician" to determine medical necessity, the OIG tacitly acknowledges that Medicare will not solely rely on a physician's determination of medical necessity at all times. Id.

### C. Boston Heart's Argument Based on Recordkeeping Regulations is Meritless.

Boston Heart argues that it can be inferred from the recordkeeping requirements for laboratories that labs bear no responsibility to ensure that they are only billing for medically

necessary tests. (Mot. at 8-10 (citing 42 C.F.R. § 410.32(d)). Boston Heart argues that the plain language of the requirements shows that labs are merely a pass-through entity, and that so long as they "maintain the documentation physicians provide" and can show that the "claims [the labs] submitted for reimbursement reflect the tests physicians ordered," they have satisfied their legal obligations. Id. at 9. However, there is nothing in the recordkeeping requirements that (1) absolves labs from their obligation to certify that its claims are for medically necessary tests; (2) indicates that the documentation provided by the ordering practitioner represents the entire universe of possible support for medical necessity; or (3) states that the mere existence of such documentation automatically supports a finding of medical necessity.

Contrary to Boston Heart's argument, these recordkeeping requirements support a lab's obligation to certify medical necessity. They mandate that the ordering practitioner "maintain documentation of medical necessity in the beneficiary's medical record" and that the lab maintain such documentation. 42 C.F.R. §§ 410.32(d)(2)(i), (d)(2)(ii). Furthermore, the lab "may request additional diagnostic and other medical information to document that the services it bills are reasonable and necessary." Id. at § 410.32(d)(2)(iii). All of this directly supports the lab's independent obligation to certify that the tests for which it bills the government are medically necessary. To argue otherwise makes the lab merely a storage facility for the ordering practitioner's documentation, which cannot be the intent of these regulations, particularly where the regulations also authorize the Government to request supporting documentation directly from the ordering practitioner. Id. at § 410.32(d)(3)(ii). Furthermore, the subsection entitled "Medical necessity" sets forth the actions a lab may take to "**document that the services it bills are reasonable and necessar**y." Id. at § 410.32(d)(3)(iii) (emphasis added).

**D. The Court Correctly Cited Case Law to Support Its Holding.**

Boston Heart incorrectly contends that two of six the cases relied upon the Court in the section of the Opinion addressing this issue "confirm that it is the physician who determines medical necessity, and a laboratory's responsibility is confined to submitting that documentation to the government and maintaining the physician's documentation supporting such a determination." (Mot. at 11).

As a starting point, Boston Heart only substantively addresses two of the six cases cited by the Court in the relevant section of its Opinion. With respect to the other cases, Boston Heart dismisses these cases in saying "[n]one of the remaining cases . . . supports the proposition that a laboratory must independently establish the medical necessity of tests it performs on a physician's request." (Mot. at 12). Suffice it to say, Boston Heart's failure to discuss these cases appears to be an acknowledgement that the cases stand for the propositions for which the Court cited them.

Boston Heart first challenges the Court's reliance on Garcia v. Sebelius, 2011 WL 5434426 (C.D. Cal. Nov. 8, 2011), which as relevant here, involved whether services provided to Medicare beneficiaries were medically necessary. Garcia notes that the "regulatory scheme places the burden of establishing the medical necessity of diagnostic tests on the entity submitting the claim." 2011 WL 5434426, at *7. Garcia correctly explains that under 42 C.F.R. § 410.32(d), the Government can request documentation from the billing entity to support medical necessity, and if the billing entity does not provide sufficient information, the Government can directly request the information from the physician. Id. at *7 n. 6. The Government's ability to request information from the physician does not somehow absolve the billing entity of any responsibility with respect to certifying medical necessity.

The second case challenged by Boston Heart is Nephropathology Assocs., PLC v. Sebelius, 2013 WL 3285685 (E.D. Ark. June 27, 2013). This case chiefly concerns a regulatory provision, not directly applicable in this case, that provides that "[t]ests not ordered by the physician who is treating the beneficiary are not reasonable and necessary" and thus not reimbursable. 42 C.F.R. § 410.32(a). The Government denied a lab's reimbursement claims, because the lab failed to demonstrate that physicians had actually ordered the services. The lab challenged this denial on the basis that physicians had in fact ordered the services. The court rejected this argument. First, the court noted that "[t]he burden is on the provider of services . . . to furnish sufficient information for the decision maker to determine whether payment should be made and how much should be made." Id. at *3. The court then held that the lab failed to carry its burden to demonstrate that the services were ordered by a physician. Id.

As with Garcia, the Court cited Nephropathology Assocs. for the limited purpose of pointing out that the entity submitting a claim has the burden to establish compliance with regulatory criteria. (Op. at 17). Boston Heart claims that Nephropathology Assocs. "stands for the proposition that the substantive decision on medical necessity lies with the treating physician, and it is the laboratory's responsibility to perform the test and maintain documentation of the physician's order." (Mot. at 8). This is incorrect. This case found that the lab failed to show that the treating physician ordered the tests, which is a regulatory requirement. Of course, the fact that tests *not* ordered by the treating physician are *not* considered reasonable and necessary does not mean that, as Boston Heart appears to contend, all tests ordered by treating physicians are necessarily reasonable and necessary. This is flawed logic and an attempt to rewrite the regulation.

**CONCLUSION**

For these reasons, the Court should deny Boston Heart's motion for reconsideration.

Dated: July 18, 2017

Respectfully submitted,

*/s/ Russell D. Paul*
Sherrie R. Savett (admitted *pro hac vice)*
(PA Bar No. 17646)
Russell D. Paul (admitted *pro hac vice)*
(PA Bar No. 71220)
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103-6305
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
ssavett@bm.net
rpaul@bm.net

Steven A. Skalet
**MEHRI & SKALET, PLLC**
1250 Connecticut Ave. NW Suite 300
Washington, DC 20036
Telephone: 202.822.5100 ext. 105
Facsimile: 202.822.4997 |
sskalet@findjustice.com

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed on July 18, 2017 with the Clerk of Court through the Court's CM/ECF system.

*/s/ Russell D. Paul*
Russell D. Paul