**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al. ex rel.* TINA D. GROAT, M.D., M.B.A.<br><br>Plaintiffs,<br><br>v.<br><br>BOSTON HEART DIAGNOSTICS CORPORATION<br><br>Defendant. | ))))))))))))))))) CASE NO. : 1:15-cv-00487 (RBW) |

**RELATOR'S RESPONSE TO BRIEF OF AMICUS CURIAE**
**<u>AMERICAN CLINICAL LABORATORY ASSOCIATION</u>**

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

**INTRODUCTION** ..........................................................................................................................1

**ARGUMENT** .................................................................................................................................1

    **I.**    **ACLA Identifies No Appropriate Basis for Reconsideration** .............................1

    **II.**   **Labs Can, and Are Required to, Assess Medical Necessity** ...............................2

        1.   The Relevant Legal Question is Whether a Legal Obligation Exists ................2

        2.   Labs Are Capable of Assessing Medical Necessity...........................................3

        3.   Assessing Medical Necessity Does Not Constitute the Practice of Medicine ...6

        4.   ACLA's Speculation that Labs Will Be Subject to Liability is Unsupported and Inconsistent ................................................................................................7

    **III.**  **ACLA Misinterprets the OIG Lab Guidance, Which Affirmatively Establishes a Lab's Obligation to Assess Medical Necessity**..............................8

    **IV.**  **ACLA's Illusory Parade of Horribles Concerning Patients' Ability to Obtain Testing is Hyperbolic and Unsupported** ...........................................................10

**CONCLUSION** ...........................................................................................................................11

# TABLE OF AUTHORITIES[1]

**Cases**

In re Surface Min. Regulation Litig., 627 F.2d 1346 (D.C. Cir. 1980) ............................................. 5

Lovely-Coley v. D.C., 2017 WL 2533339 (D.D.C. June 9, 2017) (Walton, J.) ............................. 2

U.S. ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370 (5th Cir. 2004) ........................... 10

U.S. ex rel. Schweizer v. Oce N.V., 677 F.3d 1228 (D.C. Cir. 2012) ............................................ 5

ViroPharma, Inc. v. Hamburg, 898 F. Supp. 2d (D.D.C. 2012) .................................................... 9

**Statutes, Regulations, and Rules**

42 U.S.C. § 1395y ......................................................................................................................... 9

42 C.F.R. § 410.32 ............................................................................................................. *passim*

Mass. Gen. Laws ch. 111D ............................................................................................................ 7

243 Mass. Code Regs. § 2.01 .................................................................................................... 6, 7

105 Mass. Code Regs. § 180.001 .................................................................................................. 7

**Other Authorities**

CENTERS FOR DISEASE CONTROL AND PREVENTION, Flu Symptoms & Complications, available at https://www.cdc.gov/flu/consumer/symptoms.htm ............................................................ 4

CENTERS FOR DISEASE CONTROL AND PREVENTION, International Classification of Diseases, Tenth Revision, Clinical Modification (ICD-10-CM), available at https://www.cdc.gov/nchs/icd/icd10cm.htm#FY%202018%20release%20of%20ICD-10-CM ................................................................................................................................... 4

HHS-OIG, SPECIAL FRAUD ALERT: PHYSICIAN LIABILITY FOR CERTIFICATIONS IN THE PROVISION OF MEDICAL EQUIPMENT AND SUPPLIES AND HOME HEALTH SERVICES (Jan. 1999), available at https://oig.hhs.gov/fraud/docs/alertsandbulletins/dme.htm ............................................... 9

Publication of OIG Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 45,706-03, 1998 WL 517789 (Aug. 24, 1998) ............................................................... 7, 8

---

[1] Local Civil Rule 7(a) provides that "[i]f a table of cases is provided, counsel shall place asterisks in the margin to the left of those cases or authorities on which counsel chiefly relies." Undersigned counsel respectfully suggests that Relator does not "chiefly rely" on any cases within the meaning of Local Civil Rule 7(a).

# INTRODUCTION

In its opinion on Boston Heart's motion to dismiss, the Court held that Boston Heart "has an obligation to establish that the tests for which it seeks government reimbursement are medically necessary because when it submits the CMS-1500 form, it certifies that the tests performed were medically necessary." (Dkt. 54 ("Op.") at 16). This conclusion is likely self-evident given that all providers, including labs, are prohibited from billing Medicare for medically unnecessary services and are required to certify the medical necessity of any services billed to Medicare. Of course, a lab cannot accurately certify that a medically unnecessary test is medically necessary.

Nevertheless, Boston Heart asks the Court to reconsider that conclusion and the American Clinical Laboratory Association ("ACLA"), a self-described "organization that represents the interests of clinical laboratories," has filed an amicus brief in support of Boston Heart's motion. (Dkt. 70 ("AB") at 1). Both entities take the position that labs are entitled to bill Medicare for medically unnecessary tests, irrespective of the certification of medical necessity, so long as a physician has ordered the tests. Id. at 2. Like Boston Heart, ACLA never reconciles this position with a lab's obligation to certify the medical necessity of tests.

# ARGUMENT

ACLA makes three arguments, to which Relator responds after briefly addressing the threshold issue of the standard governing reconsideration.

## I. ACLA Identifies No Appropriate Basis for Reconsideration.

As addressed in Relator's response to Boston Heart's motion for reconsideration, Boston Heart bears the burden of establishing an appropriate basis for reconsideration and "motions for reconsideration are not vehicles for either reasserting arguments previously raised and rejected

1

by the court or presenting arguments that should have been raised previously with the court." (Dkt. 63 at 2 (citing Lovely-Coley v. D.C., 2017 WL 2533339 (D.D.C. June 9, 2017) (Walton, J.)). In its amicus brief, ACLA contends that the Court should reconsider its opinion because it asserts that (1) labs are not positioned to assess medical necessity, (2) labs have never been obligated to assess medical necessity, and (3) obligating labs to assess medical necessity would adversely affect patient health. (AB at 3). While these arguments are meritless for the reasons addressed below, the same arguments were made by Boston Heart in its initial motion to dismiss or were available to Boston Heart at the time it filed its motion to dismiss. Thus, none of these arguments are an appropriate basis for reconsideration.

## II. Labs Can, and Are Required to, Assess Medical Necessity.

ACLA asserts that labs are not in a position to assess medical necessity because (1) doing so requires patient-specific information that labs do not have, (2) requiring labs to do so "blurs the line between the practice of medicine and the function of a clinical laboratory," and (3) labs could be subject to liability if they refuse to perform a test and the patient suffers an injury as a result. (AB at 3-5). All of these arguments are meritless.

### 1. The Relevant Legal Question is Whether a Legal Obligation Exists.

As a starting point, ACLA's argument focuses on the factual question of *how* a lab satisfies its "obligation to establish that the tests for which it seeks government reimbursement are medically necessary," rather than the threshold legal question of *whether* that obligation exists in the first place. (Op. at 16). Given that ACLA's amicus brief is filed in connection with Boston Heart's motion to reconsider the Court's opinion on its motion to dismiss, this factual question is not before the Court at this juncture. In reality, ACLA cannot dispute that this legal obligation exists, so it instead attempts to dexterously sidestep the question by asking the Court

to make the factual determination that compliance with this legal obligation is beyond a lab's capabilities.

### 2. Labs Are Capable of Assessing Medical Necessity.

Even if the Court were to consider this factual issue, ACLA's argument presupposes that personal interaction with patients or a review of medical records is necessary in all circumstances for a lab to assess medical necessity. ACLA contends that labs are not in a position to assess medical necessity because "[i]n the vast majority of cases, laboratories do not see the patient for whom the testing is being ordered" and "[i]n the overwhelming majority of cases, the laboratory does not have the patient's medical record, have knowledge of the patient's condition or medical history, or have any other information related to the patient." (AB at 3).

This is incorrect. When a physician orders a test from a lab, the physician submits a test requisition form that informs the lab of the patient's underlying conditions (in the form of diagnosis code(s)) that justify performance of the test(s). For example, Boston Heart attached to its motion to dismiss what it describes as its current test requisition form, which requires physicians to disclose "ALL OF THE REASONS FOR ORDERING THE TEST(S)" in the form of diagnosis codes. (Dkt. 48-3 (emphasis original)). Moreover, in addition to the information submitted on the test requisition form, labs "may request additional diagnostic and other medical information from the ordering physician . . . to document that the services it bills are reasonable and necessary," and if a lab does so, it "must request material relevant to the medical necessity of the specific test(s), taking into consideration current rules and regulations on patient confidentiality." 42 C.F.R. § 410.32(d)(3)(ii).

In light of this framework, ACLA's factual contention that labs are incapable of assessing medical necessity is meritless:

3

- For tests that are known to be never medically necessary, labs can obviously determine the lack of medical necessity.

- For tests that are known to be only medically necessary in connection with certain diagnosis codes, labs can easily assess medical necessity by comparing the diagnosis codes and the ordered tests – all of this information is provided on the test requisition form. (Dkt. 48-3). If the diagnosis code(s) do not correlate with the ordered tests, labs can request additional "material relevant to the medical necessity of the specific test(s)" from physicians. 42 C.F.R. § 410.32(d)(3)(iii).

- For non-controversial tests that are generally considered appropriate, a lab can defer to the documentation and diagnosis given by the ordering provider in order to justify the medical necessity of the test. Nothing in the Court's opinion provides that a lab must question the diagnosis code(s) and other information provided by the ordering physician. For example, if physician submits a test requisition form providing diagnostic codes of R05 (cough), R05.9 (fever), R06.02 (shortness of breath), and R51 (headache), this presumably would suffice to establish the medical necessity of a diagnostic lab test for influenza (the flu) given that these are the signs and symptoms of the flu.[2]

ACLA also suggests that a lab's assessment of medical necessity is inconsistent with a Medicare provision providing that "[t]ests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." (AB at 4 (citing 42 C.F.R. § 410.32(a)). ACLA infers that this provision means that any tests ordered by physicians are reasonable and necessary. Id. This is simply flawed logic. The fact that a test not ordered by a physician is not

---

[2] See CENTERS FOR DISEASE CONTROL AND PREVENTION, Flu Symptoms & Complications, available at https://www.cdc.gov/flu/consumer/symptoms.htm (outlining symptoms of the flu); CENTERS FOR DISEASE CONTROL AND PREVENTION, International Classification of Diseases, Tenth Revision, Clinical Modification (ICD-10-CM), available at https://www.cdc.gov/nchs/icd/icd10cm.htm#FY%202018%20release%20of%20ICD-10-CM (providing ICD-10 diagnostic codes).

4

considered medically necessary does not mean that every test ordered by a physician is medically necessary.

Moreover, if this provision conclusively determined that any tests ordered by physicians were medically necessary, every other regulatory provision concerning medical necessity – including § 410.32(d)(3)(iii) entitled "medical necessity" – would be entirely superfluous in contravention of the well-stablished canon of construction against interpreting a statute or regulation to render certain provisions superfluous or meaningless.³ For example, as discussed above, labs can "request additional diagnostic and other medical information from the ordering physician" so long as the requested material is "relevant to the medical necessity of the specific test(s)." Id. at § 410.32(d)(3)(iii). If any test ordered by a physician was automatically determined to be medically necessary, then there would be no reason to specifically empower labs to request additional information. In a footnote, ACLA contends that this proposition "*permits* the laboratory to seek additional information from the physician but "does not *mandate* that it do so." (AB at 8 n. 18). This artificial distinction misses the point: there would be no reason to authorize a lab to obtain "additional diagnostic and other medical information" that is "relevant to the medical necessity of the specific test(s)" from the ordering physician if it was not intended that the lab do anything with that information. 42 CFR § 410.32(d)(2)(iii).

Finally, it is disingenuous for ACLA to argue that a lab may bill Medicare for any tests ordered by physicians when labs may, and often do, include a myriad of tests in easily-ordered test panels on test requisition forms. (Dkt. 38 ¶¶ 4, 51-52). If all the tests in the panel are

---

³ See U.S. ex rel. Schweizer v. Oce N.V., 677 F.3d 1228, 1234 (D.C. Cir. 2012) (rejecting a proposed statutory interpretation that would "contravene the longstanding canon of statutory construction that terms in a statute should not be construed so as to render any provision of that statute meaningless or superfluous") (internal quotation marks omitted); In re Surface Min. Regulation Litig., 627 F.2d 1346, 1362 (D.C. Cir. 1980) (describing the "fundamental principal of statutory construction that effect must be given, if possible, to every word, clause and sentence of a statute . . . so that no part will be inoperative or superfluous, void or insignificant") (internal quotation marks omitted).

5

automatically considered medically necessary simply because the doctor ordered the panel, then such panels, where doctors must make an all-or-nothing decision and a check-the-box form makes it extremely easy for them to choose "all", allow labs to add medically unnecessary tests to test panels without any scrutiny and opens the door to fraud on the Government. Indeed, a lab could then perform and bill for medically unnecessary tests with impunity if its test requisition form only includes test panels without allowing physicians to order individual tests. The likelihood of fraud increases when a lab markets itself as the expert in a particular medical field, and even more so when the lab markets to general practitioners and other physicians who do not have expertise in that field. In effect, this is what Relator has alleged that Boston Heart did – falsely promoted medically unnecessary tests incorporated into test panels as having medical value to non-specialist general practitioners. Id. The protection against such fraud is the certification of medical necessity that a lab must make, and be legally responsible to stand behind, when submitting a claim.

**2. Assessing Medical Necessity Does Not Constitute the Practice of Medicine.**

ACLA incorrectly contends that requiring labs to assess medical necessity constitutes the "practice of medicine" and suggests that labs cannot engage in the practice of medicine. (AB at 5-6). In support of its argument, ACLA points to Massachusetts (the location of Boston Heart) regulations defining "practice of medicine" as:

> The following conduct, the purpose or reasonably foreseeable effect of which is to encourage the reliance of another person upon an individual's knowledge or skill in the maintenance of human health by the prevention, alleviation, or cure of disease, and involving or reasonably thought to involve an assumption of responsibility for the other person's physical or mental well being: diagnosis, treatment, use of instruments or other devices, or the prescribing, administering, dispensing or distributing of drugs for the relief of diseases or adverse physical or mental conditions.

6

243 Mass. Code Regs. § 2.01.[4] ACLA presupposes, without any citation to authority, that a lab's assessment of medical necessity is "conduct . . . involving or reasonably thought to involve an assumption of responsibility for the other person's physical or mental well being: diagnosis, treatment," and thus constitutes the practice of medicine under Massachusetts law. (AB at 5).

In any case, the Massachusetts regulations appear to account for this. While selectively quoting from the Massachusetts regulation, ACLA declined to point out that it specifically excludes "[c]onduct lawfully engaged in by persons licensed by other boards of registration with authority to regulate such conduct" from the definition of "practice of medicine." 243 Mass. Code Regs. § 2.01. Labs are specifically governed and regulated by Massachusetts law. See Mass. Gen. Laws ch. 111D, § 2 et seq. 105 Mass. Code Regs. § 180.001 et seq. Accordingly, the Massachusetts regulation appears to expressly exclude labs from the "practice of medicine."

Lastly, even if assessing medical necessity could somehow be described as the "practice of medicine" under Massachusetts law, this characterization cannot override the clear language of a lab's certification on the CMS-1500 form that "the services on this form were medically necessary." (Op. at 16 (quoting CMS-1500 form)). Simply put, as the Court explained, "the CMS-1500 form requires the entity submitting the claim, be it a 'physician or supplier,' to certify the medical necessity." Id. at 17.

### 3. ACLA's Speculation that Labs Will Be Subject to Liability is Unsupported and Inconsistent.

ACLA speculates that a lab could be subject to liability if a physician orders a test, a lab declines to perform it because it determines the test is not medically necessary, and the failure to perform the test somehow causes an injury to a patient. (AB at 5-6). As a starting point, ACLA points to no instances in which a lab's failure to perform a test resulted in an injury to the patient

---

[4] ACLA cites to 243 Code Mass. Regs. § 2.07. (AB at 5). This appears to be a mistake as the language cited by ACLA appears in 243 Mass. Code Regs. § 2.01.

or the imposition of liability against the lab.  Moreover, ACLA's argument rings hollow in light of the fact that labs presumably decline to perform tests every day under circumstances where a physician orders a test for a patient and a lab determines that, for whatever reason, the patient's healthcare insurance carrier would not cover the test.  As ACLA describes, a lab is "unlikely to perform tests for which it would not be paid," id. at 6, notwithstanding the theoretical risk that the failure to perform the test could result in injury to the patient.  Of course, declining to perform the test would, under ACLA's argument, subject the lab to liability, but ACLA does not contend that a lab is required to perform tests for which it will not be paid to avoid liability.  In the same vein, the same speculative liability would attach when a lab declines to perform a test because it cannot sufficiently assess medical necessity.

> **III. ACLA Misinterprets the OIG Lab Guidance, Which Affirmatively Establishes a Lab's Obligation to Assess Medical Necessity.**

ACLA contends that labs have never been required to assess medical necessity, *i.e.* that labs have always been entitled to bill Medicare for medically unnecessary tests so long as a physician orders the test. (AB at 6-8).

ACLA primarily relies on the same OIG Compliance Program Guidance for Clinical Laboratories relied upon by Boston Heart and contends it establishes that labs are permitted to bill Medicare for any tests ordered by a physician irrespective of medical necessity. Id. at 6 (citing Publication of OIG Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 45,706-03, 1998 WL 517789 (Aug. 24, 1998).  This argument is incorrect for the same reasons addressed in Relator's response in opposition to Boston Heart's motion for reconsideration, which Relator incorporates by reference herein. (Dkt. 63 at 6-7).  As Relator explains, the OIG Lab Guidance confirms that a lab may only submit claims for medically necessary tests. Id.

8

It bears emphasizing that the OIG Lab Guidance is designed to prevent fraud, abuse, and waste. 63 Fed. Reg. 45,706-03 ("The adoption and implementation of voluntary compliance programs significantly advance the prevention of fraud, abuse, and waste in the clinical laboratory industry[.]").  Of course, the paradigmatic example of **"*fraud, abuse, and waste*"** in the Medicare context is the use of Government funds to pay for medically unnecessary services given that the foundational requirement of Medicare is that it does not cover services that "are not reasonable and necessary."  42 U.S.C. § 1395y(a)(1)(A).  ACLA attempts to pervert the salient purposes of the OIG Lab Guidance to suggest that it provides that labs may bill Medicare for any tests ordered by physicians and certify the medical necessity of those tests irrespective of whether the tests are actually medically necessary.  Of course, this would promote the very "fraud, abuse, and waste" the OIG Lab Guidance is designed to curtail, and a regulation should not be interpreted to facilitate the very misconduct it is meant to address.[5]

Additionally, ACLA contends that "it is not up to the laboratory or the physician to determine whether Medicare should pay for a service or not" because this determination is made by Medicare once the lab submits a claim. (AB at 7).  Based on this statement, ACLA appears to suggest that providers can bill Medicare for medically unnecessary services and falsely certify the medical necessity of such services because, at the end of the day, Medicare determines whether to reimburse the lab.  This is patently incorrect and would render the certification of medical necessity meaningless.  Of course, Medicare relies on the good faith certifications of medical necessity by providers such as physicians and labs.[6]  Moreover, ACLA's argument

---

[5] See ViroPharma, Inc. v. Hamburg, 898 F. Supp. 2d 1, 19 (D.D.C. 2012) (explaining that a "statute's terms should be read in context, the statute's place in the overall statutory scheme should be considered, and the problem Congress sought to solve should be taken into account" (internal quotation marks omitted)).

[6] See e.g., HHS-OIG, SPECIAL FRAUD ALERT: PHYSICIAN LIABILITY FOR CERTIFICATIONS IN THE PROVISION OF MEDICAL EQUIPMENT AND SUPPLIES AND HOME HEALTH SERVICES (Jan. 1999), available at https://oig.hhs.gov/fraud/docs/alertsandbulletins/dme.htm ("Medicare primarily relies on the professional judgment of the beneficiary's treating physician, since he or she knows the patient's history and makes

would essentially eviscerate the well-established theory of FCA liability based on the knowing provision of medically unnecessary services since providers would always be able to claim that the certification was immaterial given that Medicare ultimately determines whether to pay for the service.  Cf. U.S. ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370, 376 (5th Cir. 2004) ("[C]laims for medically unnecessary treatment are actionable under the FCA.").

### IV. ACLA's Illusory Parade of Horribles Concerning Patients' Ability to Obtain Testing is Hyperbolic and Unsupported.

ACLA suggests a lab's "obligation to establish that the tests for which it seeks government reimbursement are medically necessary" imposes such an onerous burden on labs so as to adversely affect patients' ability to obtain testing. (AB at 8-10).  Without citing to any authority and simply asking the Court to accept its unsubstantiated representations as undisputed matters of fact, ACLA speculates that compliance with this obligation would engender substantial delay in the performance of testing, which ACLA claims would undermine patient health by increasing the amount of time it would take physicians to receive testing results.  Id.

ACLA's speculation presumes that a lab's assessment of medical necessity must always involve a comprehensive review of patient-specific information.  In run-of-the-mill cases involving non-controversial tests, labs can easily assess medical necessity by comparing the submitted diagnostic code(s) with the ordered test(s).  Repeating the example from above, the submission of the diagnosis codes for a cough, fever, shortness of breath, and a headache would presumably suffice to demonstrate the medical necessity of a diagnostic lab test for the flu and consequently enable a lab to accurately certify the medical necessity of the test.  This simple

---

critical decisions, such as admitting the patient to the hospital; ordering tests, drugs, and treatments; and determining the length of treatment. In other words, the physician has a key role in determining both the medical need for, and utilization of, many health care services, including those furnished and billed by other providers and suppliers.").

comparison of diagnostic codes and tests plainly does not impose an onerous burden on labs and could presumably be accomplished with electronic software.

In other instances, it may be necessary (as labs are expressly authorized to do) to "request additional diagnostic and other medical information from the ordering physicians . . . to document that the services it bills are reasonable and necessary." 42 C.F.R. § 410.32(d)(3)(iii). In these circumstances, it may be true that there will be some delay in obtaining additional information to assess medical necessity, despite the fact that the Medicare regulation specifically allows for it. But ACLA offers no reason to believe that this will engender the veritable parade of horribles it proffers in its brief. Nor does ACLA offer any basis to conclude that any such delay serves as a basis for disregarding a lab's obligation to assess and certify medical necessity.

Finally, it bears noting that a lab is free to *perform* whatever tests a physician orders, and the effect of the medical necessity question is limited to whether such tests are *reimbursable* by Medicare. Consequently, while ACLA couches this argument in terms of patient health, it is really about generating revenue for a lab by ensuring that tests qualify for Medicare reimbursement. This ostensible appeal to patient safety is undermined by ACLA's telling acknowledgment that a lab "is unlikely to perform tests for which it would not be paid." (AB at 2). Thus, labs certainly ensure that a patient has health insurance and that the insurance will cover whatever tests were ordered before performing any tests, notwithstanding the delay that doing so entails – indeed, Boston Heart's test requisition form requires the provision of insurance information alongside the applicable diagnosis codes. (Dkt. 48-3 at 1). Moreover, even assuming *arguendo* that the assessment of medically necessity would engender any delay, labs could avoid this delay by performing the test(s) and then assessing medical necessity afterwards. While a lab presumably wants to know whether it will be paid before it provides services, as a

for profit entity, a lab can evaluate what measures it wishes to undertake to balance its obligation to asses medical necessity with the delay that such assessment would (according to ACLA) produce.

## CONCLUSION

For the reasons stated herein, Relator respectfully requests that this Court deny Boston Heart's motion for reconsideration and reject the arguments raised in ACLA's amicus brief.

Dated:  August 4, 2017

Respectfully submitted,
**MEHRI & SKALET, PLLC**

*/s/     Steven A. Skalet*
Steven A. Skalet
Mehri & Skalet, PLLC
1250 Connecticut Ave. NW Suite 300
Washington, DC  20036
Telephone: 202.822.5100 ext. 105
Facsimile: 202.822.4997 |
sskalet@findjustice.com

Sherrie R. Savett (admitted *pro hac vice)*
(PA Bar No. 17646)
Russell D. Paul (admitted *pro hac vice)*
(PA Bar No. 71220)
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA  19103-6305
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
ssavett@bm.net
rpaul@bm.net

## **CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed on August 4, 2017 with the Clerk of Court through the Court's CM/ECF system.

                                */s/ Steven A. Skalet*
                                Steven A. Skalet